JOHN P. FLYNN, State Bar No. 141094
COLLEEN BAL, State Bar No. 167637
DYLAN G. SAVAGE, State Bar No. 310452
MALAVIKA F. LOBO, State Bar No. 317635
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: jflynn@wsgr.com
       cbal@wsgr.com
       dsavage@wsgr.com
       mlobo@wsgr.com

PILAR GONZALEZ-MORALES, State Bar No. 308550
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E Colfax Ave., Suite 400
Denver, CO 80218
Telephone: (303) 757-7901
Email: pgonzalez@creeclaw.org

TIFANEI RESSL-MOYER, State Bar No. 319721
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
OF THE SAN FRANCISCO BAY AREA
131 Steuart Street, Suite 500
San Francisco, CA 94105
Telephone: (916) 634-8687
Email: tresslmoyer@lccrsf.org

*Attorneys for Plaintiff Meg White*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| MEGAN WHITE, | CASE NO.: |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SACRAMENTO POLICE DEPARTMENT; THE CITY OF SACRAMENTO; DANIEL HAHN; and DOES 1-200 (the names and numbers of which are currently unknown), | |
| Defendants. | |

Plaintiff Megan White ("Ms. White"), by and through her attorneys, as and for her Complaint against Defendants Sacramento Police Department, the City of Sacramento, Daniel Hahn, and Does 1-200, hereby alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil rights action to vindicate the constitutional rights of Californians protesting against systemic racism, white supremacy, and police violence in Sacramento, California. This lawsuit seeks compensatory relief for severe injuries that Ms. White suffered at the hands of the Sacramento police, and injunctive relief to stop the City of Sacramento and its police department from continuing to employ discriminatory, violent tactics against anti-racist and anti-police brutality protesters.

2. On May 25, 2020, 46-year-old father and brother George Floyd was killed in Minneapolis, Minnesota by Minneapolis police officer Derek Chauvin. Mr. Chauvin knelt on Mr. Floyd's neck for over eight minutes as Mr. Floyd repeatedly pleaded that he could not breathe. Mr. Chauvin's fellow officers, Thomas Lane, J. Kueng, and Tou Thao, restrained Mr. Floyd and/or prevented onlookers from intervening. For the final two minutes when Mr. Chauvin's knee was pressed to Mr. Floyd's neck, Mr. Floyd was motionless and had no pulse. Darnella Frazier, then seventeen years old, courageously recorded the murder in a cellphone video that quickly spread worldwide. Mr. Chauvin has since been convicted of Mr. Floyd's murder and sentenced to over twenty-two years in prison.

3. In the days and weeks following Mr. Floyd's killing, protests against police violence and in support of police accountability erupted across the world, including in Sacramento. The Sacramento Police Department responded with outsized and unequal force against anti-racist and anti-police brutality protesters, while permitting persons who aligned with pro-police (including Blue Lives Matter) ideologies to demonstrate unharmed. This disparate treatment is consistent with a years-long pattern and practice of discrimination on the part of Sacramento police.

4. Meanwhile, divisive, harmful rhetoric from then-President Donald Trump increasingly emboldened white supremacist and far-right groups. After losing to President Joe

Biden in the November 3, 2020 election, President Trump baselessly claimed that the presidency had been stolen and exhorted his supporters to refuse to accept the results. White supremacist groups and "Stop the Steal" protesters began weekly protests in Sacramento claiming, among other things, that the election was invalid. Those so-called "protesters" harassed and assaulted community members, including vulnerable individuals experiencing houselessness. Sacramento police officers witnessed such violence but failed to intervene.

5.      Against this backdrop of police inaction, anti-racist, anti-police brutality protesters began to (peaceably) counter-protest. The counter-protesters also attempted to shield community members from violence. In response, they were assaulted by white supremacists and far-right ideologues in clear view of members of the Sacramento Police Department. Police officers—in keeping with a long history of doing so—targeted the counter-protesters with extreme force and intimidation to stop their protest activity, while turning a blind eye to violence perpetrated by white supremacists and allowing their protest activity to continue unhindered.

6.      Ms. White, a 34-year-old Black woman who runs a grassroots community group in Sacramento, was severely injured by the Sacramento police while observing counter-protests in late 2020 and early 2021. Ms. White witnessed law enforcement's pattern of restraining and assaulting counter-protesters while permitting Stop the Steal protesters and members of the white supremacist organization, the Proud Boys to move freely even when wielding weapons like large knives and mace. Sacramento police assaulted Ms. White directly when she tried to help others who were attacked by the Proud Boys, and when she asked police for their help. As a result of police violence, Ms. White suffered severe bruising, chronic knee and hip pain, chemical burns, and a shoulder injury so significant that it left her unable to raise her arm.

7.      The Sacramento Police Department's policies and practices are discriminatory, racist, and inhumane. They violate, at a minimum, the First Amendment's protection of freedom of speech, the Fourth Amendment's proscription of excessive force, and the Fourteenth Amendment's promise of equal protection. Defendants should be enjoined from further violations of Ms. White's constitutional rights and be ordered to compensate Ms. White for her injuries.

**JURISDICTION**

8. This Court has subject matter jurisdiction over Ms. White's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and over Ms. White's state law claims pursuant to 28 U.S.C. § 1367(a).

9. The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

10. The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Ms. White the declaratory and injunctive relief she prays for herein.

11. An award of attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

**VENUE**

12. Venue is proper in the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

**THE PARTIES**

13. Plaintiff Megan "Meg" White (she/her) is a resident of the City of Sacramento in the State of California. Ms. White is a small business owner and leader for a local organization called JUICE Sacramento ("JUICE"), which stands for Justice Unites Individuals and Communities Everywhere.

14. Defendant Sacramento Police Department ("SPD") is the police department for the city of Sacramento, California. Defendant SPD acted on its pattern and practice of suppressing anti-racist, anti-police-brutality protest when its officers—including those defendants individually named below—violently injured Ms. White at protests she observed in Sacramento between late 2020 and early 2021.

15. Defendant City of Sacramento (the "City") is a municipal entity created and authorized under the laws of the State of California. The City is authorized by law to maintain a

police department, and does maintain the Sacramento Police Department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

16. Defendant Daniel Hahn is, and at all times material herein was, a law enforcement officer and Chief of Police for the City and SPD, acting within the scope of that employment.

17. Defendants Doe 1 to 200 are and/or were agents or employees of Defendants SPD and/or the City and acted within the scope of that agency or employment and under color of state law. Defendants Doe 1 to 200's true and correct names are not now known and they are identified by their fictitious names. Defendants Doe 1 to 200's fictitious names will be substituted for their true and correct names when ascertained.

## FACTUAL ALLEGATIONS

### A. Defendants' Pattern of Discrimination Against Anti-Racist Protesters

18. On March 13, 2020, three Louisville police officers, Jonathan Mattingly, Brett Hankison, and Myles Cosgrove, fatally shot Breonna Taylor, a young Black woman, while she was asleep inside her own apartment. The officers, dressed in plainclothes, broke down Ms. Taylor's door in the middle of the night without announcing themselves. The officers shot Ms. Taylor six times before she died.

19. On May 25, 2020, Minneapolis police officer Derek Chauvin killed George Floyd by pressing a knee to his neck for over eight minutes. His fellow officers, Thomas Lane, J. Kueng, and Tou Thao, restrained Mr. Floyd and/or prevented onlookers from intervening. In cellphone video footage widely circulated around the globe, Mr. Floyd can be seen taking his last breaths. Mr. Chauvin was convicted of Mr. Floyd's murder and sentenced to over twenty-two years in prison.

20. The violent killings of Ms. Taylor and Mr. Floyd follow a long line of Black individuals who have died in police custody. In recent years alone, the deaths of Sandra Bland, Eric Garner, Michael Brown, Tamir Rice, Walter Scott, Alton Sterling, and Philandro Castile captured nationwide attention. Outrage over the continuous police violence galvanized people to

the streets, with anti-police brutality and anti-racist protests occurring across the United States (including in Sacramento) during the summer of 2020.

21. Sacramento is no stranger to police violence. In the midst of this nationwide reckoning, the City continued to grapple with the memory of Stephon Clark, a 22-year-old Black man who was shot and killed by police in March 2018 in the backyard of his grandmother's house. The district attorney declined to bring charges against the two Sacramento police officers involved in his fatal shooting, Terrence Mercadal and Jared Robinet.

22. In March 2019, community activists and religious leaders organized protests in opposition to the decision to not charge Mr. Mercadal and Mr. Robinet. The protests remained peaceful as community members exercised their constitutional right to demonstrate, but the SPD responded with belligerence.

23. The unjustified hostility of Sacramento police culminated in the mass arrest of eighty-four people on March 4, 2019, including members of the clergy and reporters, during a peaceful demonstration in affluent East Sacramento. Over 100 people had marched through the "Fab 40s" section of East Sacramento, and police trapped protesters on the 51st Street bridge before moving in to make arrests. The arrests occurred at the end of the demonstration as protesters were simply trying to disperse. There was no threat to public safety or to property that justified this police suppression of protest activity through citation and arrest.

24. The SPD's historical targeting of anti-racist demonstrators was repeated during the mass protests that occurred following Mr. Floyd's murder in May 2020. Sacramento police responded with the same brute force as before and again waged a program of intimidation. Peaceful protesters were brutalized by militarized police armed with riot gear, who used batons, tear gas, flash bang grenades, pepper balls, and rubber bullets. Police also employed dangerous crowd control tactics like bull-rushing and kettling, a technique where police will corral demonstrators into a confined space so they cannot leave. Kettling can become particularly dangerous when (as here) police use force, leaving people without a way to escape.

25. On information and belief, demonstrators were also subjected to surveillance, traffic stops, and police raids after the protests.

26. Right-wing protesters and white supremacists, by contrast, have not endured the violent treatment that anti-racist and anti-police brutality protesters have consistently received from police. Empowered by former President Trump's hateful rhetoric surrounding the November 3, 2020 presidential election, right-wing and white supremacist groups like the Proud Boys and the Oath Keepers staged so-called "protests" at the Capitol in Sacramento and in other parts of the City including as part of the "Stop the Steal" movement. The Oath Keepers are a paramilitary anti-government organization, while the Proud Boys are a far-right, neo-fascist, chauvinist, and exclusively male organization that engages in political violence and is designated as a hate group by the Southern Poverty Law Center. The Proud Boys in particular remained present *en masse* in Sacramento in the weeks and months following the election. The SPD rarely intervened in such demonstrations and largely allowed such groups to move freely throughout Sacramento.

27. During these "protests," white supremacists and right-wing demonstrators harassed and assaulted members of the community, including unhoused people and others not actively participating in the protests. Sacramento police were either slow to respond or failed to intervene at all to stop the violence. White supremacist protestors, for example, were often armed with mace and pepper spray, and would use those weapons against community members. SPD, however, did not step in.

28. In light of the SPD's utter failure to aid vulnerable Sacramento citizens, community leaders began to organize counter-protests against the white supremacists and right-wing ideologues terrorizing the city. As part of the counter-protests, racial justice and anti-police brutality activists mobilized to shield community members from violence and take a stand against racism and hate. Keeping with the SPD's long-established practices, Sacramento police targeted the counter-protesters with extreme force and intimidation, while turning a blind eye to violence perpetrated by white supremacists.

**B.    Plaintiff Megan "Meg" White**

29. Plaintiff Megan "Meg" White, a thirty-four-year-old Black woman, small business owner, and local organization leader, experienced the disparate police response firsthand. Motivated by the deaths of Mr. Floyd, Ms. Taylor, Mr. Clark, and too many others, particularly in

Sacramento's history of violent policing, Ms. White observed protests against police brutality throughout Sacramento including as part of her work with JUICE.

30. In late 2020, Ms. White went to observe the counter-protests in Sacramento against white supremacist and right-wing organizers. Having heard that such groups were perpetrating attacks on the surrounding community, Ms. White, who has CPR and first aid training, had hoped to provide aid to community members who were harmed by the white supremacist groups. Unfortunately, SPD assaulted Ms. White while she attempted to provide aid. She also observed SPD lending their tacit approval to the white supremacist attacks on the community, as officers stood by and did nothing to help.

31. On or about November 21, 2020, Ms. White was handing out winter clothing to unhoused persons in Cesar Chavez Park when she saw a group that appeared to be part of the Proud Boys attack and beat a woman. The woman was carrying Black Lives Matter and Gay Pride flags. The attack occurred in full view of Sacramento police officers, who did not intervene.

32. Seeing the officers do nothing, Ms. White attempted to assist the woman by providing her cover. A Sacramento police officer then rushed toward Ms. White and the woman she was trying to aid. The officer violently grabbed and tossed Ms. White to the ground with such force that it caused bruising. The officer also threatened to arrest Ms. White if she did not immediately leave the area.

33. The same day, Ms. White witnessed an individual wearing a Proud Boys t-shirt attack a man who was clearly a medical volunteer (wearing a hat with a first-aid sign and carrying medical supplies). Ms. White attempted to de-escalate the situation, and the man in the Proud Boys t-shirt shoved her—again, in full view of the SPD. The police officers did nothing to assist.

34. On or about December 12, 2020, Ms. White observed an anti-racist counter-protest in Downtown Sacramento near the State Capitol. Police officers ordered the protesters to disperse, then charged the group and tackled individuals who were simply trying to follow orders and leave. While Ms. White was attempting to leave the area (with her hands up), an SPD officer bearing badge number 684 shoved her in the back and hit her with his department-issued bicycle. This

1  brutal force caused Ms. White to stumble and suffer severe bruising as well as long-lasting hip and
2  knee pain, which continues to this day.

3  35.  On or about December 26, 2020, Ms. White observed an anti-racist event with other
4  community members near R Street and 13th Street in Sacramento. During the event, a Sacramento
5  police officer knocked a legal observer (identifiable by wearing a green hat) to the ground. After
6  witnessing police officers step over or ignore the legal observer, Ms. White called out to the police
7  asking for help. Rather than offering assistance, a member of the SPD hit Ms. White with his
8  baton several times and struck her with his department-issued bicycle. The attack caused severe
9  bruising on Ms. White's shoulder and exacerbated a previously-existing foot injury. Ms. White
10 was required to miss work and could not raise her arm for weeks due to the shoulder injury.

11 36.  On or about January 22, 2021, Ms. White observed an anti-racist counter-protest
12 near L Street and 10th Street in Sacramento. The SPD kettled a small group of counter-protesters
13 with a much larger group of individuals who appeared to be associated with the Proud Boys and
14 white supremacist groups. While in the kettle, one such person punched an anti-racist counter-
15 protester in the face. Ms. White attempted to assist the victim, but an SPD officer sprayed the
16 victim and Ms. White with a chemical agent (including in Ms. White's eyes). The chemical agent
17 caused Ms. White, who wears contact lenses and has sensitive skin, severe pain and cough.

18 37.  In addition to her physical injuries and out-of-pocket losses from being unable to
19 work, Ms. White has suffered significant emotional distress as a result of the SPD's use of
20 excessive force. Ms. White also feels exhausted, experiences nightmares, and feels unsafe in her
21 own home. She struggles to eat and experiences flashbulb memories that can be debilitating. She
22 suffers from shock, anxiety, and insomnia to this day.

23 38.  Ms. White filed an administrative tort claim with the City on or about May 24,
24 2021, asserting, among other things, violations of her First, Fourth, and Fourteenth Amendment
25 rights. Her claim was denied on or about June 1, 2021.

**C.     Defendants' Policies and Customs**

39.     Defendants City and SPD possess policy-making authority under state law and the SPD's General Orders. *See* Cal. Gov. Code § 38630(a); General Orders, Sacramento Police Department, available at https://www.cityofsacramento.org/Police/Transparency/General-Orders.

40.     Defendants Hahn and Does 1 to 200 acted or purported to act under the color of state law.

41.     Defendants' policies and/or informal customs and practices precipitated the constitutional violations alleged in this action. The policies that led to Ms. White's injuries are found in SPD's General Orders and Manuals, which constitute the official policies of SPD and the City.

42.     SPD Reference Manual 532.11, titled "Crowd & Riot Control Manual" (the "Crowd Manual," available at https://www.cityofsacramento.org/-/media/Corporate/Files/Police/Transparency/RMs/RM-53211-Crowd-and-Riot-as-of-1298.pdf?la=en) permits officers to use crowd dispersal techniques even if police only "anticipate" resistance or that arrests will occur. The Crowd Manual instructs officers to "never underestimate . . . rioters" and gives police free reign to make "selective" arrests to gain a "psychological and tactical advantage." The Crowd Manual provides no guidance regarding how to "anticipate" resistance or the number of arrests.

43.     The Crowd Manual further states that "[p]rompt and decisive action to an impending disturbance or existing civil disorder is essential to a successful police operation," and that a "spontaneous event has the potential of escalating . . . to major riot situations." "Spontaneous event" is defined to include "First Amendment Right activities"; it is left to the incident commander's discretion to "assess the overall civil disturbance . . . and determine the appropriate response actions . . ."

44.     The Crowd Manual allows police to issue a dispersal order so long as there are "reasonable and articulable factors," but does not define what "reasonable and articulable factors" are. Police are not required to provide protesters with any set amount of time to disperse, and dispersal orders may be issued even where "only scattered individuals are violent . . . ." The Crowd

Manual encourages officers to make arrests of individuals in a non-violent crowd as an "effective" crowd control technique, and does not require that protesters even hear the order before further tactics may be employed.

45. Defendants' policies also permit police officers to use excessive force even against non-violent demonstrations. For example, the Crowd Manual states: "If a display of officers accompanied by a dispersal order does not result in voluntary dispersal, more forceful action may be employed." General Order 432.11, chapter 2, section (A)(3)(e).

46. On June 30, 2021, in a meeting with the Sacramento Community Police Review Commission, Deputy Chief Kathy Lester admitted that Reference Manual 532.11 was removed as an implementation authority in August 2014 pending review. SPD claims to have been drafting a First Amendment Assembly Manual, which is supposedly meant to replace the current Crowd Manual, for the last seven years (since at least 2014).

47. SPD's General Order 580.12 provides that "less lethal" weapons may be used in any manner "consistent with department policy and training guidelines," and whenever "specific information reasonably indicates the potential for the system's use." The same Order provides that "[s]ituations for use of . . . less lethal weapon systems may include, but are not limited to," "[s]elf-destructive, dangerous and/or combative individuals," "[r]iot/crowd control and civil unrest incidents," and "[c]ircumstances where a tactical advantage can be obtained." General Order 580.02(A)(8)(c) defines projectile weapons such as pepperballs, beanbag rounds, and foam projectiles fired by officers at persons to be "Less Lethal Force." Yet projective weapons have the ability to severely injure, permanently disable, or even kill targets.

48. The SPD's Chemical Agent Manual further provides that police officers are free to use chemical agents after "careful consideration."

49. The SPD also maintains an "Arrest of Passive Resisters Manual." http://www.cityofsacramento.org/-/media/Corporate/Files/Police/Transparency/RMs/RM-52309-Passive-Resisters-as-of-0397.pdf ("Arrest Manual"). The Arrest Manual provides that "officers shall apply Department authorized arrest and control methods to take passive resisters into custody," and directs officers to use methods such as a "[c]hinlock to rear wristlock," a

"[c]rossface takedown to prone control," and a "[h]air pull takedown to prone control" in order to subdue perceived violators.

50. All of these policies enable police to prevent even non-violent, peaceable protest activity of any kind without any demonstrated threat of future risk to public safety. No policy cabins SPD's authority to make the decision to suppress speech activity in this way based on the viewpoint of the protesters.

51. Beyond their written policies, Defendants have a demonstrated practice and custom of using unconstitutional tactics in response to anti-racist, anti-police brutality protests. This practice dates back prior to March 4, 2019, when SPD officers corralled, kettled, and trapped individuals on a highway overpass who were protesting the killing of Stephon Clark. The officers declared an unlawful assembly and used unconstitutional force to detain and arrest eighty-four people.

52. Subsequently, the Office of Public Safety and Accountability ("OPSA") which has broad oversight authority to evaluate Sacramento's public safety departments, issued a report on the SPD's response to the March 4, 2019 protests. Within the report, OPSA provided several recommendations including that SPD should review whether its tactics for policing protests "balance[ed] the demands of public safety with the desirability of facilitating peaceful protests" and whether its current model of response was "commensurate with the degree of threat posed by the situation." In addition, OPSA suggested that "SPD should review whether the strategic objective(s) of sensitive police operations such as the policing of protests, [were] sufficiently established and communicated within its organization." OPSA Review of Police Response to March 4, 2019 Protest Incident, available at https://www.cityofsacramento.org/-/media/Corporate/Files/OPSA/OPSA-Review-Protest-Incident-March-4-2019.pdf.

53. The issues identified by OPSA were never addressed and the SPD policies remained the same. As a result, these patently objectionable practices continued in the policing of protests following the killing of George Floyd in 2020 and into 2021. Defendants' lack of investment in Sacramento's public safety oversight structure is made clear by the SPD's refusal to

act on the feedback provided by OPSA, and the City's chronic underfunding of OPSA, which until 2020 had only one full-time employee.

54. The SPD's pattern of discriminatory and violent policing is evident in the scores of lawsuits brought against SPD. The SPD partially settled a lawsuit for over $2 million arising out of the killing of Stephon Clark, captioned *Clark v. City of Sacramento*, No. 2:19-cv-00171-JAM-EFB (E.D. Cal.). Multiple other lawsuits involving allegations of significant injuries and the use of excessive force were also settled in the last few years alone. *See, e.g.*, *Hernandez v. City of Sacramento*, No. 2:17-cv-02311-JAM-DB (E.D. Cal.) (settlement of $5.2 million); *Mann v. City of Sacramento*, No. 2:16-cv-01847-WBS-DB (settlement of $719,000); *Cain v. City of Sacramento*, No. 2:17-cv-00848-JAM-DB (settlement of $550,000).

55. Defendants also maintain an unofficial practice and custom of permitting officers to use unreasonable and excessive force in response to anti-racist, anti-police brutality protests. As early as January 2019, the California Department of Justice acknowledged "significant deficiencies" in the City and SPD's use of force policies and training. Report & Recommendations, dated January 29, 2019, available at https://oag.ca.gov/system/files/attachments/press-docs/spd-report.pdf.

56. On information and belief, Defendants have failed and/or refused to hold their police officers accountable for unreasonable and excessive uses of force, including a failure to train, supervise, or discipline members of the SPD.

## CAUSES OF ACTION

### First Claim for Relief
### First Amendment Viewpoint Discrimination
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Ms. White's Rights Under the First Amendment to the United States Constitution*

57. Ms. White repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

58. Defendants Doe 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, engaged in conduct that

1 directly or indirectly deterred Ms. White from exercising rights protected by the First Amendment
2 of the U.S. Constitution, or failed to intercede and/or were integral participants to such conduct.

3   59.   Defendants Hahn, SPD, and the City, acting or purporting to act under color of state law and as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Ms. White, in violation of rights protected by the First Amendment of the U.S. Constitution.

4   60.   As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Ms. White is entitled to relief from the potential that such violations will recur.

5   61.   The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Second Claim for Relief**
**Fourth Amendment Excessive Force**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Ms. White's Rights Under the Fourth Amendment to the United States Constitution*

  62.   Ms. White repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

  63.   Defendants Doe 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, used unreasonable and excessive force against Ms. White, or failed to intercede and/or were integral participants in the use of unreasonable and excessive force, in violation of the Fourth Amendment of the U.S. Constitution.

  64.   Defendants Hahn, SPD, and the City, acting or purporting to act under color of state law and as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Ms. White, in violation of rights protected by the Fourth Amendment of the U.S. Constitution.

  65.   As a result of Defendants' acts and omissions, Defendants deprived Ms. White of her federal, state, and/or other legal rights; caused Ms. White bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Ms. White to expend costs and expenses; and/or otherwise damaged and injured Ms. White.

66. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Ms. White is entitled to relief from the potential that such violations will recur.

67. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### Third Claim for Relief
**Fourteenth Amendment Equal Protection**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Ms. White's Rights Under the Fourteenth Amendment to the United States Constitution*

68. Ms. White repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

69. Defendants Doe 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, discriminated against Ms. White based upon an animus towards attendees at protests concerning police violence and accountability, without a rational relationship to any legitimate state interest, or failed to intercede and/or were integral participants to such discrimination, in violation of rights protected by the Fourteenth Amendment of the U.S. Constitution.

70. Defendants Hahn, SPD, and the City, acting or purporting to act under color of state law and as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Ms. White, in violation of rights protected by the Fourteenth Amendment of the U.S. Constitution.

71. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Ms. White is entitled to relief from the potential that such violations will recur.

72. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### Fourth Claim for Relief
**Equal Protection Under the California Constitution Article 1, Section 7**
*Pursuant to Cal. Civ. Code § 52.1 (The Bane Act) for Defendants' Violations of Ms. White's Rights under the California Constitution*

73. Ms. White repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

74. The acts and/or omissions of the Defendants, and each of them, individually and/or while acting in concert with one another, constituted interference, and attempted interference, by threats, intimidation and coercion, with Ms. White's peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code § 52.1, including Article 1, Section 7 of the California Constitution.

75. Defendants Doe 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, discriminated against Ms. White based upon an animus towards attendees at protests concerning police violence and accountability, without a rational relationship to any legitimate state interest, or failed to intercede and/or were integral participants to such discrimination, in violation of rights protected by Article 1, Section 7 of the California Constitution.

76. Defendants Hahn, SPD, and the City, acting or purporting to act under color of state law and as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Ms. White, in violation of rights protected by Article 1, Section 7 of the California Constitution.

77. As a result of Defendants' wrongful conduct, Ms. White suffered damages as alleged above.

78. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Ms. White is entitled to relief from the potential that such violations will recur.

79. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Fifth Claim for Relief**
**California Ralph Act**
*Pursuant to Cal. Civ. Code § 51.7 for Defendants' Violations of Ms. White's Rights under the California Ralph Act*

80. Ms. White repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

81. Ms. White is informed and believes bias against Ms. White's perceived political affiliation with the protests against police violence and police racism, and bias against Ms. White's

perceived race, national origin, and/or religion, were motivating reasons for the defendants' above-described misconduct toward them.

82. Defendants' above-described conduct violated Ms. White's rights to be free from violence and intimidation by threat of violence because of their actual or perceived political affiliation and/or viewpoint, in violation of California Civil Code § 51.7.

83. As a result of Defendants' wrongful conduct, Ms. White suffered damages as alleged above.

84. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Ms. White is entitled to relief from the potential that such violations will recur.

85. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### Sixth Claim for Relief
### Assault and Battery
*Pursuant to California Tort Claims Act, Cal. Gov. Code § 815.2 for Defendants' Liability for Ms. White's Injuries Caused by Act of Public Entity Employee*

86. Ms. White repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

87. Defendants committed assault and battery Ms. White by hitting her with a department-issued bike, shoving, using chemical weapons and other force on her.

88. Said acts by defendants and/or each of them were unreasonable and excessive uses of force.

89. Ms. White did not consent to the use of force against her and was injured thereby.

90. As a result of Defendants' wrongful conduct, Ms. White suffered damages as alleged above.

91. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Ms. White is entitled to relief from the potential that such violations will recur.

92. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Seventh Claim for Relief**
Negligence
*Pursuant to California Tort Claims Act, Cal. Gov. Code § 815.2 for Defendants' Liability for Ms. White's Injuries Caused by Act of Public Entity Employee*

93. Ms. White repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

94. Defendants, and/or each of them, individually and/or while acting in concert with one another, owed Ms. White the duty to use reasonable care to avoid causing foreseeable injury and damage to Ms. White during the events described in this Complaint. The above-described acts and omissions of defendants breached the duty of care defendants owed to Ms. White.

95. In doing the acts and/or omissions as alleged herein, Defendants and/or each of them, breached said duty to use reasonable care and said breach of duty caused, and/or contributed to the cause, of Ms. White's injuries and damages as alleged in this Complaint.

96. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**PRAYER FOR RELIEF**

WHEREFORE, Complainant Meg White prays for relief as follows:

a. Judgment in Ms. White's favor and against Defendants on all causes of action alleged herein;
b. For damages in an amount to be proven further at trial;
c. For punitive damages;
d. For issuance of a judgment declaring that Defendants' actions, inactions, and/or policies or customs complained of herein unconstitutional under the U.S. Constitution;
e. For injunctive relief prohibiting Defendants' prospective actions, inactions, and/or policies or customs complained of herein in violation of the U.S. Constitution;
f. For pre- and post-judgment interest;
g. For attorneys' fees and costs and costs of suit incurred herein; and
h. For such other and further relief as the Court may deem to be just and proper.

**DEMAND FOR JURY TRIAL**

Ms. White hereby demands trial by jury for all causes of action, claims, or issues in this Action that are triable as a matter of right to a jury.

Dated: November 30, 2021

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ John P. Flynn
    John P. Flynn
    jflynn@wsgr.com

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
Pilar Gonzalez-Morales
pgonzalez@creeclaw.org

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
Tifanei Ressl-Moyer
tresslmoyer@lccrsf.org

*Attorneys for Plaintiff*
*Megan White*