1    TIFANEI RESSL-MOYER, SBN 319721            DAN SIEGEL, SBN 56400
     LAUREN CARBAJAL, SBN 336485                EMILYROSE JOHNS, SBN 294319
2    LAWYERS'COMMITTEE FOR CIVIL RIGHTS         SIEGEL, YEE, BRUNNER & MEHTA
     OF THE SAN FRANCISCO BAY AREA              475 14th Street, Suite 500
3    131 Steuart Street, Suite 400             Oakland, California 94612
     San Francisco, CA 94105                    Telephone: (510) 839-1200
4    Telephone: (916) 634-8687                  Facsimile: (510) 444-6698
     Email: tresslmoyer@lccrsf.org             Email: danmsiegel@gmail.com;
5          lcarbajal@lccrsf.org                        emilyrose@siegelyee.com
6

7    PILAR GONZALEZ MORALES, SBN 308550          *Attorneys for Plaintiffs*
     ELIZABETH BALLART, SBN 299226
8    CIVIL RIGHTS EDUCATION AND
     ENFORCEMENT CENTER
9    1245 E Colfax Avenue, Suite 400
     Denver, CO 80218
10   Telephone: (303) 757-7901
     Email: pgonzalez@creeclaw.org
11          eballart@creeclaw.org
12

13                  **UNITED STATES DISTRICT COURT**

14                  **EASTERN DISTRICT OF CALIFORNIA**

15                     **SACRAMENTO DIVISION**

16
                                              )
17   MEGAN WHITE, JERONIMO AGUILAR,            ) Case No. 2:21-cv-02211-JAM-DB
     LOREN WAYNE KIDD, LYRIC NASH,             )
18   NICOLLETTE JONES, and ODETTE ZAPATA,      ) **SECOND AMENDED COMPLAINT**
                                              )
19              Plaintiffs,                    )
                                              )
20          v.                                 )
                                              )
21                                             )
     SACRAMENTO POLICE DEPARTMENT; THE         )
22   CITY OF SACRAMENTO; DANIEL HAHN;          )
     and DOES 1-200 (the names and numbers of  )
23   which are currently unknown),             )
                                              )
24              Defendants.                    )
                                              )
25   _____)

26

27

28

---

*White v. Sacramento*, No. 2:21-cv-02211-JAM-DB
Second Amended Complaint - 1

Plaintiffs Megan White ("Ms. White"), Jeronimo Aguilar ("Mr. Aguilar"), Loren Wayne Kidd ("Mr. Wayne Kidd"), Lyric Nash ("Ms. Nash"), Nicollette Jones ("Ms. Jones"), and Odette Zapata ("Ms. Zapata") (collectively, "Plaintiffs") by and through their attorneys, as and for their Second Amended Complaint against Defendants Sacramento Police Department, the City of Sacramento, Daniel Hahn, and Does 1-200, hereby allege as follows:

**NATURE OF THE ACTION**

1.     The City of Sacramento and its Police Department have conditioned the public to fear the violent and targeted force of the state when attending a protest, a demonstration or even a vigil for racial justice. This is a civil rights action to vindicate the rights of Californians protesting against racism, white supremacy, and police violence in Sacramento, California. This lawsuit seeks compensatory relief for severe injuries that Plaintiffs endured at the hands of the Sacramento police, and injunctive relief to stop the City of Sacramento and its Police Department from continuing to employ discriminatory, violent tactics against protesters.

2.     On May 25, 2020, 46-year-old George Floyd was killed in Minneapolis, Minnesota by Minneapolis police officer Derek Chauvin. Chauvin knelt on Floyd's neck for over eight minutes as Floyd repeatedly pleaded that he could not breathe. Chauvin's fellow officers, Thomas Lane, J. Kueng, and Tou Thao, restrained Floyd and prevented onlookers from intervening. For the final two minutes while Chauvin pressed his knee into Floyd's neck, Floyd was motionless and had no pulse. Darnella Frazier, then seventeen years old, recorded the murder in a cellphone video that quickly spread worldwide. Chauvin has since been convicted of Floyd's murder and sentenced to over twenty-two years in prison.

3.     In the days and weeks following George Floyd's murder, protests against police violence and in support of police accountability erupted across the world, including in Sacramento. The Sacramento Police Department responded with disproportionate, illegal, and unequal force against protesters.

4.     The actions of the Sacramento Police Department, the City of Sacramento, and the individual defendants have violated the rights of Plaintiffs and other protesters in Sacramento, Chilling their Constitutional right to assemble and protest. Plaintiffs have been targeted and brutalized by the Sacramento Police Department, causing them to stop or greatly decrease engaging in their First Amendment rights.

Plaintiffs have also suffered physical, psychological and emotional harm arising from the excessive force and discrimination of Defendants.

5.      By contrast, the Sacramento Police Department has allowed persons aligned with white supremacist and organized hate groups (including the Proud Boys) to demonstrate unhindered and unharmed. This disparate treatment is consistent with a years-long pattern and practice of discrimination on the part of the Sacramento Police Department, and has had a substantial chilling effect on Plaintiffs' exercise of freedoms guaranteed by the First Amendment.

6.      After former President Trump lost the 2020 election on November 3, 2020, he baselessly claimed that the presidency had been stolen and exhorted his supporters to refuse to accept the election results. Emboldened by this harmful rhetoric, white supremacist and far right groups planned protests across the country, including in Sacramento. These protests became known as the "Stop the Steal" protests.

7.      In Sacramento, white supremacist groups and "Stop the Steal" protesters began weekly protests claiming, among other things, that the 2020 presidential election was invalid. These white supremacists and Stop the Steal protesters harassed and assaulted community members, including vulnerable individuals experiencing houselessness. The Sacramento Police Department witnessed such violence yet failed to intervene, failing to protect the victims and allowing the violence to continue largely without repercussions.

8.      Against this backdrop of police inaction, racial justice and anti-police brutality protesters began to create mutual aid networks and street medic programs, and to show up as peaceful "counter" protesters in an attempt to keep the larger community safe.   The counter-protesters tried to shield community members from violence perpetrated by white supremacists and Stop the Steal protesters, and to show that such groups were not welcomed in Sacramento. While trying to provide this assistance, counter-protesters were assaulted by the white supremacists and Stop the Steal supporters in clear view of Sacramento Police Department officers. Consistent with a long history of doing so, the Sacramento Police Department targeted the counter-protesters with extreme force and intimidation to stop their First Amendment activity. The counter-protesters were identifiable to the police because they were clad in support for Black Lives Matter or in clothing associated with racial justice speech, and/or were otherwise expressing or appeared to be associated with racial justice, anti-police brutality sentiments.

9.      Meanwhile, Sacramento Police Department continued to ignore violence perpetrated by organized groups recognized as white supremacists, allowing their criminal activity to continue unhindered.

10.     In recent years alone, a culture of racism and violence against Black people within the Sacramento Police Department has resulted in the tragic deaths of:   Joseph Mann (2016), Dazion Flenaugh (2016), Nandi Cain (2017), Darrell Richards (2018), Brandon Smith (2018), Stephon Clark (2019), and Jeremy Southern (2020). Sacramento City Mayor Darrell Steinberg admitted that "implied racism" is a factor in these incidents.

11.     The Sacramento Police Department's policies and practices are discriminatory, racist, and inhumane. They violate the First Amendment's protection of freedom of speech, the Fourth Amendment's proscription of excessive force, the Fourteenth Amendment's promise of equal protection, and protections secured by the California Constitution and other state laws. Defendants should be enjoined from further violations of Plaintiffs' constitutional rights and be ordered to compensate Plaintiffs for their injuries.

**JURISDICTION**

12.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

13.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

14.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. 26 Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief prayed for herein.

15.     An award of attorneys' fees is authorized pursuant to 42 U.S.C. § 1988(b).

**VENUE**

16.     Venue is proper in the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

///

///

**THE PARTIES**

17.     Plaintiff Megan "Meg" White, a 34-year-old Black woman, is a resident of Sacramento, California. Ms. White is a small business owner and leader for Justice Unites Individuals and Communities Everywhere ("JUICE"), a local grassroots organization. Ms. White observed racial justice protests and attempted to provide basic first aid to protest participants and community members in 2020 and 2021. The Sacramento Police Department severely injured Ms. White during protests, including when she pled for help from officers as she tried to render aid to people who were attacked by white supremacist groups. As a result of this police violence, Ms. White suffered severe bruising, chronic knee and hip pain, chemical burns, and a shoulder injury so significant that it left her unable to raise her arm. Ms. White also witnessed law enforcement restrain and assault racial justice protesters, while permitting white supremacist groups wielding weapons like large knives and mace to move freely. Ms. White filed an administrative tort claim with the City of Sacramento on or about May 24, 2021, asserting, among other things, violations of her First, Fourth, and Fourteenth Amendment rights. Her claim was denied on or about June 1, 2021.

18.     Plaintiff Jeronimo Aguilar, a 29-year-old Chicano man, is a resident of Winters, near Sacramento, California. A husband and father, Mr. Aguilar is a member of the Brown Berets, a pro-Chicano organization known for their actions against police brutality and other racial justice initiatives.  Mr. Aguilar works for Legal Services for Prisoners with Children, an organization that has served the community since 1978. He is active with All of Us or None, a grassroots human and civil rights organization that advocates for the rights of currently and formerly incarcerated individuals and their families. Mr. Aguilar attended several protests in May and June of 2020, where he chanted in support of racial justice and tried to prevent violence from law enforcement and organized hate groups. Sacramento Police Department officers targeted Mr. Aguilar, surveilled him, and illegally raided his home, causing Mr. Aguilar to stop participating in protests in Sacramento. Mr. Aguilar filed an administrative tort claim with the City of Sacramento on or about September 9, 2021 asserting, among other things, violations of his First, Fourth, and Fourteenth Amendment rights. The City of Sacramento denied his claim on its merits on October 7, 2021. The City of Sacramento did not notify Mr. Aguilar of any time defect in his claim, effectively waiving its defense as to the time limit according to California Gov't Code s. 911.3(b).

1       19.     Plaintiff Loren Wayne Kidd, a 34-year-old white man with epilepsy, is a resident of Elk

2   Grove in the County of Sacramento, California. Galvanized by footage of police brutality at a protest in the

3   wake of George Floyd's death, Mr. Kidd attended many protests in the Sacramento area between May 2020

4   and January 2021. The Sacramento Police Department shot Mr. Kidd with impact munitions, shoved him

5   into and over parked vehicles, targeted him for wearing black attire (which officers associate with anti-racist

6   speech), discriminated against him based on his disability during arrest, and watched as white supremacist

7   groups brutally attacked Mr. Kidd without intervening. Mr. Kidd still lives with the injuries he endured from

8   the Sacramento Police Department, including significant psychological trauma. He has substantially

9   decreased his participation in racial justice protests out of fear that law enforcement will instigate, facilitate,

10  or acquiesce in violence. Mr. Kidd filed an administrative tort claim with the City of Sacramento on or

11  about June 21, 2021, which was denied on or about July 1, 2021.

12      20.     Plaintiff Lyric Nash, a 21-year-old biracial woman, is a resident of West Sacramento,

13  California. Ms. Nash is affiliated with NorCal Resist, a grassroots organization focused on fighting

14  oppression and empowering communities through shared resources and support. Ms. Nash attended many

15  racial justice protests in Sacramento between the end of May 2020 and February 2021. The Sacramento

16  Police Department targeted Ms. Nash with verbal harassment and threats on multiple occasions. Sacramento

17  Police Department officers also routinely bull-rushed her and other racial justice protesters, and

18  indiscriminately fired pepper balls, foam-tipped bullets, and beanbag rounds into crowds when she was

19  present. She fears entering downtown Sacramento due to the Sacramento Police Department's conduct,

20  experiences significant psychological harm, and has significantly decreased her participation in racial justice

21  protests.

22      21.     Plaintiff Nicollette Jones, a 34-year-old woman of Punjabi Asian and European descent, is a

23  resident of Sacramento, California. Ms. Jones is a peer crisis counselor for Mental Health First, a project of

24  the Sacramento Chapter of Anti Police-Terror Project, which she co-created to model a safe community-led

25  response for people experiencing mental health crises. Ms. Jones has attended demonstrations in

26  Sacramento for a decade, including racial justice protests from May 2020 through January 2021. The

27  Sacramento Police Department knows Ms. Jones by name and regularly targeted her during protests. In May

28  2020, while Ms. Jones chanted, Sacramento Police Department officers kicked an active teargas canister

toward Ms. Jones and shot impact munitions directly into her body at least eleven times. Ms. Jones still lives with the injuries she endured, including significant psychological trauma, and has severely decreased her participation in protests.

22.     Plaintiff Odette Zapata, a 29-nine-year-old Latinx woman, is a resident of Sacramento, California. Because she was raised in a Black family, issues of police brutality against Black and Brown people deeply affect Ms. Zapata. She has attended multiple racial justice protests against police brutality and used de-escalation training from Anti-Police Terror Project in an attempt to keep her community safe from violence. Ms. Zapata witnessed law enforcement's pattern of violent escalation against those it deemed to be racial justice protesters while allowing white supremacist and organized hate groups to freely exert violence against community members. Ms. Zapata has also been the target of extreme and illegal surveillance by law enforcement, including through aerial surveillance and visits to her home, since her participation in protests. Ms. Zapata lives with severe psychological trauma from her experience with the Sacramento Police Department; she no longer feels safe anywhere she goes and has substantially decreased her protest activity.

23.     Defendant Sacramento Police Department (the "Police Department") is the Police Department for Sacramento, California. Defendant Police Department engaged in a pattern and practice of suppressing racial justice and anti-police-brutality protests, including when its officers—such as those defendants individually named below—violently injured Plaintiffs at protests they attended in Sacramento between late 2020 and early 2021.

24.     Defendant City of Sacramento (the "City") is a municipal entity created and authorized under California law. The City is authorized by law to maintain the Sacramento Police Department, which acts as its law enforcement agent and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

25.     Defendant Daniel Hahn at all material times was a law enforcement officer and Chief of Police for the City and Police Department ("Police Chief"), acting within the scope of that employment.

26.     Defendants Does 1 to 200 are and/or were agents or employees of Defendants Police Department and/or the City and acted within the scope of that agency or employment and under color of state law. Defendants Does 1 to 200's true and correct names are not now known and they are identified by

their fictitious names. Defendants Does 1 to 200's fictitious names will be substituted for their true and correct names when ascertained.

FACTUAL ALLEGATIONS

**I.   BACKGROUND**

27.    The Police Department has a long and violent history of discriminatory policing, targeting and surveilling people who organize racial justice initiatives, protest police brutality, and support Black liberation. The Police Department has used fear, intimidation, and violence as tactics to suppress this constitutionally-protected speech and garner political support for its (unconstitutional) actions.

**A.    The Police Department's Ongoing Suppression of Racial Justice Speech**

28.    An uprising sprouted in nearly every metropolitan area of the United States after Minneapolis police officers murdered George Floyd in May 2020. People poured into the streets of the City to protest police brutality and institutional racism.

29.    For merely participating, protesters faced brutal, targeted police violence.  The Police Department indiscriminately shot protesters with impact munitions, chemical weapons, and used  excessive force on people who demonstrated peacefully. Protest participants required surgery, stiches and staples, and other significant medical attention. Many protesters suffer ongoing medical and psychological injuries because of the extreme police violence.

30.    This illegal conduct directed at Plaintiffs and other racial justice protesters stands in stark contrast to the preferential treatment Defendants have afforded blatantly violent white supremacist groups.

31.    White supremacist groups, fomented by former-President Donald Trump's fabricated claims of a fraudulent election, began organizing in the City in late 2020. As part of a nationwide "Stop the Steal" movement, these groups planned to contest the results of the certified United States Presidential Election of 2020.   The groups included the Oath Keepers, Three Percenters, and the Proud Boys, each of which is identified as an organized hate group by the Southern Poverty Law Center, and the latter two as terrorist entities by the Canadian government.

32.    Participants of the Stop the Steal protests congregated at the State Capitol building in the City every Saturday from November 7, 2020 through January 20, 2021, the days between Election Day and Inauguration Day. The Police Department maintains "primary jurisdiction and responsibility for law

enforcement within the City of Sacramento," according to its Memorandum of Understanding with other law enforcement agencies. The Police Department planned to and did maintain a significant presence at the rallies.

33.     White supremacists and organized hate groups attended these demonstrations clad in militia gear, armed with bear mace and knives, and brandished and/or used those weapons against community members. These groups harassed and assaulted community members who were not actively participating in any protest or demonstration, including unhoused people, bystanders, and passersby. It is widely reported that Proud Boys, when recruiting for members, require inductees to seek out and injure a person of color.

34.     While physically present, the Police Department neglected to intervene, promptly or at all, to prevent violence, intimidation, and injuries caused by these white supremacist groups. Again, Defendants' dereliction stands in stark contrast to Defendants' violent response to Plaintiffs and others participating in peaceful demonstrations at the George Floyd protests less than six months earlier.

35.     In light of the Police Department's failure to aid vulnerable Sacramento citizens, community leaders in support of racial justice began to organize to attend the demonstrations for a number of important reasons, including: (a) to observe, (b) to provide a counter-narrative to the white supremacist ideologies espoused by the Stop the Steal demonstrators (i.e. counter-protest), and/or (c) to render aid and provide protection to people who were impacted by the violence of the white supremacists.

36.     The City and Police Chief were silent in the beginning weeks of the Stop the Steal rallies. However, on December 7, 2020, after anti-racist activists began to observe and counter-demonstrate, the Police Chief released a video warning people against attending the protests. In the video, he indiscriminately characterized demonstrators as harmful and destructive.

37.     The Police Department simultaneously released a press release mischaracterizing people who attended to observe, aid, or counter the white supremacist groups as all part of "one group" intent on "inflicting violence upon each other and vandalism in our community."

38.     Later, the Police Chief would identify the "groups" participating as Proud Boys and the other as antifa (a long-standing political movement against fascism whose proponents are known to protest racism and support the Black Lives Matter movement, but which operate autonomously without a unified organization or hierarchal leadership structure). The use of the term "antifa" has been widely utilized as a

dog whistle to Trump-supporters and white supremacist ideologues who popularly villainize antifa as a political tactic.

39.     The Police Department also mischaracterized people wearing "Black Bloc" attire as especially dangerous. "Black Bloc" is a camouflaging technique that involves dressing in primarily black clothing and/or wearing protective gear such as masks. It emerged as a safety measure for racial justice protesters in the wake of the Police Department's indiscriminate use of force and surveillance.

40.     On January 6, 2021, a mob of primarily white rioters affiliated with the Proud Boys, Oath Keepers, and Three Percenters (a far right, anti-government militia) violently entered the United States Capitol in an attempt to prevent Congress from certifying the presidential election. Some participants of the "Stop the Steal" rallies in Sacramento also participated in the riot at the United States Capitol and were criminally charged by the federal government.

41.     During the Capitol uprising, five people died and hundreds were injured. Images emerged of some law enforcement interacting with white rioters rather than intervening.

42.     In light of the national attention, Sacramento City Council held a meeting where it invited the Police Department to defend its behavior with respect to the protests in Sacramento. Despite concerns from Sacramento residents about the presence of white supremacist groups and discriminatory policing, the Police Department continued to mischaracterize events and to vilify racial justice protesters.

## II.     CONSTITUTIONAL VIOLATIONS AT PROTESTS IN THE CITY OF SACRAMENTO FROM MAY 29, 2020 TO PRESENT DAY

43.     The Police Department has engaged in a pattern of unlawful conduct from May 2020 to present. It deployed brutal, excessive force against Plaintiffs and witnesses, including impact munitions, chemical weapons, batons, and harassment when they were expressing protected speech protesting police brutality and the racist institutions that safeguard it. Plaintiffs and witnesses also consistently experienced disparate treatment. The Police Department permitted white supremacist groups to pass freely through police lines or barricades, but significantly limited the movement of racial justice protesters.   The Police Department threatened Plaintiffs and witnesses with arrest and force, while permitting white supremacist groups to openly carry weapons such as knives and bear mace with no consequences. The Police Department passively observed violent attacks by white supremacist groups, but then arrested the

1  victims or did nothing at all.

2       **A.    May and June 2020**

3       44.    Throughout the months of May and June, hundreds to thousands of people marched and

4  chanted slogans for racial justice and a society free of police violence. Plaintiffs and witnesses attending

5  these protests describe largely peaceful crowds that the Police Department (and partner law enforcement

6  agencies) agitated and brutalized.

7            **1.    May 29, 2020**

8                 **a)    Mr. Aguilar**

9       45.    On or around the evening of May 29, 2020, Mr. Aguilar attended a protest wearing his

10  Brown Beret clothing. He arrived at the Police Department's Joseph E. Rooney Police Facility, where

11  protesters stood in front of the facility chanting. Mr. Aguilar later started to leave, walking with a small

12  group of protesters for safety. The crowd stopped to chant near a Highway 99 freeway entrance which was

13  blocked by a line of California Highway Patrol officers in full riot gear. Even though the crowd was

14  peaceful, the Police Department sent in reinforcements dressed in riot gear, wielding batons. The Police

15  Department and Highway Patrol formed a confrontation line and pushed against the crowd in an attempt to

16  kettle the protesters, a police tactic used to confine a crowd within a limited area. They fired tear gas

17  canisters into the air and shot pepper balls, bean bags, and foam-tipped bullets indiscriminately into the

18  crowd.

19       46.    Police Department officers beat people with batons and targeted others with pepper balls and

20  other impact munitions. Police Department officers enclosed demonstrators and continued to shoot

21  indiscriminately into the crowd.

22       47.    Police Department officers shot Mr. Aguilar with a beanbag round and a pepper ball round,

23  which left him with torn, open skin, bleeding, and severe bruising on his back.

24       48.    Mr. Aguilar also suffered and continues to endure psychological trauma as well. Because of

25  the Police Department's actions, he significantly decreased his participation in protests in Sacramento.

26                 **b)    Ms. Jones**

27       49.    In or around late afternoon on or about May 29, 2020, Ms. Jones attended a demonstration

28  for racial justice in front of the Sacramento County Jail. Ms. Jones recognized Police Department officers

who, working with the Sacramento County Sheriff's Department, used shields and various munitions, such as foam-tipped bullets, to confuse crowd participants and violently push people in two directions along I Street.

50.     Ms. Jones witnessed a Police Department officer, with his gun pointed toward a protest participant, rip a "Black Lives Matter" sign from the hands of a young transgender woman.

51.     Ms. Jones also witnessed the Police Department attack multiple other nonviolent protesters with excessive force, including deploying foam-tipped bullets aimed in close proximity at the heads and torsos of people into the crowd.

### c)     Mr. Kidd

52.     Mr. Kidd attended the protest at the Sacramento County Jail.  The protest was largely peaceful, but law enforcement officers pushed people aggressively until they had nowhere to go.   Police Department officers used their batons to repeatedly strike and push people.  One Police Department officer pushed Mr. Kidd with his baton so aggressively into a parked vehicle that Mr. Kidd fell up and over the car, dislocating his shoulder and aggravating a previous back injury, causing his back muscles to spasm painfully for weeks afterward.

### 2.     May 30, 2020

### a)     Ms. Zapata

53.     Concerned by accounts of the prior days' protests, Ms. Zapata attended a protest on or about May 30, 2020. She brought a first aid kit, which included bandages to attend to injuries from impact munitions, earplugs to protect against explosives, and milk to treat the effects of chemical irritants, all of which were tactics she heard the Police Department was using against racial justice protesters.

54.     Around sunset near the intersection of J Street and 21st Street, Ms. Zapata observed a peaceful crowd, with people holding each other's hands or holding their hands in the air. In response, Police Department officers held their guns toward the heads and torsos of protest participants.

55.     Without provocation, the Police Department suddenly moved in unison to push the group back, indiscriminately shooting impact munitions, and dispensed tear gas into the crowd.

56.     In the police-instigated chaos, Ms. Zapata attended to a woman bleeding from a head wound from an impact munition shot by the Police Department officers. The woman told Ms. Zapata that she was

too scared to go to the hospital for additional treatment because police officers injured her.

57.     Tear gas made it difficult for Ms. Zapata to breathe, see, or even walk. Her eyes burned and she coughed uncontrollably. The violence from the Police Department traumatized Ms. Zapata and made her feel unsafe protesting in Sacramento.

### b)     Ms. Jones

58.     On or about May 30, 2020 and/or in the early hours of May 31, 2020, Ms. Jones was notified that the Police Department shot her friend in the head with a tear gas canister and at least six foam-tipped bullets, near the intersection of 21st Street and J Street. Ms. Jones drove to the area, where she smelled tear gas and saw Police Department officers donning gas masks. The police were standing in a militarized fashion, heavily armed and armored, a distance from the crowd.

59.     As Ms. Jones approached the crowd, two Police Department officers called out Ms. Jones by name, making her feel targeted. Because she regularly attends protests in the City, Ms. Jones recognized Officer Radcliffe. He and other officers held guns in their hands even though the crowd was standing at least ten feet away, posing no threat.

60.     The Police Department shot a tear gas canister and foam-tipped bullets at a protester, who was standing near Ms. Jones holding a "Black Lives Matter" sign. When the active, hot tear gas canister ricocheted back toward the officers, the officers kicked it at Ms. Jones, who quickly kicked it away from herself.

61.     In retaliation, the Police Department immediately shot Ms. Jones with eleven foam-tipped bullets rounds. Five rounds dug into the front of Ms. Jones' body, five pummeled her back, and one hit her left hand.

62.     Ms. Jones could not breathe with the impact of the rounds. Chemical irritants stung her eyes. She suffered severe bruising and lacerations, including two large lacerations on her upper thigh. The bullet that hit Ms. Jones's left hand broke her middle finger in two places, caused deformity to her nail, and injured her index finger such that she cannot bend it.

### c)     Ms. Nash

63.     Ms. Nash attended a protest on or about May 30, 2020. Police Department officers present at the protest were dressed in riot gear, even though the marching participants were peaceful. After around

6:00 PM, Police Department officers formed a line to stop protesters from marching and cut off the march moments before firing chemical agents, pepper balls, and beanbags indiscriminately into the crowds, causing confusion and chaos. Ms. Nash suffered pain in her lungs from the chemical irritant and experienced difficulty breathing.

### 3. June 1, 2020

64. On June 1, 2020, the Sacramento City Council unanimously passed a resolution that imposed a curfew on the City, effective from 8pm to 5am.

65. The curfew order was discriminatorily-applied to Black and Brown people, unreasonably and excessively punished First Amendment activity, and banned innocuous movement throughout the entire city. It was also imposed without sufficient notice as residents were unaware of the order before it was enforced.

66. The City and its Police Department sought the assistance of members of the National Guard, which deployed five hundred troops in tactical gear and tanks, to join the Police Department in an intimidating display of state power.

#### a) Ms. Nash

67. On June 1, 2020, Ms. Nash attended a peaceful vigil for George Floyd in Sacramento at Cesar Chavez Plaza, wearing all black with a bandana over her face. The vigil involved performances and speeches made to express solidarity with the Black Lives Matter movement.

68. Ms. Nash witnessed the Police Department officers rush vigil participants as they attempted to disperse. Ms. Nash saw officers physically assault people who could not run fast enough to avoid them.

#### b) Mr. Kidd

69. Mr. Kidd also attended the vigil. A group of vigil participants kneeled before Police Department officers who had formed a menacing line. Mr. Kidd saw the police line, apparently acting on command, open fire onto the participants, including people still on their knees, aiming directly at their heads.

70. The Police Department's pepper ball rounds smashed into Mr. Kidd's torso and covered his jacket. Flash bang grenades ignited and exploded near his head and between his legs before he could

run away. Mr. Kidd lost hearing in his right ear for several weeks and still experiences sporadic hearing loss in this ear.

**B.   November 2020 to January 2021**

71.    The Police Department continued to demonstrate its pattern and practice of excessive force and discriminatory enforcement at protests during the fall and winter months, where Stop the Steal rallies brought white supremacist demonstrations to the City. Plaintiffs and witnesses observed the Police Department consistently react with violence against counter-protesters while allowing white supremacist groups to both demonstrate and inflict violence unhindered and unharmed.

**1.   November 7, 2020**

72.    On November 7, 2020, people gathered at the Capitol to celebrate the results of the 2020 Presidential election. Pro-Trump supporters, including white supremacists and organized hate groups, also rallied at the Capitol building to protest the election results.

**a)   Ms. Zapata**

73.    Plaintiff Zapata watched as Proud Boys rode in the beds of pickup trucks freely around the city. On a live-stream available on Oreo Express, recognized as an extremist online publication, Proud Boys members announced their intention to march to Cesar Chavez Park to search for people they would identify as "antifa."

74.    On this day, the Proud Boys members were clearly identified by press and bystanders as picking fights with people of color and people wearing black. For example, members of Proud Boys attacked a young Black passerby with no intervention from Sacramento Police Department. Nearby citizens as well as counter-protest participants attempted to extract him from the attack.

75.    Once out from the grasp of Proud Boy members, Sacramento Police Department arrested the Black passerby, the victim of the attack. The victim was seen bleeding heavily as officers arrested him.

76.     The police continued to arrest people wearing black or targeted by the Proud Boys, while members of the Proud Boys marched safely and without consequence back to the capitol.

**b)   Ms. Jones**

77.    Ms. Jones attended the post-election rally at the Capitol on November 7, 2020 to help

1    escort people safely to their cars. She saw law enforcement officers open a police line on or near L Street

2    and 10th Street to allow Proud Boys in a truck bed to exit the rally.

3        78.    Ms. Jones told Police Department officers that multiple pro-Trump protesters were armed

4    with guns, expressed concern that members of the organized white supremacist and hate groups were

5    targeting people trying to leave, and questioned why law enforcement permitted these hate groups to move

6    freely while others were not permitted to do so. The officer only responded with silence and a smile. By

7    contrast, in the following months, Ms. Jones saw police impound a truck full of racial justice protesters, and

8    stop and ticket a truck carrying Anti Police-Terror Project's sound system after an event.

9        79.    Throughout the series of Saturday events from November to January, Ms. Jones observed

10   police arresting racial justice protesters for being in the possession of pepper spray, even if they did not use

11   it. By contrast, Proud Boys used pepper spray in full view of Police Department officers, who were not

12   treated the same.

13                **2.    November 14, 2020**

14       80.    The first organized "Stop the Steal" rally took place in front of the Capitol building in

15   Sacramento on November 14, 2020.  A small group of people gathered to counter-protest.

16                **a)    Mr. Kidd**

17       81.    Mr. Kidd attended a counter-protest at the Capitol on November 14, 2020.  The Police

18   Department allowed a group of Proud Boys through a police barrier.  Mr. Kidd and the demonstrators

19   near him formed a line to protect themselves. However, one of the men from the Proud Boys kicked Mr.

20   Kidd in the chest twice.  When the Proud Boy attempted to kick Mr. Kidd a third time, Mr. Kidd tried to

21   block the Proud Boy's foot with his hands.  In response to Mr. Kidd's defense, several other Proud Boys

22   charged at and assaulted Mr. Kidd, punched him, kicked him, and removed his gas mask to fill it with bear

23   mace, which is well-known to be three times as potent as standard pepper spray. Other Proud Boys chanted

24   nearby to hang him from a tree like a Christmas ornament.

25       82.    The attack occurred in full view of Police Department officers, who did nothing to intervene.

26   Despite screams from crowd members that Mr. Kidd needed help, the police continued to do nothing until a

27   counter-protester aimed pepper spray at the Proud Boys in an effort to defend himself and others.  The police

28   then immediately reacted, but did not offer any assistance to Mr. Kidd, nor detain or arrest the Proud Boys

1  for the assault.

2  83.    Mr. Kidd sustained a number of injuries from the attack. His attackers dislocated his

3  shoulder. He could not lift or manipulate his arm and shoulder for days. Mr. Kidd also had bruises and

4  contusions. Mr. Kidd suffered burning eyes and loss of vision from the bear mace. He had difficulty

5  breathing, and his skin burned and swelled for days. Mr. Kidd lives with a post-traumatic stress response

6  whenever he sees a law enforcement officer. Mr. Kidd's shoulder continues to dislocate easily.

7  84.    Police Department officers chose to do nothing when racial justice protesters were harmed by

8  organized white supremacists in the officers' full view.

9  85.    In one instance members of Proud Boys encircled racial justice protesters and pushed a

10  woman. Police Department officers observed but did not intervene.

11  86.    Police Department officers watched passively as the Proud Boys sprayed counter-protesters

12  with chemicals, and only intervened when counter-protesters attempted to defend themselves and allowed

13  Proud Boys to slip back into the crowd without consequence.

14  87.    In another instance, Sacramento police allowed Proud Boys members to move in and out of

15  the protest barricades freely (even as the members made statements of intending to harm "antifa") while

16  significantly restricting counter-protester movement.

17  88.    At or around 2:00 pm, Proud Boys approached counter demonstrators and instigated a fight.

18  The police officers did not act until the Proud Boys began to retreat from the counter demonstrators after

19  beating and spraying the demonstrators.

20  **3.    November 21, 2020**

21  89.    Another organized "Stop the Steal" rally occurred on November 21, 2020 at the Capitol

22  building in Sacramento.  People supporting racial justice gathered to counter-protest.

23  **a)    Mr. Kidd**

24  90.    Mr. Kidd attended the Stop the Steal rally on or around November 21, 2020. As a white man

25  dressed in western wear, his treatment from law enforcement and organized hate groups was much different

26  than the week before when he was dressed in black.

27  91.    Mr. Kidd was permitted to walk uninterrupted through the police  barricades  to  join  the

28  rally,  where  law  enforcement  officers  exchanged  friendly conversation and words of affirmation with

1   people clearly identified as Proud Boys.

2        92.    Members of the organized hate groups carried large cans of bear mace and big knives on

3   their waists, and several people had obvious outlines of firearms beneath their outerwear.

4        93.    One or more rally participants declared that Mr. Kidd was associated with "antifa" or "Black

5   Lives Matter." The crowd swarmed around him, threatened him, and asked the Police Department to escort

6   him out of the rally.

7        94.    The Police Department made room for and allowed the group to expel Mr. Kidd from the

8   rally, even though Mr. Kidd had been peaceful.  Police officers refused to permit him to re-enter.

9                          **b)    Ms. Zapata**

10       95.    Ms. Zapata witnessed a group of Proud Boys break police barriers in full view of, and

11  without repercussion from, the Police Department or other law enforcement officers.

12       96.    The Proud Boys then began marching from the Capitol toward Cesar Chavez Plaza, which

13  the Proud Boys stated they believed to be an "antifa" site.

14       97.    Proud Boys in Cesar Chavez Plaza taunted and assaulted people of color and any person in

15  black clothing. One bystander tried to intervene and protect a person the Proud Boys were assaulting.

16       98.    The Police Department arrested the bystander, instead of the Proud Boys aggressor.

17  Ms. Zapata observed the same pattern occur throughout the day:  Police Department officers arrested or

18  admonished the victims of the violence instead of the Proud Boys, and were significantly more forceful

19  with counter-protesters than with the Proud Boys.

20       99.    Ms. Zapata witnessed members of Proud Boys run up to people demonstrating for racial

21  justice while yelling threats and throwing objects, and then retreat behind police lines.

22       100.   Ms. Zapata walked back to her vehicle after a demonstration with other racial justice

23  demonstrators. The group of them feared that the combination of members of Proud Boys and the

24  Sacramento Police would be dangerous, where they would be beaten by the former and arrested by the

25  latter. When Ms. Zapata and others arrived at their cars, Proud Boys members were waiting. The Proud

26  Boys began throwing bottles and rocks at Ms. Zapata and other racial justice demonstrators.

27       101.   Once again, Sacramento Police Department officers threatened to arrest the racial justice

28  protesters rather than intervening or offering any protection.

*White v. Sacramento*, No. 2:21-cv-02211-JAM-DB
Second Amended Complaint - 18

102.    Ms. Zapata also witnessed Sacramento Police Department write down license plate information of the racial justice protesters and take down no comparable notes of the Proud Boys who were assaulting and harassing them.

103.    During this Stop the Steal Protest members of the Proud Boys created a circle around one counter-protester. The Proud Boys kicked, punched and beat the person with the pole of an American flag.

104.    Police officers arrested the counter-protester.

### c)    Ms. White

105.    On November 21, 2021, Ms. White was handing out winter clothing to unhoused persons in Cesar Chavez Plaza when she saw a group that appeared to be part of the Proud Boys attack and beat a woman.  The woman was carrying Black Lives Matter and Gay Pride flags.  The attack occurred in full view of Police Department officers, who did not intervene.

106.    Seeing the officers do nothing, Ms. White attempted to assist the woman by providing her cover. Rather than stop the attack, a Police Department officer rushed toward Ms. White and the woman she was trying to aid, violently grabbed and tossed Ms. White with such force that it caused bruising, and threatened to arrest Ms. White if she did not immediately leave the area.

107.    The same day, Ms. White witnessed an individual wearing a Proud Boys shirt attack a medical volunteer, a man wearing a hat with a first-aid sign and carrying medical supplies.  Ms. White attempted to de-escalate the situation, and the man in the Proud Boys shirt shoved her.

108.    Again, the incident took place in full view of Police Department officers who did nothing to assist.

109.    Members of the Proud Boys sprayed another person with bear mace in her face. The person visibly suffered from intense burning and had trouble breathing.

110.    The incident took place in full view of officers from the Sacramento Police Department. The officers did not react, intervene, or take any specific actions to stop the white supremacist group from attacking others. The officers provided no assistance to the person that had been maced.

### 4.    December 5, 2020

111.    On December 5, Bike Unit Police Department officers followed, encircled, and verbally harassed racial justice protesters, even after the protest had ended.

1

      **5.**     **December 12, 2020**

2

      **a)**     **Ms. White**

3      112.    Ms. White was present at the counter-protests on December 12, 2020. While Ms. White was

4  attempting to leave the area (with her hands up), a Police Department officer bearing badge number 684

5  shoved her in the back and hit her with his bicycle. This brutal force caused Ms. White to stumble and

6  suffer severe bruising as well as lasting hip and knee pain, which continue to this day.

7

      **6.**     **December 19, 2020**

8      113.    Another weekly "Stop the Steal" rally occurred on December 19, 2020, as well as a counter-

9  protest.

10

      **a)**     **Mr. Kidd**

11      114.    On December 19, 2020, the Police Department swarmed and arrested Mr. Kidd as he was

12  leaving a demonstration. The officers accused Mr. Kidd of throwing a water bottle at a law enforcement

13  officer, and falsely stated they had video footage of him.

14      115.    When Mr. Kidd inquired further, an officer made disparaging remarks to Mr. Kidd, who is

15  white, about wearing all black clothing, suggesting the officers targeted him for wearing black.

16      116.    The Police Department officers who arrested Mr. Kidd handcuffed him so tightly that he

17  could not feel his hands for hours. The tight handcuffing also aggravated his shoulder injury from the prior

18  assault by a Proud Boy, and left marks on his wrists.

19      117.    When the Police Department admitted there was no evidence of the alleged crime, they

20  released Mr. Kidd with a certification identifying him as "exonerated." The Police Department

21  officers escorted Mr. Kidd out of the station without his shoes or property.

22      118.    Mr. Kidd asked the police to apologize for detaining him without evidence, but the officer

23  only repeated that Mr. Kidd was the one who made the mistake of wearing all black.

24      119.    Mr. Kidd has epilepsy. Because of his epilepsy and the seizures that he experiences as a result, Mr.

25  Kidd cannot drive and has significant difficulty working. When Mr. Kidd reported that he had epilepsy and could

26  not drive, the Police Department left him at a gas station near the police station without access to a phone to call

27  anyone for transportation home. Without a means for transportation, Mr. Kidd eventually walked alone for hours

28  through the night to his nearest friend's home. While at the gas station, contemplating what to do, a group of

Police Department officers swarmed him again, further harassing him before he showed them his papers indicating his release.

### 7.    December 26, 2020

120.    On or about December 26, 2020, Ms. White observed a racial justice event with other community members near R Street and 13th Street in Sacramento.  During the event, a Sacramento police officer knocked a legal observer, who was easily identifiable by wearing a neon green hat, to the ground.

121.    After witnessing this, Ms. White called out to the police to ask for help.  Rather than helping, a member of the Police Department hit Ms. White with his baton several times and struck her with his Police Department-issued bicycle.

122.    The attack caused severe bruising on Ms. White's shoulder and exacerbated a previously-existing foot injury.  Ms. White missed work and could not raise her arm for weeks due to the shoulder injury.

### 8.    December 31, 2020

123.    On December 31, 2020, protesters gathered outside the Sacramento County Jail in solidarity with incarcerated people.  Police officers assaulted peaceful protesters who had fallen on the ground and sprayed them with mace.  One officer shoved a protester filming the misconduct with a bicycle while another pepper sprayed her.

### 9.    January 6, 2021

124.    On January 6, 2021 Proud Boys, white supremacists, and other right-wing protesters gathered at the Sacramento Capitol building.

125.    Police Department officers, identifiable by their uniform patches and emblems on their cars, surveilled the streets where racial justice protesters were gathering. Officers took pictures of people, cars, and license plates. Officers did not seem do the same for the crowd of white supremacists, Proud Boys, and right-wing supporters, even though they were a larger percentage of the crowd and had a history of violence and intimidation.

126.    At a protest, a group of Proud Boys threatened and assaulted racial justice counter-protesters, while Police Department officers did nothing.

127.    For example, a group of racial justice protesters attempted to attend an event at the state

1    Capitol. But the Police Department officers prevented them from nearing the Capitol grounds. When

2    members of the Proud Boys began to follow the racial justice protesters as they walked away, Police

3    Department officers aided the Proud Boys by kettling the racial justice protesters [location].

4           128.    Proud Boys, taking advantage of this formation, began to throw objects and harass the

5    protesters.

6           129.    That day, Police Department officers arrested at least one racial justice protester for carrying

7    a small aerosol can of bear spray, which was clearly in compliance with Penal Code 12403.7, prohibiting

8    possession of more than 2.5 ounces.

9           130.    The Police Department handcuffed the racial justice protester and walked her into an area

10   gathered by members of Proud Boys and other organized white supremacist groups.

11          131.    The racial justice protester was handcuffed for over an hour.

12          132.    During that time, members of the white supremacist groups called her racial slurs and threw

13   objects such as pens and water bottles at her.

14          133.    The Police Department did not address or stop the Proud Boys' behavior, thus enabling their

15   conduct, humiliating and allowing the racial justice protester to be harmed.

16                          **10.     January 22, 2021**

17          134.    On or about January 22, 2021, Ms. White observed a counter-protest near L Street and 10th

18   Street in Sacramento.  The Police Department kettled a small group of counter-protesters with a much larger

19   group of individuals who appeared to be associated with the Proud Boys and white supremacist groups.

20          135.    While in the kettle, one such person punched a counter-protester in the face.

21          136.    Ms. White attempted to assist the victim, but a Police Department officer sprayed the victim

22   and Ms. White with a chemical agent (including in Ms. White's eyes) which caused her severe pain.

23          137.    By kettling the small group of racial justice protesters with the Proud Boys and white

24   supremacist, the police aided the Proud Boys' violence against the racial justice protesters.

25   **III.    DEFENDANTS USE SURVEILLANCE AND/OR RAIDS TO HARASS AND TRACK**

26          **RACIAL JUSTICE PROTESTERS IN THE CITY OF SACRAMENTO.**

27          138.    Plaintiffs have experienced a threatening and unlawful level of surveillance after

28   participating in racial justice protests, which has created an environment of fear and intimidation. On

1   information and belief, no similar raids or surveillance tactics were exacted upon people of organized

2   white supremacist groups.

3         **A.**    **Ms. Zapata**

4         139.     After Ms. Zapata participated in protests, the Police Department and its mutual aid agencies

5   began surveilling her. In May 2021, Ms. Zapata learned from her neighbor that the Police Department had

6   tried to search her home. Police Department officers told her neighbor that someone from the house had

7   made a 911 call, but no one was home at the time. Ms. Zapata had recently provided space for racial justice

8   protesters to meet in her home and believes the Police Department officers visited her home to intimidate

9   her.

10         140.     Ms. Zapata has also been a target of heavy aerial surveillance facilitated by aircrafts and

11   unmanned aerial vehicles (or drones). She began to notice them after her participation in the George Floyd

12   uprisings, and has noticed their increased presence after participating in the counter demonstrations. Her

13   family members and friends have seen the drones hovering after her for hours, creating intense fear and

14   feelings of paranoia. On September 4, 2021, in or near Natomas, California, Ms. Zapata borrowed a drone

15   from a friend to obtain a closer view of one of the drones that has followed her. Within minutes, the Police

16   Department approached near her in a police vehicle.

17         141.     In addition to persistent drone surveillance, after the George Floyd protests, Ms. Zapata

18   noticed Police Department vehicles near her home, occasionally following her. The Police Department's

19   marked vehicles trailed Ms. Zapata in her vehicle, even though she drove lawfully. Ms. Zapata's mother

20   also noticed an increased number of Police Department vehicles when she drove Ms. Zapata's car.

21         142.     Because of the surveillance, Ms. Zapata feels that she, her friends, and her family are unsafe.

22   The surveillance substantially decreased Ms. Zapata's protest activity and has caused her to feel that she had

23   to stop protesting altogether.

24         **B.**    **Ms. Nash**

25         143.     Ms. Nash has often observed the Police Department's drones at the protests she attends. In

26   one instance, Ms. Nash saw a Police Department drone following her as she gave a friend a ride to their

27   home after attending a protest. Whenever Ms. Nash gestured towards the drone, it attempted to hide. The

28   drone stopped following Ms. Nash once she reached the Sacramento city limits.

144.    On another occasion, during a protest in September 2020, Police Department officers approached Ms. Nash's vehicle, audibly read her license plate number, and wrote it down.

145.    On or about January 20, 2021, Ms. Nash was riding home when she and her companion were pulled over by Police Department officers. Officers approached the car with guns drawn. Ms. Nash and her companion were each detained in the back of a police car while the car was searched. A Police Department officer said to Ms. Nash: "This is what accountability looks like."

146.    On another occasion, on or about March 28, 2020, Ms. Nash was peacefully protesting and overheard the Police Department explain what clothing she was wearing into a two-way radio or similar communication device.

147.    Ms. Nash and other racial justice protesters have also been followed by Police Department officers all the way to their homes.  Ms. Nash has become so frightened by the constant surveillance that she has stopped driving to protests.

**C.    Mr. Kidd**

148.    Mr. Kidd was followed by a drone after being swarmed by police at a Solidarity with Kenosha rally.

149.    Mr. Kidd has also experienced a much larger number of Elk Grove police parked on the street where he lives. Prior to his participation in protests, he had not observed Elk Grove police on his street. Documents from Public Records Act requests show that Elk Grove is one of the departments that participated in policing protests at the request of the Sacramento Police Department.

**D.    Mr. Aguilar**

150.    Mr. Aguilar decreased his participation in protests after his traumatizing experience on June 2, 2020 but the Police Department still followed him.

151.    Mr. Aguilar lives in a small town and is familiar with the cars of other residents, but has noticed cars he does not recognize parked around his residence and occasionally following him.

152.    On November 12, 2020, Police Department officers raided Mr. Aguilar's home and arrested him while his family was present. Approximately sixty Sacramento police officers, including SWAT units in tactical gear, gang units, and investigators, swarmed the house. Over the radio, the police said they had a warrant for Mr. Aguilar's arrest.  Mr. Aguilar repeatedly asked to see the warrant, but police refused to

come to the door.

153.    Mr. Aguilar peacefully exited his home to multiple police officers with their guns drawn at him. They forced him to get on his knees, and handcuffed him.  Police then handcuffed Mr. Aguilar's entire family, including his three-months pregnant wife, his elderly mother who lives with chronic pain conditions, and his father who has severe arthritis, with zip ties.  The police trashed Mr. Aguilar's home and searched through Mr. Aguilar's wife's undergarments.

154.    The Police Department extensively questioned Mr. Aguilar about his political ideologies and connection to the Brown Berets. The Police Department officers then took him to a police car, arrested him, and accused him of kicking an officer during a protest months prior. Mr. Aguilar was booked at the station and not given any additional information.

155.    Mr. Aguilar and his family suffered emotional and psychological harm from the raid. Mr. Aguilar's wife sought medical treatment for fear that she might miscarry. She also sought treatment for the psychological harm and continues to see a therapist to this day. Mr. Aguilar's mother sought medical treatment for severe injuries. Mr. Aguilar sought out mental health treatment for the trauma he experienced. He and his family continue to feel insecure and unsafe in their home and community.

156.    Mr. Aguilar stopped his protesting activity after the raid.

## IV.    THE PSYCHOLOGICAL IMPACT OF DEFENDANTS TARGETING RACIAL JUSTICE PROTESTERS HAS A PROFOUND CHILLING EFFECT.

157.    Multiple Plaintiffs have serious psychological consequences from the Police Department's actions.

158.    The Sacramento Police Department's treatment of Ms. Zapata and other racial justice protesters has had a significant impact on her mental health.  She frequently threw up after protests and is not sleeping or eating well. Ms. Zapata has a heightened fear of police and fears attending future protests.

159.    Ms. White has suffered significant emotional distress.  She feels exhausted, experiences nightmares, and feels unsafe in her own home. She struggles to eat and experiences flashbulb memories that can be debilitating.  She experiences anxiety, shock, and insomnia to this day.

160.    Ms. Nash experiences anxiety and post-traumatic stress because of the police violence she witnessed and experienced. Loud bangs or loud footsteps cause her anxiety even when she is at

home in her own apartment. Seeing Police Department vehicles or officers on bicycles likewise causes her anxiety and fear. She has anxiety visiting friends and constantly worries she is putting her friends at risk.

161.    Ms. Jones experienced significant psychological harm from the Police Department violence that took place from May 2020 through January 2021. Her relationship with her home city of Sacramento has permanently changed and she no longer feels safe. The physical injuries she endured were so painful that she was unable to have physical contact with loved ones for weeks, which had a tremendous impact on her well-being. Ms. Jones struggles to process the overwhelming sense that the government is willing to enact violence on people for participating in a racial justice protest.

162.    Mr. Kidd has been both physically and mentally affected by police violence. Mr. Kidd is constantly on edge, which is exacerbated if he sees a police building, car, or officer. He has trouble sleeping. Because the police expressed so much interest in his mobile phone in December, Mr. Kidd rarely carries his mobile phone with him in public. He is constantly afraid that police will recognize him and retaliate in some way. Mr. Kidd usually travels on foot, as he does not drive due to his epilepsy, and feels especially vulnerable without the protection of a car.

163.    Mr. Aguilar has been both physically and mentally affected by police violence. Being kettled and shot with impact munitions by Police Department officers was traumatizing and prevented Mr. Aguilar from participating in other racial justice protests. Mr. Aguilar also suffered physical harm during the raid; he continues to suffer circulation problems in his hands and arms. He also suffered psychological and emotional harm. He has been diagnosed with Post-Traumatic Stress Disorder (PTSD). He has had trouble concentrating at work and suffers from insomnia and nightmares. He also experiences depression.

## V.    DEFENDANT SACRAMENTO POLICE DEPARTMENT CONSPIRED WITH ORGANIZED HATE GROUPS TO HARM, INTIMIDATE, AND SUPRESS EXPRESSIONS OF LAWFUL SPEECH

164.    It is a tactic, recognized by the Federal Bureau of Investigations, for white supremacists and organized hate groups to infiltrate law enforcement agencies or to recruit law enforcement personnel. This type of infiltration of has a long-recognized and painful history in the United States and in California (e.g. A Fresno Police Officer was recently ousted for participating in the Sacramento Stop the Steal protests

wearing Proud Boys insignia). The coordination of hate groups and law enforcement was, in fact, one principal reason in prompting the enactment of 42 U.S.C. § 1983, to protect against conspiracies between local law enforcement and private individuals.

165.    In reports, the Department refers to members of Proud Boys as "security" for protest events, inferring a level of coordination between the Department and the hate group.

166.    One former Proud Boys member reported to a local publication that he was in direct communication with the Department throughout the protest events he attended in the City and alleged that some law enforcement officers even joined the Proud Boys membership.

167.    The Proud Boys are also recognized for their anti-government positions. Nevertheless, in body worn camera footage, Proud Boys members can be heard telling Department officers, "we've got your back." This dynamic, one of showcasing understanding, ideological alignment, or coordination played out over and again during the incidents detailed in the complaint herein.

168.    On countless occasions Plaintiffs, other racial justice protesters and members of the press have witnessed the Police Department show particular favor to members of organized hate groups. This favoritism by the Police Department supposes an established, pre-existing relationship with members of hate groups and includes protection of these hate groups when such groups have enacted violence against racial justice protesters and bystanders. The Department has permitted, and in some cases facilitated, such violence against Plaintiffs.

169.    The Department publicly adopted a false narrative proffered by the organized hate groups themselves, that racial justice demonstrators—or anyone who disagrees with the Proud Boys--are members of "antifa" who are dangerous, intend to be violent, or support violence. The Department adopted this narrative and constructed a simplistic dichotomy for the public by referring to protest participants as part of one of two sides: Proud Boys versus "antifa." The Department failed to exercise independent judgement from the organized hate group's portrayal.

170.    In reality, many racial justice protesters, some who wear Black Bloc as a safety measure in large part due to the police violence and surveillance they endured by the Department during racial justice protests, do not identify as "antifa."

171.    The Department also, in equating the two sides, obscured the distinction that the Proud Boys

are an internationally recognized hate group—including terrorist designations in at least two countries—with history of targeted racialized violence in the City of Sacramento, while the same is not true of Plaintiffs and other racial justice groups. There is also no comparably recognized hate or terrorist group classification of "antifa."

## VI.   DEFENDANTS COORDINATE WITH OTHER LAW ENFORCEMENT AGENCIES TO SUPPRESS LAWFUL SPEECH

172.   Defendants regularly request crowd control support from other law enforcement agencies, which Deputy Chief Lester acknowledged during the January 19, 2021 City Council meeting.     The support includes officers and resources from Sacramento County Sheriff's Department and the California Highway Patrol. These agencies have aligned themselves with white supremacist groups and against racial justice protesters in recent years

173.   In connection with a June 26, 2016 white nationalist event at the state Capitol, California Highway Patrol investigator Donovan Ayres recommended that a Black journalist, who had been hospitalized after being stabbed three times by neo-Nazi demonstrators, be charged on eleven counts including disturbing the peace, unlawful assembly, and assault. By contrast, affiliates of a neo-Nazi group, including some that carried knives onto capitol grounds, were never charged.

174.   In 2020, California Highway Patrol officers used aerial surveillance to track people who participated in the racial justice protests of the George Floyd uprisings, capturing images of people as they demonstrated as well as tracking people before they entered and after they left the protest areas.  The Highway Patrol tracked people throughout California, including in Sacramento, but did not use the same heavy surveillance tactics of protests organized by white supremacist or right-wing groups the same year.

175.   Similarly, in or around August 2020, Sacramento Sheriff Scott Jones held a press conference where he called anti-racist demonstrators protesting the death of Jacob Blake an "attempted insurrection."  Sherriff Jones pointed fingers at antifa, claiming that it was armed with an "endless supply of tools of destruction," "advanced communication," and "intelligence."  In the days of this alarmist rhetoric, law enforcement targeted racial justice protesters with brutal force, arrest, and harassment.

176.   Yet, national media revealed that several Sacramento deputy sheriffs took part in the January 6, 2021 deadly riot at the nation's Capitol.  Rather than condemn the behavior Sherriff Jones stated

that he had to "be a little careful from a leadership perspective with trying to quell someone's First Amendment rights."

## VI.   DEFENDANTS EXHIBIT A PATTERN OF DISCRIMINATING AGAINST RACIAL JUSTICE PROTESTERS

177.   Beyond the months-long misconduct cataloged herein, Defendants have a demonstrated pattern, practice, and/or custom, whether official or unofficial, of using unconstitutional tactics in response to racial justice, anti-police brutality protests.

178.   The March 4, 2019 protest for Stephon Clark shows the Police Department's animosity towards people demanding justice for the police killings of unarmed Black men. Police Department officers corralled, kettled, and trapped individuals on a highway overpass. The Police Department declared an unlawful assembly and used unconstitutional force to detain and arrest 84 protesters, including several members of the press and clergy.

179.   As evidenced through statements of City Councilmembers and the Mayor, the pattern of disparate policing continued in 2020 and 2021. On December 15, 2020, Councilmember Katie Valenzuela stated she had seen videos "that really bother me showing behaviors of the Sacramento Police Department toward counter-protesters, toward the press that would be pretty unacceptable if those videos turn out to be accurate[.]"

180.   On January 19, 2021, Councilmember Mai Vang questioned whether policing tactics were being equally deployed against right-wing, white supremacist groups compared to racial justice, anti-police brutality protesters. Councilmember Vang had previously indicated "it did not appear that police tactics were applied equally to different demonstrations this year."

181.   Also in January 2021, Mayor Steinberg acknowledged "growing concerns that police have treated white supremacists more favorably than counter-protesters during recent confrontations downtown, and also more favorably than those who participated in the largely peaceful protests against police brutality over the summer."

182.   In light of the concerns and community outrage, City Council called on the Police Chief and Deputy Chief Lester to testify at a January 19, 2021 City Council meeting. Sacramento residents attended the meeting and expressed concern about the Police Department's repression of speech. Many residents

wrote-in or waited hours to vocalize their concerns by phone, including persons who stated they "repeatedly observed Sac PD intentionally giving cover to the proud boys gang," that there were "more arrests and assaults on BLM protesters while police are treating Trump supporters, white supremacist groups, anti-maskers, etc. with more care and civility," and that "BLM protesters are treated very differently (more aggressive, sometimes violent treatment) than Proud Boy type protesters by police."

183.    Mirroring the response to the March 2019 protest, then-Police Chief Hahn and then-Deputy Police Chief Lester gave no assurances as to how any harmful practices would change in the future. Instead, the Police Chief claimed counter-demonstrators "seem to want to destroy our form of government altogether," and Deputy Chief Lester characterized all counter-demonstrators as "a gathering of various local social groups that support the antifa ideology, and utilize Black Bloc tactics."

184.    Statistical evidence confirms that, over decades, the Police Department has targeted the people racial justice movements seek to protect. The report of a Racial Profiling Commission issued in or around 2000 indicated that Sacramento City Police Officers were twice as likely to pull over Black motorists as other motorists. Two decades later, the Center for Policing Equity released a report indicating that for the years 2014 to 2019, the Police Department is 4.5 times more likely to commit acts of force against Black people and Black residents make up nearly forty percent of the Police Department's traffic stops, despite comprising only thirteen percent of the City's population. The Police Chief admitted he was not surprised by these "disparities."

185.    In 2020, a Sacramento City Grand Jury report attributed "allegations of racial animus" to a dramatic decline in the public perception of the Police Department, and identified the allegation as a critical factor in the Police Department's inability to recruit new staff.

186.    The Police Department's pattern, practice, and/or unofficial custom of discriminatory and violent policing is further evident in the multiple lawsuits recently brought against the Police Department. The City of Sacramento previously settled a lawsuit based on conduct strikingly similar to that alleged in this Complaint. In *Coburn v. City of Sacramento*, E.D. Cal. Case No. 2:19-cv-00888-TLN-AC, the City and the Police Department agreed to pay a $500,000 settlement in a civil rights action arising out of constitutional violations committed during the protests following the killing of Stephon

1    Clark. The Police Department also partially settled a lawsuit for over $2 million arising out of Clark's death.

2    *Clark v. City of Sacramento*, No.5      2:19-cv-00171-JAM-EFB (E.D. Cal.).

3         187.    The Police Department has settled multiple other lawsuits in the last few years alone.

4    *See, e.g.*, *Cain v. City of Sacramento*, E.D. Cal. Case No. 2:17-cv-00848-JAM-DB (lawsuit settled  for

5    $550,000 alleging that a police officer grabbed, tackled, and punched a man for jaywalking on April

6    10, 2017); *Hernandez v. City of Sacramento*, E.D. Cal. Case No. 2:17-cv-02311-JAM-DB (lawsuit settled

7    for $5,200,000 alleging police tased, beat, and pinned a man to the ground until he asphyxiated to the point

8    of coma); *Mann v. City of Sacramento*, E.D. Cal. Case No. 2:16-cv-01847-WBS-DB (lawsuit settled for

9    $719,000 where mentally-ill man shot to death); *Namoca v. City of Sacramento*, E.D. Cal. Case No. 2:16-

10   cv-02283-TLN-EFB (lawsuit settled for $40,000 alleging  that  two  police  officers  tackled  a  minor

11   without  lawful  justification  and dislocated his shoulder); *Thompson v. City of Sacramento*, E.D. Cal.

12   Case No. 2:18-cv-00806-KJM-D (lawsuit settled alleging that a police officer slammed a woman's face

13   multiple times into a patrol vehicle, breaking her nose and the orbital socket around her eye); *Halcomb*

14   *v. City of Sacramento*, E.D. Cal. Case No. 2:14-cv-02796-MCE-DB (lawsuit settled for $220,000 involving

15   alleged use of excessive and unreasonable force).

16   **V.      DEFENDANTS' UNCONSTITUTIONAL POLICIES FURTHER SUPPORT UNLAWFUL**

17   **PATTERNS AND PRACTICES**

18        188.    Defendants City, Police Department, and/or Police Chief possess final policy-making

19   authority under state law and the Police Department's General Orders. See Cal. Gov. Code § 38630(a);

20   General Orders, Sacramento Police Department, available at

21   https://www.cityofsacramento.org/Police/Transparency/General-Orders.

22        189.    Defendants Does 1 to 200 acted or purported to act under the color of state law.

23        190.    Defendants City, Police Department, and Police Chief ratified the conduct of Does 1 to 200.

24        191.    Defendants' policies and/or informal customs and practices precipitated the

25   constitutional violations alleged in this action.

26        192.    The policies that led to Plaintiffs' injuries are found in the Police Department's General

27   Orders and Manuals, which constitute the official policies of the Police Department and the City.

28

193.    The Police Department Reference Manual 532.11, titled "Crowd & Riot Control Manual" (the "Crowd Manual"), permits officers to use crowd dispersal techniques even if police only "anticipate" resistance or that arrests will occur. The Defendants have not updated the Crowd Manual since December 1998, and though it references a corresponding General Order (532.11), no such implementing order exists. The Crowd Manual is attached hereto as Exhibit 1 and contains a number of problematic, unconstitutional polices.

194.    For example, the Crowd Manual instructs officers to "never underestimate . . . rioters" and gives police free reign to make "selective" arrests to gain a "psychological and tactical advantage." The Crowd Manual provides no guidance regarding how to "anticipate" resistance or the number of arrests.

195.    The Crowd Manual further states that "[p]rompt and decisive action to an impending disturbance or existing civil disorder is essential to a successful police operation," and that a "spontaneous event has the potential of escalating . . . to major riot situations." "Spontaneous event" is defined to include "First Amendment Right activities." No meaningful guidelines (or limitations on discretion) are set forth in the Crowd Manual.

196.    The Crowd Manual also contains disturbing instructions with respect to "strategies to control a crowd." The Crowd Manual instructs officers to "[i]solate the crowd," make a "[s]how of force," engage in "[s]elective/[m]ultiple arrests," and order dispersal.

197.    The Crowd Manual encourages officers to make arrests to gain an advantage even if a crowd "although unlawful, is not openly violent[.]"

198.    The Crowd Manual encourages officers to make arrests of individuals in a non-violent crowd as an "effective" crowd control technique.

199.    The Crowd Manual boasts that one "main objective" is a "show of force," noting that "the appearance of a competent, organized and highly disciplined contingent of officers" will "often" cause participants "to become so disheartened" that they "abandon" their activities. The Crowd Manual specifically instructs officers to "take advantage of the element of surprise."

200.    The Crowd Manual permits use of the police baton "where deadly force is not required" and even praises the baton as a "primary weapon" that provides officers with "greater confidence" in crowd

control. The Crowd Manual states that there are "several" and a "number" of techniques which an officer may use when "discomfort or pain compliance is appropriate."

201.    Tellingly, the Crowd Manual instructs team members to "guard against any appearance of favoritism or bias." (Emphasis added.)   It does not instruct team members to actually act in a non-biased way.

202.    The Crowd Manual further provides that police officers are free to use chemical agents after "consider[ing]" a vague list of "factors," including "tactical capabilities," crowd conditions," "weather conditions," and "environmental hazards." There is no prohibition on using chemical agents on non-violent demonstrators and no meaningful restrictions cabining discretion with respect to chemical agents.

203.    The Police Department Reference Manual 580.07, titled "Chemical Agent Manual" (the "Chemical    Manual,"    available    at    https://www.cityofsacramento.org/-/media/Corporate/Files/Police/Transparency/RMs/RM-58007-Chemical-Agents-22619-redacted.pdf?la=en), states only that "[p]lans to deploy chemical munitions must be based on the tactical situation and Police Department policy," and that chemical agents "shall be used with caution[.]"

204.    The Police Department claims to have been drafting a First Amendment Assembly Manual, which is supposedly meant to replace the current Crowd Manual, for the last seven years (since at least 2014).

205.    The Police Department's General Order 580.12 provides that "less lethal" weapons may be used in any manner "consistent with Police Department policy and training guidelines," and whenever "specific information reasonably indicates the potential for the system's use."

206.    Force may even be deployed against pregnant people, young children, and the elderly where "necessary and reasonable under the circumstances." Likewise, the "head, neck, spine, heart and groin" may be targeted where "threat and circumstances justify their use." Announcement prior to use of less lethal force is only required when "practical."

207.    General Order 580.02 defines projectile weapons such as pepper balls, beanbag rounds, and foam projectiles fired by officers at persons to be "Less Lethal Force." Yet, such projectile weapons have the ability to severely injure, permanently disable, or even kill targets.

208.     The Police Department also maintains an "Arrest of Passive Resisters Manual." (the "Arrest Manual," available at http://www.cityofsacramento.org/-/media/Corporate/Files/Police/Transparency/RMs/RM-52309-Passive-Resisters-as-of-0397.pdf). Even during "peaceful demonstrations," the Arrest Manual instructs officers to "increase [physical] pressure" if faced with undefined "resistance," and directs officers to use methods such as a "[c]hinlock to rear wristlock," a "[c]rossface takedown to prone control," a "[h]air pull takedown to prone control," or a "[t]wistlock" in order to subdue perceived violators.

209.     The Police Department's General Order 580.02, governing Use of Force, further compounds the problems. The General Order sets forth an officer-friendly standard for reviewing use of force that is rife for abuse, stating that such decision shall be evaluated based on a reasonable person standard, taking into account the totality of the circumstances either known or merely perceived at the time. The General Order specifically states that the analysis cannot be "with the benefit of hindsight" and warns that the totality of the circumstances must account for "occasions when officers may be forced to make quick judgments about using force."

210.     In 2019, the California Police Department of Justice acknowledged "significant deficiencies" in the City and the Police Department's use of force policies and training. Report & Recommendations, dated January 29, 2019, available at https://oag.ca.gov/system/files/attachments/press-docs/spd-report.pdf.

211.     All of these policies enable police to prevent and punish non-violent, peaceable protest activity of any kind without any demonstrated threat of future risk to public safety.  No policy cabins the Police Department's authority to suppress speech based on the viewpoint of the protesters.

**VIII.   DEFENDANTS ARE DELIBERATELY INDIFFERENT, DISREGARD OVERSIGHT, AND REFUSE TO ACT**

212.     The Office of Public Safety and Accountability ("OPSA"), which has broad oversight authority to evaluate Sacramento's public safety, issued a report on the Police Department's response to the March 4, 2019 Stephon Clark protests. The report provided recommendations, including that the Police Department should review whether its tactics for policing protests "balanc[ed] the demands of public safety with the desirability of facilitating peaceful protests" and whether its current model of response was "commensurate with the degree of threat posed by the situation." In addition, OPSA suggested that "SPD

should review whether the strategic objective(s) of sensitive police operations such as the policing of protests, [were] sufficiently established and communicated within its organization." OPSA Review of Police Response to March 4, 2019 Protest Incident, available at https://www.cityofsacramento.org/-/media/Corporate/Files/OPSA/OPSA-Review-Protest-Incident-March-4-2019.pdf.

213.   The issues identified by OPSA were never addressed and the Police Department's policies on the management of protest events and activities remained the same. As a result, these patently objectionable practices continued in the policing of protests following the killing of George Floyd in 2020 and into 2021.

214.   The California Police Department of Justice also carried out a study of the Police Department's policies and procedures after the shooting of Stephon Clark. In its report, the California Police Department of Justice acknowledged "significant deficiencies" in the City and the Police Department's use of force policies and training. These deficiencies helped drive the passage of California's Act to Save Lives (AB 392), also called Stephon Clark's Law, which took effect in January 2020 and stipulated that use of force policies should incorporate an objective standard.

215.   The Police Chief and other Department officers also communicated directly with City Manager Howard Chan and the City Council about activities against racial justice protesters, seeking insight and approval. For example, City employees participated in a group text message exchange where the Police Department provided live updates about Police Department action at racial justice protests. In another text message exchange, a Councilmember provided the Police Department with screenshots of proposed protest routes of racial justice protests.

216.   Further demonstrating the City Council's awareness and condonement, the City adopted the Police Department's language vilifying racial justice protests by filing a petition for a workplace restraining order against Sacramento resident Skyler Michel-Evleth. Michel-Evleth, in a podcast, criticized Sacramento law enforcement and defended racial justice protests against public officials. The petition claimed that Michel-Eyleth was a threat to City employees, citing his unsubstantiated affiliation to "antifa" as a major point of concern. The Sacramento County Superior Court denied the petition and highlighted "obvious First Amendment concerns."

217.   The Sacramento Community Police Review Commission ("SCPRC"), tasked with encouraging community participation in the development of police policies and procedures,

recommended that the Police Department modify its definition of objectively reasonable force to bring it into compliance with Stephon Clark's law. The Police Department refused, calling it an "overreaching power grab" and deeming SCPRC as "anti-police" and sympathetic to "the activist agenda[.]" The Police Department's use of force policy was only brought into compliance in June 2021, when the matter was brought to City Council.

218.   The City gives cover to the Police Department's unwillingness to engage with oversight by chronically underfunding and undermining OPSA and SCPRC. And, like the Police Department, the City has largely ignored SCPRC by not voting on the Commission's 2018 or 2019 Annual Report recommendations. As of December 2021, the City Council has taken a vote on only a single recommendation by the Commission since its creation in 2016.

219.   The City's lack of response led the SCPRC to recommend in its 2020 Annual Report that City Council "adopt a process...that requires the body to vote on the recommendations received by the SCPRC no later than three months from receipt[.]" City Council has yet to adopt this recommendation.

220.   Despite OPSA's numerous responsibilities including investigating and responding to all complaints filed against Sacramento's public safety departments, the office remains understaffed and underfunded. In 2020, OPSA documented 313 complaints against the Police Department alone, with 794 allegations of misconduct. OPSA failed to complete investigations in 304 out of the 794 allegations of misconduct made that year. SCPRC drew attention to these staffing issues in its 2020 report, stating "OPSA has extremely limited staff."

221.   The City made similar spending decisions when allocating revenue generated by Measure U, a sales tax plan meant to raise revenues for community services and investment. The Measure U Community Advisory Committee was tasked with advising the City on how to allocate these funds to meet community needs. While the City pledged to align its budget priorities with the priorities of Sacramento residents, it abandoned that goal to increase its investment in policing. Ignoring Committee Chair Flojaune Cofer's recommendation to re-allocate $15 million from the Police Department and Sacramento Fire budget to community projects, the City increased the Police Department's budget for 2021/22 to an all-time high of nearly $166 million.

222.   Defendants' treatment of OPSA and SCPRC guarantees that public safety oversight will not

hold the Police Department accountable, but rather maintain the status quo of discriminatory and biased policing in Sacramento.

223.    Defendants have failed and/or refused to hold their police officers accountable for unreasonable and excessive uses of force, including a failure to train, supervise, or discipline members of the Police Department.

## CAUSES OF ACTION

### First Claim for Relief (by all Plaintiffs against all Defendants)

### First Amendment Viewpoint Discrimination

### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First Amendment to the United States Constitution*

224.    Plaintiffs repeat each and every allegation contained in the above paragraphs as if fully set forth herein.

225.    Defendants Does 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, engaged in conduct that directly or indirectly deterred Plaintiffs from exercising rights protected by the First Amendment of the U.S. Constitution by distinguishing between types of speech based on the viewpoint expressed, regulating speech motivated by a desire to suppress a particular viewpoint, or failing to intercede and/or being integral participants to such conduct.

226.    Defendants Hahn, the Police Department, and the City, acting or purporting to act as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Plaintiffs, in violation of rights protected by the First Amendment of the U.S. Constitution.

227.    Defendants Hahn, the Police Department, and the City maintained training policies amounting to deliberate indifference to the constitutional rights of Plaintiffs, whose constitutional injuries would have been avoided with proper training.

228.    Defendants' conduct also violates Article 1, Sections 1 through 3 of the California Constitution.

229.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Plaintiffs are entitled to injunctive relief from the potential that such violations will recur.

230.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### **Second Claim for Relief (by all Plaintiffs against all Defendants)**

### **First Amendment Retaliation**

### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First Amendment to the United States Constitution*

231.    Plaintiffs repeat each and every allegation contained in the above paragraphs as if fully set forth herein.

232.    Defendants Does 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, retaliated against Plaintiffs for exercising rights protected by the First Amendment of the U.S. Constitution, or failed to intercede and/or were integral participants to such conduct.

233.    Defendants Hahn, the Police Department, and the City, acting or purporting to act as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Plaintiffs, in violation of rights protected by the First Amendment of the U.S. Constitution.

234.    Defendants Hahn, the Police Department, and the City maintained training policies amounting to deliberate indifference to the constitutional rights of Plaintiffs, whose constitutional injuries would have been avoided with proper training.

235.    Defendants' conduct also violates Article 1, Sections 1 through 3 of the California Constitution.

236.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Plaintiffs are entitled to injunctive relief from the potential that such violations will recur.

237.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

///

///

///

**Third Claim for Relief (by all Plaintiffs against all Defendants)**

**Fourth Amendment Excessive Force**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the*

*Fourth Amendment to the United States Constitution*

238.    Plaintiffs repeat and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

239.    Defendants Does 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, used unreasonable and excessive force against Plaintiffs, or failed to intercede and/or were integral participants in the use of unreasonable  and excessive  force,  in  violation  of  the  Fourth  Amendment  of  the  U.S. Constitution.

240.    Defendants Hahn, the Police Department, and the City, acting or purporting to act as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Plaintiffs, in violation of rights protected by the Fourth Amendment of the U.S. Constitution.

241.    Defendants Hahn, the Police Department, and the City maintained training policies amounting to deliberate indifference to the constitutional rights of Plaintiffs, whose constitutional injuries would have been avoided with proper training.

242.    Defendants' conduct also violates  Article  1,  Section  7  of  the  California Constitution.

243.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

244.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Plaintiffs are entitled to injunctive relief from the potential that such violations will recur.

245.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

///

///

**Fourth Claim for Relief (by all Plaintiffs against all Defendants)**

**Fourteenth Amendment Equal Protection**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the*

*Fourteenth Amendment to the United States Constitution*

246.    Plaintiffs repeat and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

247.    Defendants Does 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, discriminated against Plaintiffs based upon an animus towards attendees at protests concerning police violence and accountability, without a rational relationship to any legitimate state interest, or failed to intercede and/or were integral participants to such discrimination, in violation of rights protected by the Fourteenth Amendment of the U.S. Constitution.

248.    Defendants Hahn, the Police Department, and the City, acting or purporting to act and as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Plaintiffs, in violation of rights protected by the Fourteenth Amendment of the U.S. Constitution.

249.    Defendants Hahn, the Police Department, and the City maintained training policies amounting to deliberate indifference to the constitutional rights of Plaintiffs, whose constitutional injuries would have been avoided with proper training.

250.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Plaintiffs are entitled to injunctive relief from the potential that such violations will recur.

251.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Fifth Claim for Relief (by all Plaintiffs against all Defendants)**

**Civil Rights Conspiracy**

*Pursuant to 42 U.S.C. § 1983*

252.    Plaintiffs repeat and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

253.    Defendants, defendants' employees, and private individuals, including but not limited to

members of the Proud Boys organization, agreed among themselves to act in concert to deprive Plaintiffs, of their constitutional rights under the First, Fourth, and Fourteenth Amendments.

254.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts as described above, working with private individuals to use fear, intimidation, violence, and misinformation.

255.    Defendants created an environment where organized hate groups felt safe to enact violence against racial justice protesters with impunity, while Plaintiffs and other racial justice protesters consistently feared for their safety and liberty.

256.    Despite Defendants' enormous presence at the protests identified herein, Defendants engaged in a systemic denial of law enforcement protection to Plaintiffs and other racial justice protesters. Defendants' overt actions toward racial justice protesters created and/or increased the risk of Plaintiffs' injuries, including the violation of their constitutional rights.

257.    As a direct and proximate result of the deprivation of their constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

258.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Plaintiffs are entitled to injunctive relief from the potential that such violations will recur.

259.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Sixth Claim for Relief (by all Plaintiffs against all Defendants)**

**Failure to Intervene**

***Pursuant to 42 U.S.C. § 1983***

260.    Plaintiffs repeat and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

261.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

262.    During the events described above, the Defendants stood by, without intervening, to prevent the violations of Plaintiff's constitutional rights alleged herein, even though violations occurred in plain view of numerous Defendant Police Officers and all of the Defendant Police Officers had the opportunity to do so.

263.    Defendants' failure to intervene was caused in part by the City's and Police Chief's failure to provide adequate policies requiring Police Officers to intervene and report constitutional violations by other officers when they are present and observe them, particularly when those violations happened to racial justice protestors.

264.    Each of the Defendants had the power to prevent or aid in preventing the commission of those wrongs.

265.    Defendants neglected to prevent or aid in preventing these wrongful acts where the wrongful acts were committed and could have been prevented by reasonable diligence.

266.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

267.    As a direct and proximate result of the conduct referenced above, Plaintiffs' constitutional rights were violated and they suffered the injuries and damages set forth above.

268.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Plaintiffs are entitled to injunctive relief from the potential that such violations will recur.

269.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Seventh Claim for Relief (by Plaintiffs White, Aguilar, and Kidd against all Defendants)**

**Viewpoint Discrimination, Retaliation, Excessive Force, Equal Protection, and Privacy**

**Under the California Constitution Article 1**

***Pursuant to Cal. Civ. Code § 52.1 (The Bane Act) for Defendants' Violations of Plaintiffs'***

***Rights under the California Constitution***

270.    Plaintiffs repeat and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

271.    The acts and/or omissions of the Defendants, and each of them, individually and/or while acting in concert with one another, constituted interference, and attempted interference, by threats, intimidation and coercion, with Plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code § 52.1, including Article 1, Sections 1, 2, 3, 7, and 13 of the California Constitution.

272.     Defendants Does 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, discriminated against Plaintiffs based upon an animus towards attendees at protests concerning police violence and accountability, without a rational relationship to any legitimate state interest, or failed to intercede and/or were integral participants to such discrimination, in violation of rights protected by Article 1, Sections 1, 2, 3, 7, and 13 of the California Constitution.

273.     Defendants Hahn, the Police Department, and the City, acting or purporting to act under color of state law and as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Plaintiffs, in violation of rights protected by Article 1, Sections 1, 2, 3, 7, and 13 of the California Constitution.

274.     As a result of Defendants' wrongful conduct, Plaintiffs suffered damages as alleged above.

275.     As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, Plaintiffs are entitled to injunctive relief from the potential that such violations will recur.

276.     The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Eighth Claim for Relief (by Plaintiffs White, Aguilar, and Kidd against all Defendants)**

**California Ralph Act**

***Pursuant to Cal. Civ. Code § 51.7 for Defendants' Violations of Plaintiffs' Rights under the California Ralph Act***

277.     Plaintiffs repeat and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

278.     Plaintiffs are informed and believes bias against Plaintiffs' perceived political affiliation with the protests against police violence and police racism, and bias against Plaintiffs perceived race, national origin, and/or religion, were motivating reasons for Defendants' above- described misconduct toward them.

279.     Defendants' above-described conduct violated Plaintiffs' rights to be free from violence and intimidation by threat of violence because of their actual or perceived political affiliation and/or viewpoint, in violation of California Civil Code § 51.7.

1    280.   As a result of Defendants' wrongful conduct, Plaintiffs suffered damages as alleged above.

2    281.   As a result of Defendants' wrongful conduct, and the potential that such conduct will recur,

3  Ms. White is entitled to relief from the potential that such violations will recur.

4    282.   The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless,

5  and was of such a nature that punitive damages should be imposed against them.

6  **Ninth Claim for Relief (by by Plaintiffs White, Aguilar, and Kidd against all Defendants)**

7  **Assault and Battery**

8  ***Pursuant to California Tort Claims Act, Cal. Gov. Code § 815.2 for Defendants' Liability for***

9  ***Plaintiffs' Injuries Caused by Act of Public Entity Employee***

10    283.   Plaintiffs repeat and re-alleges each and every allegation contained in the above

11  paragraphs as if fully set forth herein.

12    284.   Defendants committed assault and battery against Plaintiffs by hitting, shoving, using

13  chemical weapons and other force on Plaintiffs.

14    285.   Said acts by Defendants and/or each of them were unreasonable and excessive uses of

15  force.

16    286.   Plaintiffs did not consent to the use of force against them and were injured thereby.

17    287.   As a result of Defendants' wrongful conduct, Plaintiffs suffered damages as alleged above.

18    288.   As a result of Defendants' wrongful conduct, and the potential that such conduct will

19  recur, Plaintiffs are entitled to relief from the potential that such violations will recur.

20    289.   The unlawful conduct of Defendants was willful, malicious, oppressive, and/or

21  reckless, and was of such a nature that punitive damages should be imposed against them.

22  **Tenth Claim for Relief (by Plaintiffs White, Aguilar, and Kidd against all Defendants)**

23  **Negligence**

24  ***Pursuant to California Tort Claims Act, Cal. Gov. Code § 815.2 for Defendants' Liability for***

25  ***Plaintiffs' Injuries Caused by Act of Public Entity Employee***

26    290.   Plaintiffs repeat and re-alleges each and every allegation contained in the above

27  paragraphs as if fully set forth herein.

28    291.   Defendants, and/or each of them, individually and/or while acting in concert with one

another, owed Plaintiffs the duty to use reasonable care to avoid causing foreseeable injury and damage to Plaintiffs during the events described in this Complaint.  The above-described acts and omissions of defendants breached the duty of care Defendants owed to Plaintiffs.

292.    In doing the acts and/or omissions as alleged herein, Defendants and/or each of them, breached said duty to use reasonable care and said breach of duty caused, and/or contributed to the cause, of Plaintiffs' injuries and damages as alleged in this Complaint.

293.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Eleventh Claim for Relief (by Plaintiff Kidd against all Defendants)**

**Americans with Disabilities Act**

***Pursuant to 42 U.S.C. § 12101 et seq.***

294.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

295.    Title II of the ADA and its implementing regulations provide that "no qualified individual shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). The requirements of Title II apply to "anything a public entity does," including arrests and other law enforcement interactions. 8 C.F.R. § 35, app. B. Title II affirmatively requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

296.    Defendants City and Police Department each qualify as a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

297.    Mr. Kidd is a person with epilepsy who is substantially limited in one or more major life activities.

298.    At all material times herein, Mr. Kidd was regarded as having a physical or mental impairment that substantially limited one or more major life activities; or was perceived to have a physical or mental impairment.

299.    Mr. Kidd is a qualified individual with a disability within the meaning of the ADA and its implementing regulations.

300.    By reason of Mr. Kidd's disability, Defendants Does 1 to 200, acting or purporting to act under color of state law and in the performance of their official duties as law enforcement officers, excluded Mr. Kidd

from participation in or denied Mr. Kidd benefits of the services, programs, or activities of the Police Department or subjected Mr. Kidd to discrimination, including but not limited to failing to make reasonable modifications in policies, practices or procedures during law enforcement interactions with Mr. Kidd and the arrest of Mr. Kidd on or about December 19, 2020, failing to intercede and prevent and/or acting as integral participants to the use of unreasonable and excessive force against Mr. Kidd because of his apparent or perceived disabilities, in violation of rights protected by the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

301.    Defendants Hahn, the Police Department, and the City, acting or purporting to act under color of state law and as policymaking authorities, maintained policies or customs of action or inaction resulting in harm to Mr. Kidd, in violation of rights protected by the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

302.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief as follows:

a.    Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

b.    Judgment declaring that Defendants' actions, inactions, and/or policies or customs complained of herein are unconstitutional under the Constitution of the United States and the State of California;

c.    Injunctive relief prohibiting Defendants' prospective actions, inactions, and/or policies or customs complained of herein in violation of the Constitution of the United States and the State of California;

d.    For damages in an amount to be proven further at trial;

e.    For pre- and post-judgment interest;

f.    For punitive damages;

g.    For attorneys' fees and costs and costs of suit incurred herein; and

h.    For such other and further relief as the Court may deem to be just and proper.

///

///

///

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury for all causes of action, claims, or issues in this Action that are triable as a matter of right to a jury.

Dated:  July 11, 2022

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA

By: /s/ *Tifanei Ressl-Moyer*
　　　　Tifanei Ressl-Moyer
　　　　Lauren Carbajal


CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
Pilar Gonzalez Morales
Elizabeth Ballart


SIEGEL, YEE, BRUNNER & MEHTA
Dan Siegel
EmilyRose Johns

*Attorneys for Plaintiffs*

# Exhibit 1

# NOTICE

**This manual normally contains pictures, but the pictures are temporarily unavailable.**

# SACRAMENTO POLICE DEPARTMENT

## CROWD & RIOT CONTROL MANUAL



## RM 532.11



# SACRAMENTO POLICE DEPARTMENT
## CROWD & RIOT CONTROL MANUAL



**REVISED: 12-98**

The purpose of this manual is to establish training guidelines for handling crowds and riots. General Order 532.11, implements this manual and requires personnel know its contents and follow its guidelines when handling crowd and riot situations. This manual is for Department use only and does not apply to the standard of care, in an evidentiary sense in criminal or civil proceedings. The instructions, guidelines, and policies contained in this manual are not intended to nor should they be construed as a creation of a legal standard of safety or care higher than the minimum the law requires with respect to third party claims. This policy statement is an expansion of that found in the General Order.

It is the policy of the Sacramento Police Department to respond quickly and effectively to any crowd or riot situation in the most professional manner possible.

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 52 of 77

## CHAPTER ONE
## CIVIL DISORDER: INTRODUCTORY CONCEPTS AND PROCEDURAL DUTIES

A.  Civil Disorder and the Police Mission
   1.  First Amendment Rights and the Role of the Police
      a.  In determining the appropriate departmental response to an incident, personnel must keep in mind that "freedom of expression" is a Constitutional, First Amendment right, which includes informational and demonstration activities, (e.g., passing out leaflets, picketing, rallies, marches, etc.)
      b.  When that right is lawfully exercised, it allows individuals and groups the opportunity to openly express support of, or opposition to, issues without fear of reprisal.
      c.  First Amendment rights exercised within the law must be respected and protected by all departmental personnel.
   2.  The Police Mission
      a.  In every case, when dealing with any crowd or riot situation, it is the policy of the Department to concentrate on our basic law enforcement mission of protecting life and property.
      b.  This shall be done in a rapid, firm, fair, and impartial manner, using only the reasonable force necessary to accomplish the mission.
   3.  Levels of Civil Disorder
      Officers may be tasked with confronting three (3) levels of civil disorder.
      a.  Passive disobedience - unlawful assembly and non-violent behavior.
      b.  Active disobedience - unlawful assembly and riotous behavior.
      c.  Anarchy- urban terrorism and violence.

B.  Definitions of Spontaneous and Scheduled Events
   1.  Spontaneous events may create threats to the public health and safety. They may include crowd disorders, First Amendment Right activities, school incidents, and labor strikes.
   2.  Scheduled special events require permits and large numbers of persons may gather or participate. They may include parades, cultural programs, musical rock concerts, block parties, and sporting events.

C.  Spontaneous Event
   1.  Initial Response
      a.  Prompt and decisive action to an impending disturbance or existing civil disorder is essential to a successful police operation.
      b.  Accordingly, the first officers to arrive at the scene are crucial to the overall performance of the Department.
      c.  A spontaneous event has the potential of escalating from minor neighborhood problems to major riot situations.
      d.  The proper departmental response is dependent upon early assessment by the first officers assigned to the call.
      e.  The first officers assigned to the call of a disturbance should observe the situation from a safe distance and gather information necessary for a later determination as to the course of action. This information should include:
         (1)  Size of the crowd.
         (2)  Specific location and/or direction of travel.
         (3)  Whether the crowd is violent or non-violent.
         (4)  The purpose of the disturbance, if this can be determined from observations of placards, signs, and/or chanting.
         (5)  Whether the crowd is organized or chaotic.
      f.  The sector sergeant should be appraised of this information.
   2.  Responsibilities of the Sector Sergeant
      a.  As soon as possible, the sector sergeant shall proceed to the scene and be appraised of all pertinent information to determine the severity of the disorder.
      b.  The sector sergeant shall gather additional pertinent information and take the following courses of action:
         (1)  Establish an on-scene command.

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 53 of 77

  (2) Make and broadcast a situation estimate.

  (3) If warranted, establish a command post.

  (4) Request number of additional officers or other needed personnel and equipment.

  (5) Establish a staging area.

  (6) Note/determine access routes for emergency vehicles.

  (7) Determine the need for outside assistance required (e.g. ambulance, fire, public utility, etc.).

  (8) Estimate the number and type of casualties/ injuries, if any.

 c. If an emergency condition exists, the sector sergeant shall notify the watch commander and recommend the initial course of action. The watch commander shall take command of the situation and shall become the Incident Commander.

3. Responsibilities of the Incident Commander

 a. It is the responsibility of the incident commander, or his/her designee, to assess the overall civil disturbance and/or crowd control incident(s) and determine the appropriate response actions, degree of departmental involvement, and selection if appropriate operational modes.

 b. The incident commander, regardless of rank, is responsible for incident activities, including the development and implementation of strategic decisions for approving the ordering and releasing of resources.

 c. The incident commander or his/her designee, shall establish a perimeter around the affected area, isolating the area of involvement.

  (1) A perimeter is established to control access to and departure from the event.

  (2) In some instances, (e.g., barricaded subjects and hostages), establish an inner perimeter to contain the event, and an outer perimeter at a distance, to keep the general public from entering a danger area.

 d. Additional units shall be directed to a selected staging area and be equipped with riot gear.

 e. Make an estimate of the situation, including:

  (1) The type of event.

  (2) The location of the event.

  (3) Type of structure or vehicles involved.

  (4) Size of area involved.

  (5) Number of additional officers needed.

  (6) Location of the command post.

  (7) Location of the staging area.

  (8) Access routes.

  (9) Additional assistance or resources required (Command Post Van, ambulance, fire, etc.)

 f. The incident commander must make decisions about the control methods to be employed, depending on the degree of violence and type of event. Before taking enforcement action, consider the following:

  (1) If only scattered individuals are violent, determine whether it is better to arrest those individuals or disperse the entire crowd.

  (2) Available resources.

  (3) The ability to establish safe and clear escape routes.

  (4) The ability to assemble arrest teams.

  (5) The capability of a loudspeaker.

  (6) If proper, the ability to warn of an unlawful assembly.

  (7) The ability to accomplish dispersal and/or arrests.

D. <u>Scheduled Special Event</u>

1. In preparing for planned events, the same essential tasks as performed for spontaneous events are performed. However, because of the benefit afforded by time, the tasks can be performed with more deliberation and detail, and occasionally the sequence can be changed.

2. Evaluating the Event

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 54 of 77

a. Determine the type of event (Parade, demonstration, sports event, concert, etc.)
   (1) Consider the sponsor:  Have past events been peaceful or violent?
   (2) Consider what groups might oppose the sponsor: Have these counter groups been peaceful or violent?
   (3) Consider the location of the event: What are the peculiarities of the location?  How many people can it hold?  What about access to and from?  What are the control points in  establishing a perimeter?
   (4) Consider a staging area for an Incident Command Post and a staging area.

3. Meet with sponsors.
   a. Although meeting with event sponsors is not required, cooperation between the event  sponsors and the Incident Commander or a designated representative should be encouraged.
   b. If a meeting is arranged, the incident commander or designated representative should discuss needed permits, applicable laws, and enforcement policies.
   c. The incident commander or designated representative, should discuss ways to maintain communication with sponsors throughout the event and should consider establishing checkpoints and schedules for future contacts.
   d. If a prior meeting is not possible, then information relating to the size of the event should be collected.  Leaflets, public announcements, and media reports should be examined.

4. Plan for perimeter management.
   a. Determine the number of officers needed to police the event.
   b. Develop an operational plan and enforcement policy and assure the plan(s) and policy(ies) are communicated to all involved Department personnel.

E. Incident Command Post
1. The Incident Command Post (ICP) is a location for the coordination of police activity by the incident commander.
   a. The ICP acts as the focal point of all police resources committed to quell a civil disturbance.
   b. It is both a launching platform for enforcement activity and an outlet for press releases.
   c. Refer to Manual of Orders, OOO 532.07, Command Posts, regarding general purpose, policy, and procedures.

2. Establishing an Incident Command Post
   a. The decision to establish an ICP is discretionary and is dependent upon several factors:
      (1) The severity of the disturbance.
      (2) The propensity for violence.
      (3) The duration of the disturbance.
      (4) The size and organization of the disturbance.
      (5) The amount of resources necessary to control and/or quell the disturbance.
   b. Any one or more of the above factors may justify the establishment of an ICP, along with mobilization of the ICP van and other necessary equipment including fire engines, ambulance, prisoner transport van, etc.
   c. Any police officer may establish an ICP.  The officer establishing an ICP shall take charge of the scene as an Incident Commander and shall advise his/her immediate supervisor as well as the watch commander.

3. Location of the Incident Command Post.
   a. Proximity of the ICP to the disturbance is an important consideration as it has a direct impact on officer safety, security of equipment, organization of teams, squads, and platoons, and response time to the conflict area.
   b. In general, ingress and egress to the ICP must afford officer safety and be unaffected by traffic congestion or disturbance.
   c. The ICP must be reasonably close to the area of the disorder.

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 55 of 77

    d.    Consideration should always be given to posting officers on the perimeter of any ICP. At least two officers shall be posted at the ICP for security of equipment and vehicles.

F.    The Operations Plan

    1.    Purpose

        a.    The operations plan, developed at the field response level, contains objectives reflecting the overall incident strategy, including specific tactical actions and supporting information for a given operational period.

        b.    The operations plan specifically addresses the issue confronting the Department and is designed to allow the use of resources to resolve an incident.

    2.    Concept

        a.    The plan is developed around an duration of time called an "operational period".

        b.    The length of the operational period is determined by the length of time needed to achieve its objectives.

        c.    The planning process should begin as soon as a potential problem is identified.

G.    Developing the Operations Plan

    1.    Basic Guidelines

        a.    Operations plans may be developed by the incident commander during or before a response to an incident.

        b.    Ideally, plans should be completed far enough in advance to allow response units to brief and train their personnel prior to deployment.

        c.    A thorough understanding of departmental strategic goals is imperative when developing operations plans.

        d.    Plans should be simple, concise, and clear in presenting a solution to the problem. One common format in use follows a five paragraph model that organizes the plan in an uncomplicated manner which addresses all major considerations or components in the planning process.

    2.    The Plan is organized in the following paragraph order:

        a.    Situation

            (1)    Briefly give a description of the situation facing the Department.

            (2)    This component should be a brief overview of the circumstances.

            (3)    Describe the incident or event which requires intervention to include any aggravating or mitigating factors.

            (4)    Describe the organization of supporting agencies, both law enforcement and others involved in the operation.

            (5)    Generally, this paragraph establishes the Who, What, Where, When, and Why of the problem.

            (6)    A clearly articulated situation paragraph is critical to the development of the rest of the plan and essential to provide situation briefings to executives who are responsible for determining the posture of the department relative to the event.

        b.    Mission

            (1)    The mission is determined by the incident commander after receiving a situation briefing.

            (2)    The statement should clearly define the goal of the Department in as concise a manner as possible.

            (3)    If there is more than one mission involved, there must be a priority established and stated.

            (4)    The most effective mission statements do not involve a significant departure from normal Department operational concepts.

            (5)    The mission statement is critical because it provides the foundation and focus for all subsequent planning.

        c.    Concept of the Operation

            (1)    This paragraph is best described as the written intent of the incident commander relative to the conduct of the operation.

            (2)    It is best when it projects the event in chronological order from briefing, through mission engagement, and final demobilization.

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 56 of 77

      (3)     Specific mission assignments are not made in this paragraph. For example, the establishment of traffic control posts must be discussed, however, the units assigned to staff those posts is not designated here.

      (4)     The following topics are critical to the operation and demand full explanation in this section:

         (a)     Arrest policy.

         (b)     Use of force policy.

         (c)     Rules of engagement/conduct.

         (d)     Decisions reserved for the incident commander or his/designee.

d.    Execution

      (1)     This paragraph is used to make specific assignments to all units involved in the operation.

      (2)     Each unit must be identified and assigned a specific mission in the operation.

      (3)     Failure to make these assignments leads to confusion and can often mean that a unit is not committed at a critical time allowing the entire mission to fail.

      (4)     Completing the execution paragraph is often a complex and confusing task.

      (5)     The planner (incident commander or his/her designee) must take care to ensure that there is no duplication of assignments or conflicts requiring one unit to perform conflicting tasks while ensuring that all essential tasks are completed.

e.    Administrative Instructions

      (1)     This paragraph addresses any administrative announcements that are necessary to make the operation work.

      (2)     For large operations, a separate logistics annex or plan may be produced. For smaller operations, logistic questions are addressed within this paragraph.

      (3)     Typical to this paragraph are the following topics:

         (a)     Reporting instructions.

         (b)     Uniform requirement.

         (c)     Time keeping/fiscal reporting.

         (d)     Medical support.

         (e)     Communication issues.

         (f)     Feeding/break periods of personnel.

         (g)     Location of incident facilities.

## CHAPTER TWO
## CROWD CONTROL MEASURES

A.   <u>Crowd Control Measures</u>

   1.    Types of Control Measures

      a.    The following methods represent strategies to control a crowd:

         (1)     Isolate the crowd.

         (2)     Display of officers. (Show of force.)

         (3)     Selective/Multiple arrests.

         (4)     Dispersal.

      b.    They may be implemented in the order given, or altered if circumstances indicate a need to establish different levels of control.

   2.    Isolate the Crowd

      a.    During a scheduled event, the limits of the crowd should be defined by the placement of officers whenever possible.

      b.    As a general rule, officers should be kept together in teams, squads, or platoons to police the event.

      c.    Police resources should not be diluted by trying to encircle or box in, a large crowd.

   3.    Display of Police Officers/Show of Force

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 57 of 77

   a. Sometimes the tension and propensity for a crowd to become unruly can be reduced by the knowledge that a substantial police presence is nearby.

   b. To make an effective display of police officers, assemble the group of officers out of view of the crowd and bring it into the crowd's presence in a basic or tactical formation.

   c. Do not use a display of police officers to deter a crowd unless it is of sufficient size to accomplish a dispersal.

   d. Do not bluff.

   e. If a display of officers accompanied by a dispersal order does not result in voluntary dispersal, more forceful action may be employed.

  4. Selective/Multiple Arrests

   a. If there is sufficient ratio of officers to the crowd, and the crowd, although unlawful, is not openly violent, it may be effective to make multiple and/or individual arrests.

   b. To effect a multiple arrest, refer to Manual of Orders, GO 523.10.

B. Crowd Dispersal

  1. Considerations

   a. It may become necessary for the incident commander, platoon leader, or other unit leader with command responsibility, to order the dispersal of a crowd.

   b. The decision should be made only after careful consideration of the following points:

    (1) Reason(s)/Legal Authority the crowd should be dispersed.

    (2) Equipment and personnel availability.

    (3) Anticipated resistance.

    (4) Destination of the dispersed crowd.

    (5) Anticipated number of arrests.

    (6) Use of chemical agents.

    (7) Declarations/instructions to the demonstrators.

  2. Orders to Disperse

   a. When other measures fail to control or disperse an unlawful crowd, the crowd should be ordered to disperse according to the terms of Penal Code Section 726 PC.

   b. Announcements to a crowd to disperse must be based on reasonable and articuable factors justifying the order, and must be made in accordance with State Law.

   c. Go as close to the crowd as possible and command them in the name of the people of the State of California to disperse immediately:

     "I am (name and rank), a Police Officer for the City of Sacramento.  I hereby declare this to be an unlawful assembly and, in the name of the people of the State of California, order all those assembled at (give specific location) to disperse immediately.  If you do not disperse, you will be subject to arrest."

   d. Use a loudspeaker or PA system to assure all have an opportunity to hear the order.

   e. Officers shall broadcast the order over the appropriate radio channel, and if possible, send an officer to the far side of the crowd to tape record the order.

   f. If circumstances permit, the order should be made repeatedly over a period of time, and, if necessary, from a variety of locations.

   g. Provide the crowd with an adequate period of time and a clear and safe route to disperse.

  3. Dispersal Techniques

   a. Before physically dispersing a crowd, announce the plan and the direction of movement over appropriate radio channels so that officers will not be confronted by the crowd.

   b. The incident commander and the platoon leader (or unit leader commanding the field force) must constantly monitor the results of the dispersal action.

   c. The use of tactical formations is one of the best ways of dispersing a crowd.

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 58 of 77

    d.    One effective method is the use of a squad or platoon line sweep.
        (1)    Leave safe and clear avenues of escape.
        (2)    Use only the a amount of force proportional to the violence or resistance encountered, and reasonable to accomplish the dispersal.
        (3)    If possible, direct the crowd toward open, unobstructed area.

4.    Dispersal Strategies Specific to a Riotous Crowd
    a.    Never underestimate the rioters.
    b.    If circumstances permit, arrest teams should accompany the sweeps to make arrests when possible for specific crimes and for violation of the order to disperse.
    c.    In situations where the crowd is so unruly that officers cannot afford to dilute the integrity of their formation(s) to make arrests, sweeps can be made for the purpose of breaking up a large group, or keep the group moving.
    d.    If the use of sweeps is impractical (e.g., the crowd is resisting our actions), multiple deployment of highly mobile arrest teams can be used to gain psychological and tactical advantage.
        (1)    The arrest teams can be used to break up a crowd or to keep a crowd moving.
        (2)    They can also be used to make selective arrests.
    e.    Always guard the rear to prevent rioters from entrapping you.
    f.    When dispersing rioters, ensure that they do not regroup at a different location or later encircle the formation.
    g.    In suppressing a riot, tactical maneuvers should be implemented that will disperse rioters, clear each area, and secure that area to ensure against rioters returning.

## CHAPTER THREE
## TACTICAL CONSIDERATIONS AND CONCEPTS

A.    TACTICAL CONSIDERATIONS AND CONCEPTS
1.    Why Formations are Used
    a.    During the dynamic unfolding of a confrontation, the Commander's intent will be expressed through the team leader and carried out by the team using appropriate formations.
    b.    Once teams are constructed through basic formations, and with assigning, briefing, and the essential equipment check completed, the leader and team members are available for tactical deployment.
    c.    The deployment of personnel in tactical formations allows the control force to effectively and efficiently accomplish the mission of crowd  containment, dispersal, or arrest.
    d.    Moving out to the critical area with adequate personnel, a defined mission, and proper equipment goes along way in establishing and maintaining the teams' confidence in performing its duty.
    e.    This confidence will be reflected in team movement and carriage, its morale or spirit, and its ability to perform professionally, with discipline, determination, and proper technique.

2.    The Purpose of Formations.
    a.    Formations effectively and efficiently meet Department tactical goals when dealing with crowd and/or riot control problems.
    b.    Formations also support disciplined team work which promotes officer safety and reduces individual officer stress related to policing confrontational crowd situations.
    c.    The police response to crowd/riot situations cannot appear timid, indecisive, confused, lackadaisical, or fearful.  The police formation and it tactical use must display discipline, strength, confidence, purpose, and true capability to control and/or disperse an unlawful crowd or riot situation.
    d.    By training, temperament, and profession, police officers are often required to operate alone, making independent decisions.  Appropriate supervision and

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 59 of 77

training will help officer adjust to "teamwork" operations such as crowd/riot formations, tactics, and maneuvers.

e.  The guiding principal of strength in unity cannot be understated as the cornerstone of success in tactical formations.

f.  Team work is stressed in riot and crowd control formations.  An officer assigned to a team for crowd/ riot control must think and act as a member of that team.

3.  Duties of the Team/Squad Leader

a.  Know the goals and the objectives of the incident commander and follow the operational plan.

b.  Keep the team/squad motivated, informed, and working together by communicating through visual signal, words, and physical contact.

(1)  Assert necessary command and control over our team through effective communication.

(2)  Command your team.

c.  Individual actions undermine team integrity and should not be tolerated. Supervisors shall take immediate appropriate actions.  Be alert for signs of crowd psychology affecting officer performance: hesitation, verbal abuse, unnecessary force, or aggression.

d.  Be alert to dynamic, changing, circumstances when dealing with crowds.  Keep the incident commander informed so that the team, squad, or operational plans can be adjusted.

e.  Use your A.S.S.E.T.S:

(1)  A     Assess

(2)  S     Situation

(3)  S     Structure

(4)  E     Effective

(5)  T     Tactical

(6)  S     Solution

f.  Know the extent of your team's training and capability.

g.  Tactical capability is different when using officers who have little riot/crowd control training versus officers with continuous, on-going tactical training.

4.  Duties of the Team Member

a.  Adhere to the laws, policies, and techniques which guide your response.  Guard against any appearance of favoritism or bias.

b.  Have all your personal crowd and riot control equipment readily available and in serviceable condition.  If there are questions or problems regarding your equipment, check it with the department Armorer.

c.  Know the objective(s) of the formation(s).  Expect verbal, visual, and physical direction from the Team/ Squad Leader.

(1)  Watch, listen, and feel for the Team/Squad Leader's commands.

(2)  Assist your team in accomplishing its mission.

d.  Know individual responsibilities as part of the team effort.

(1)  Line Officer: This officer assists in holding, gaining, or containing a position and has a 180 degree area of responsibility.

(2)  Linebacker: Behind the line, helping prevent line penetration, and controls/subdues any prisoner "handed-off" by a Line officer.  Has a 180 degree area of responsibility.

(3)  Arresting Officer: Responsible for arresting, subduing, and controlling an arrested individuals.

(4)  Custody Officer: Assists the arresting officer in controlling and subduing the arrested individual. If necessary, the Custody officer can become a Protection Officer.

(5)  Protection Officer: Protects members of the five (5) or three (3) officer arrest team from interference or harm, when deployed into a hostile, violent crowd.  This officer has a 360 degree area of responsibility.

(6)  Shield Officer: carries the Department shield to protect oneself and other officers form hand thrown missiles.

     e.    No individual/independent action, unless necessary to prevent serious bodily injury or death.  Teamwork is stressed in riot control formations.

     f.    When deployed in tactical formation, be aware of crowd members who may attack from the rear or outflank your position.  If the crowd or an individual is within your "personal danger zone", protect your weapons.

     g.    Don't hesitate to communicate with your team members by word, visual signal, or touch.  This helps prevent misunderstandings, supports team work, and maintains team morale during difficult/stressful situations.

5.    Maintaining  Formation Integrity: Equal Distance and Alignment

     a.    All members of the control force must understand and apply the concept of "equal distance" and "alignment".

     b.    Equal distance means "equal distance" between officers in formation and equal distance between the tactical formation and the crowd it confronts.

     c.    Maintaining equal distance prevents openings in the formation, which could lead to weaknesses and collapse in the formation.

     d.    Alignment means the line formation is straight, which also prevents weakness and collapse of the line.

        (1)    If a line officer can see only one officer to his/her right and left, this means the line is straight.

        (2)    If a line officer can see more than one officer to his/her right and left, this means the line is not straight, and adjustments must be made.

     e.    Equal distance and alignment is maintained by the officer's awareness of the formation, and the Squad Leader's supervision of the formation through visual, verbal, and physical commands.

6.    Foot Movement and Cadence

     a.    The knowledge and application of foot movement and cadence, allows for a team, squad or platoon to maintain equal distance and alignment, while moving on foot.

        (1)    Maintaining equal distance and alignment contributes to efficient and effective application of selected formations.

        (2)    This efficient and effective movement can also be psychologically effective in displaying the dynamic power of the formation to the confronted crowd.

     b.    There are three (3) basic foot movements associated with basic and tactical formations.

        (1)    March cadence

        (2)    Double time cadence

        (3)    Slide step cadence.

     c.    Marching is approximately 120 steps a minute either in cadence or route step.  It is used to move the control force forward in either basic or tactical formation.  Cadence can be called by a unit leader or his/her designee.

     d.    Double time is approximately 180 steps a minute and is used to quickly move the control force forward from location to another.

     e.    Slide step is a tactical foot movement, used in conjunction with an officer who is standing in a tactical posture and advancing toward a hostile, violent crowd.

        (1)    The officer stands with the non-dominant foot forward and the dominant foot back, knees slightly bent, with balance toward the balls of the feet.

        (2)    The feet are separated approximately shoulder length apart.

        (3)    The baton is drawn and may be held in a selected baton carry position (e.g., port position, 5 Count Thrust, Upper Cradle, etc.)

        (4)    During forward motion, the officer's forward foot slides forward first, followed by the rear foot. Once the rear foot  slides forward, the officer has returned to the tactical posture.

        (5)    This foot movement allows officers to move forward toward a violent or potentially violent crowd while maintaining physical balance and preparedness for potential physical confrontation.

B.    <u>Communication in Tactical Formations</u>

    1.    The Purpose of Communication

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 61 of 77

    a.    Effective operation of the crowd control formation requires effective communication between the Team/Squad Leader and the formation members.

    b.    The degree in which the senses contribute to the communication process have been approximated as:

        (1)    Vision:     75%

        (2)    Hearing:    13%

        (3)    Touch:      6%

        (4)    Taste:      3%

        (5)    Smell:      3%

    c.    Verbal and "non-verbal" signals (visual and physical) can be used to effectively communicate the important decisions and directions of the Team/Squad Leader.

    d.    Thirteen visual hand signals, eight of which can be delivered with one hand, are used to assist in verbal communication:

        (1)    Form five (5) officer arrest team!

        (2)    Form three (3) officer arrest team!

        (3)    Line formation!

        (4)    There!

        (5)    Assemble!

        (6)    Forward!

        (7)    Increase speed, double time!

        (8)    Halt!

        (9)    Make arrest!

        (10)    Message understood! (I'm okay!)

        (11)    Masks on!

        (12)    Disregard last order!

        (13)    I don't understand!

2.    Team/Squad Leader Use of a "Runner" to Enhance Successful Communication.

    a.    Because of the number or officers assigned to a line formation, it may be necessary that an additional communicator--"runner"--assist the team/squad leader in passing and receiving tactical orders or information.

    b.    The runner will usually be the assistant squad Leader.

    c.    Officers within the formation can pass information "down the line" or receive information from "linebackers".

## CHAPTER FOUR
## BASIC FORMATIONS

A.    <u>BASIC FORMATIONS</u>

1.    A formation represents a specific number of officers. The Department uses four (4) basic formations:

    a.    The three (3) officer team.

    b.    The five (5) officer team.

    c.    The ten (10) officer squad.

    d.    The platoon. A platoon is composed of four (4) or more squads.

2.    Procedure for Assembling the Basic Formations

    a.    When assembling the formation, the formation leader shall:

        (1)    Give the appropriate verbal command, "Fall in"!

        (2)    Give the appropriate visual hand signal for "Assemble".

        (3)    The formation leader shall point to the position where he/she wants the apex officer to fall in.

        (4)    This position shall be either in front of the formation leader, facing the leader, or to the leader's left side, facing the same direction as the leader.

    b.    The apex officer shall immediately fall in at the position indicated by the leader.

    c.    All other formation members will immediately fall in, in a manner similar to the apex officer.

        (1)    If the apex officer was positioned to the left of the leader, all other officers shall fall in to the left of the apex officer.

       (2)    If the apex officer was positioned in front of the leader, all other officers shall fall in behind the apex officer, facing the leader.  This formation is known as a column.

   d.   When giving directions or commands and the formation is in a column:

       (1)    The leader shall step off to the formation's left side and communicate with both visual signal and verbal command.

       (2)    Stepping to the side assures that all officers in the leader's formation can hear and see given directions.

   e.   When forming a platoon, squad 1 forms as a column and squads 2,3, and 4 form to the left of squad 1.

3.     Objectives of the Basic Formations.

   a.   When officers are called upon to respond for crowd management or control, basic formations accomplish three (3) main objectives.

       (1)    "Fall-in" assembles officers quickly for deployment in tactical formations.

       (2)    Effective, efficient, and safe movement of officers from one location to another.

       (3)    A "show of force."

   b.   The mere presence of a group of law enforcement officers at the scene of a disturbance will not always prevent a crowd from committing acts of violence.

   c.   However, the appearance of a competent, organized and highly disciplined contingent of officers will often cause incident participants to become disheartened to the extent they will abandon their disruptive activities.

   d.   Officers preparing to deploy for crowd/riot control duty should take advantage of the element of surprise using the following procedures:

       (1)    Select a staging area beyond the sight of the crowd; as near as practical to save time and conserve energy, but far enough away to ensure security.

       (2)    When arriving at the staging area, officers should assemble immediately.

       (3)    Officers should prepare for assignment, briefing, and check equipment.

       (4)    Teams, squads, or platoons should march in a basic formation, to areas of assignment.  When the units reach the area assignment, they should remain in basic formations untilordered into tactical formation.

B.    <u>Actions at the Staging Area</u>

1.     The basic formations allow for the accomplishment of three other important objectives at the staging area:

   a.   Assignment

   b.   Briefing

   c.   Check equipment.

2.     Assignment

   a.   Responding officers are counted off and assigned to their respective teams.

   b.   Officers with specific skills or training can be identified and this knowledge can be utilized to define or enhance the control force mission.

   c.   Assignment is the accounting of how many officers can be utilized, team capabilities, special weapon or equipment disbursement, and the number of teams that can be mustered at the staging area. d.By giving the incident commander specific knowledge of his/her control force capabilities, the incident commander can clearly define and establish and/or modify the "commander's intent."

3.     Briefing

   a.   This is the time in which the team leader/squad leader can brief officers on the situation.

   b.   Generally, situation means "what has happened", "what is happening now", and "what can be expected to happen."

   c.   When officers respond to a situation known to be confrontational and potentially dangerous, they need to know:

       (1)    What is happening.

       (2)    What the mission is.

(3)    What law enforcement action they are expected to take.
  d.    The team/squad leader must know:
     (1)    The incident commander's intent.
     (2)    The operational plan.
     (3)    How his/her team fits into the accomplishment of specific goals within the plan.
  e.    Knowledge is power, both for the team/squad leader, and the team.
  f.    When the team is well briefed, or at least, given a framework which defines specific goals, signs of stress exhibited by team members, confusion, anxiety, apprehension, fear, can be controlled.
  g.    By controlling these detracting factors, team cohesiveness, discipline, and determination can be maintained and enhanced.

4.    Check Equipment
  a.    Before deployment, this would be the safest time for the team/squad leader to insure all officers on the team are properly equipped.
  b.    This means the leader should take the time to check members for safety equipment which will be used for the crowd control mission.
  c.    At minimum, equipment should include:
     (1)    Helmet with face shield
     (2)    Body armor
     (3)    Individual hand held chemical agent
     (4)    Chemical agent mask with carrier worn properly
     (5)    Straight baton
     (6)    Handgun with additional magazines/ammunition
     (7)    Full Sam Browne
     (8)    Hand held radio
     (9)    Flashlight
     (10)   Handcuffs
     (11)   Flex cuffs (4 minimum, team/squad officers only).

**CHAPTER FIVE**
**TACTICAL FORMATIONS:  PURPOSE AND OBJECTIVES**

A.    <u>Tactical Formations</u>
1.    Tactical formations accomplish a number of objectives:
  a.    Show of force.
  b.    Crowd containment.
  c.    Crowd dispersal.
  d.    Arrest of individuals.

2.    Selection of Tactical Formations
  a.    Tactical formations are flexible and can be modified to meet the existing situation.
  b.    Team, squad, or platoon leaders must exercise sound judgment in selecting the appropriate tactical formation or its modification.
  c.    In selecting the appropriate formation, consideration must be given to such factors as size, demeanor, attitude,  crowd intent, surrounding terrain, available dispersal routes, and the incident commander's intent.
  d.    The tactical formations shown in this manual are intended to illustrate basic concepts and not limit the use of other tactical formations that may be more appropriate for the specific incident.

3.    Five tactical formations are used by this Department:
  a.    The five (5) officer team line formation.
  b.    The ten (10) officer squad line formation.
  c.    The five (5) officer arrest team.
  d.    The three (3) officer arrest team.
  e.    The platoon formation.

B.    <u>The Five (5) and Ten (10) Officer Line Formation</u>
1.    Purpose
  a.    The line formation can accomplish 3 tasks:

(1)    Hold a position: deny the crowd entry or exit into a specific area.

(2)    Gain a position: advance to "sweep" forward and gain control over a specific area.

(3)    Contain a position: attach to other lines, forming a box or circle to contain a specific area or group of people.

  2.    Assignments

    a.    Team/Squad Leader

      (1)    Supervises and directs the squad/team mission.

      (2)    Verbally, visually, and physically maintains  squad/team integrity.

    b.    Apex Team/Squad Member

      (1)    "Falls-in" behind the team/squad leader when in column.

      (2)    Takes tactical position indicated by team/squad leader.

      (3)    All others "fall-in" to the left.

    c.    Team/Squad Members

      Responsible for carrying out the team/squad line mission:  hold, gain, or contain a specific area.

    d.    Assistant Team/Squad Leader

      (1)    Assists the team/squad leader in supervising and directing the team/squad line.

      (2)    Can act as a "runner" between the team/squad line and team/squad leader.

  3.    Formation

    a.    Five (5) Officer Team Line Formation

      (1)    Consists of a team leader and four (4) officers.

      (2)    The four officers stand equal distance and in  alignment with each other and equal distance from the crowd.

      (3)    The team leader stands behind the four (4) officer line.

    b.    Ten (10) officer squad line formation

      (1)    Consists of a squad leader, an assistant squad leader and eight (8) squad members.

      (2)    The eight (8) squad members stand equal distance and in alignment with each other.

      (3)    Both the squad leader and the assistant squad leader stand behind the line.

**C.**    <u>Three (3) and Five (5) Officer Arrest Teams</u>

  1.    Purpose

    a.    Arrest teams are highly mobile response forces.

    b.    They can carry out a number of missions:

      (1)    Make selective arrests in a crowd situation.

      (2)    Carry out a rescue extraction  of an officer or citizen trapped in a hostile crowd.

      (3)    Gain psychological and tactical advantage over a crowd when deployed quickly and strategically.

  2.    Assignments

    a.    Team Leader

      (1)    Supervises and directs the team's mission.

      (2)    Verbally, visually, and physically maintains team integrity.

    b.    Arresting Officer

      (1)    Makes physical arrest of the violator and maintains custody and control.

    c.    Custody Officer

      (1)    Assists the arresting officer in maintaining custody and control over the violator.

      (2)    Can become a protection officer if additional protection is needed.

    d.    Protection Officer

      (1)    Maintains 180 degree--360 degree security of the team during deployment.

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 65 of 77

(2) Protects the team against interference or attack from hostile or violent crowd.

3. Formation
   a. The five (5) officer arrest team.
      (1) Consists of four (4) officers and one team leader.
      (2) The team leader stands in the middle of the formation.
      (3) The number 1 officer is the arrest officer and stands to the left front of the team leader.
      (4) The number 2 officer is the custody officer and stands to the right front of the team leader.
      (5) The number 3 officer is a protection officer and stands to the left rear of the team leader.
      (6) The number 4 officer is a protection officer and stands to the right rear of the team leader.
   b. The Three (3) Officer Arrest Team
      (1) Consists of two (2) officers and one (1) team leader.
      (2) The team leader stands to the rear of the formation.
      (3) The number 1 officer is the arresting officer and stands to the left front of the team leader.
      (4) The number 2 officer is the custody officer and stands to the right front of the team leader.

4. Arrest Method
   a. The arrest team approaches a crowd/individual to make an individual arrest. Normally, the arrest team members carry their batons at port position.
   b. The team leader signals, to the team, verbally, visually, and physically, which individual is to be arrested.
   c. Both the arresting officer and custody officer quickly replace their batons in their rings and quickly and simultaneously approach the individual to be arrested.
   d. The individual is physically arrested, subdued, and controlled by the arresting and custody officer.
   e. The team leader moves behind the arrested individual who is being held by the arrest and custody officer.
      (1) The team leader remains in the middle of the formation.
      (2) The team leader is responsible for maintaining the team's integrity as it leaves the arrest site with a prisoner.
      (3) The team leader uses verbal, visual, and physical signals to maintain control of the team.
   f. Both protection officers move to the rear of the team flanking and covering both sides of the team. As the team exits, the protection officers move with their backs to the team, alert for any hostile actions on the part of the crowd.
   g. If the crowd becomes extremely hostile or violent, the custody officer can break away and become a protection officer, covering the front of the arrest team.

D. The Use of the Platoon for Tactical Formations
   1. Purpose and Leadership
      a. If the event requires a large number of officers, a platoon can be deployed to meet tactical objectives.
      b. The overall control of a platoon is maintained by a platoon leader.
      c. The platoon leader directs his/her control of the platoon through the squad leaders.
      d. In deploying and controlling platoon formations, the following procedure should be used:
         (1) The platoon leader decides which formation will be used.
         (2) He/she will designate what each squad will do.
         (3) He/she will communicate these designations by verbal and visual command, to each squad leader.

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 66 of 77

(4) When each squad leader has received his/her instructions, the platoon leader will indicate by pointing where the platoon is to form, and give the command, "Move!"

(5) The squad leaders of squads 1 and 2 will step out to the side of their squads so that they can be seen, briefly repeat the command, and give the visual signal. The squads will execute the command on the squad leader's visual and verbal command "Move!"

(6) As soon as the first two squads have cleared the formation, the next two squad leaders 3 and 4 will repeat physically and verbally, the command given to them by the platoon leader.

(7) The next squads (3 and 4) will then execute the commands given to them by their respective squad leaders.

(8) This sequence is continued until the platoon formation is complete.

e. The entire platoon should move as a well- choreographed unified, and disciplined team.

f. Squad leaders must not forget to use assertive verbal commands, physical signals, and physical touch, to command and control the platoon. The ability for squad members to hear can be hampered by ballistic helmets, chemical agent masks, and loud noises from the crowd.

2. Platoon Tactical Formation Capability

a. The platoon can configure into a wide variety of tactical formations.

b. The platoon configurations should be considered adaptable and flexible for the dynamic conditions of crowd management and/or control.

c. The following are only examples of a platoon's configuration potential:

(1) Four (4) squads attached to form a long skirmish line.

(2) Two (2) squads attached to form a skirmish line with two (2) squads attached behind to form "linebackers".

(3) Two (2) squads attached to form a skirmish line with four (4) five officer arrest teams intermittently penetrating the line to make arrests.

(4) Two (2) squads attached to form a skirmish line with one (1) squad extending rearward from each flank, forming an inverted "U". This formation is used to protect the skirmish lines flank.

(5) Two (2) squads attached to form a skirmish line, with two (2) squads in column behind and centered on the skirmish line, resembling the letter "T".

(a) When approaching a large crowd, the rear column suddenly runs through the skirmish line and penetrates the crowd.

(b) After passing the skirmish line and penetrating the crowd, the two squads face in opposite directions and march forward, splitting the crowd.

## CHAPTER SIX
## MOBILE TACTICS AND VEHICLE FORMATIONS

The scope and severity of contemporary crowd and riot control problems have resulted in development and utilization of mobile tactics and vehicle formations.

A. General Concepts and Principals

1. Mobile vehicle tactics and vehicle formations allows a unit to complete a number of missions:

a. Protection/escort of fire and/or Emergency Medical Services (EMS) personnel.

b. Conventional crowd control within defined sectors.

c. Patrol of hostile areas.

d. Security for field personnel in hostile areas.

e. Security for allied agency personnel in hostile areas.

f. Response to calls for service requiring multiple officers.

g. Officer/citizen rescue.

2. Concepts of a Mobile Unit

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 67 of 77

    a.    A mobile unit (team, squad, platoon) is designed to address isolated or widespread incidents that may arise during civil disturbance/disorder, planned or unplanned event.

    b.    A mobile unit may respond to spontaneous, life threatening events requiring immediate action.

    c.    The configuration of a mobile unit may vary in size and strength depending upon the missions assigned.

    d.    The key element of any mobile unit configuration is a rapid, organized, and well disciplined response utilizing mobile vehicle tactics.

    e.    As with foot formations and tactics, the team/squad leader has overall responsibility for the control and direction of the vehicles and vehicle formations.

        (1)    Vehicles within formation do not take independent action unless necessary to prevent serious bodily injury or death.

        (2)    Vehicles in formation and squad/team members only act on orders from the team/squad leader.

3.    Mobile unit advantages include:

    a.    Less vulnerability to attack than a conventional unit.

    b.    Can be deployed rapidly.

    c.    Effective in close riotous crowd situations, and discourage an attack by hand thrown objects.

    d.    Centralized command and decentralized control.

    e.    Enhanced vehicle security due to designated drivers.

4.    Officer Safety Considerations

    a.    The squad leader has the option of ordering the vehicle windows down or up.

        (1)    If the crowd is throwing hard objects, keeping the patrol vehicle windows down reduces the potential for injury from shattering glass.

        (2)    But if the crowd is throwing infectious objects, or if chemical agents (e.g. smoke or CS chemical agent) is in the air, keeping the windows up reduces the potential for contamination.

    b.    Wear the ballistic helmet to afford the greatest amount of protection from certain ammunition and thrown objects such as bottles, rocks, bricks etc.

    c.    Team members are responsible for "Areas of Responsibility" when in transit and/or remaining idle.

        (1)    Areas of responsibility is defined as the individual team member's specific area or zone which he/she must constantly monitor for potential threat or danger.

        (2)    Whether inside or outside the vehicle, the following zones are assigned to the following team members:

            (a)    Driver: 90 degrees to the left front.

            (b)    Front Member: 90 degrees to the right front.

            (c)    Left Rear Team Member: 90 degrees to the left rear.

            (d)    Right Rear Team Member: 90 degrees to the right rear.

B.    Mobile Vehicle Tactics

1.    The term mobile vehicle tactics describes those techniques performed by officers using patrol vehicles to control the movement of a crowd.  The following principles apply:

    a.    The vehicles are used to make a show of force to the crowd.

    b.    Surprise is a key element.  Vehicle movements should be performed at the last possible moment to limit a crowd's ability to counteract tactics used.

    c.    The speed of execution and coordination of each movement must be exact.

    d.    Movements should be assertive in nature (patrol vehicle should be responding Code 3).

    e.    Vehicle formations and bounding techniques allow for mobility when responding to and/or expediting the movements of crowds.

    f.    Using a maximum number of personnel in a minimum amount of vehicles economizes the mobile unit's ability to complete its mission without jeopardizing officer safety.

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 68 of 77

g. The use of overhead lights and siren have proven effective in gaining crowd compliance without the use of physical force. But, there may be so much noise, the squad leader may wish to abate further noise. The Squad Leader may order the sirens off, but the overhead lights remain on.

h. The squad leader should possess a portable bull horn or may use the PA system within vehicle number 1.

2. Normally, each squad will use three vehicles for response to various incidents.

    a. Each vehicle will transport one team which consists of four officers or one sergeant and three officers.

    b. Note that a mobile vehicle squad consists of 12 (with drivers included) officers versus conventional squad which consists of 10 officers.

        (1) A conventional Squad can place eight (8) officers on line, along with one (1) squad leader and one assistant squad leader.

        (2) But, when the mobile squad is dismounted, it consists of only seven (7) officers on line, with one dismounted assistant squad leader, behind the line.

        (3) All drivers remain in their respective vehicles, and the squad leader remains inside vehicle number 1.

    c. Incident commanders may modify the number of officers per vehicle or the number of vehicles per squad as needs dictate.

C. <u>Formations Associated with Mobile Vehicle Tactics</u>

1. In Trail

    a. Use of Formation: "In Trail" is a column movement used by a squad or squads when responding and/or performing a specific mission.

    b. Description of Formation: This formation aligns the vehicles one behind the other in a single line.

    c. Execution of Commands: All commands are given via police radio by the squad leader.

    d. Preparatory Command: "Prepare for In Trail."

    e. Command of Execution: "Execute."

2. Mobile On Line

    a. Use of Formation: "Mobile on Line" is the preparatory movement prior to engaging a crowd using a "Bounding" movement. "Mobile on Line" brings a squad or squads into a skirmish line.

    b. Description of Formation: Vehicles are side by side, three abreast. Vehicles were previously in the "In Trail" position. Vehicles are traveling Code-3.

    c. Factors that should be considered when determining speed of the vehicles include:

        (1) Demeanor and activity of the crowd.

        (2) Environmental factors.

        (3) Safety factors (safety of the crowd and officers).

    d. Execution of Commands: All commands are given via police radio by squad leader.

    e. Preparatory Command: "Prepare for Mobile On Line."

    f. Command of Execution: "Execute and maintain speed of ___ miles per hour."

3. Bounding

    a. Use of Formation: "Bounding" is the movement used to move a crowd with patrol vehicles. This tactic should only be used when the crowd moves away from the patrol vehicles and a dismounted skirmish line would be ineffective.

    b. Factors that should be considered when determining the speed of the vehicles include:

        (1) Demeanor and activity of the crowd.

        (2) Environmental factors.

        (3) Safety factors (safety of the crowd and officers).

    c. Description of Movement: When performing this tactic, patrol vehicles should approach the crowd at an appropriate speed determined by the team leader in the "Mobile on Line" formation.

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 69 of 77

        (1)     Patrol vehicles should come to an abrupt stop with the middle vehicle squad leader, stopping approximately two (2) car lengths from the crowd.

        (2)     The two flanking vehicles (outside) stop approximately two and one half (2 1/2) car lengths from the crowd.

        (3)     Patrol vehicles should alternately "bound" (accelerate forward), approximately one (1) to two (2) car lengths, and come to an abrupt stop, without striking the crowd.

        (4)     Cycle One:  First the squad leader car bounds forward and stops.  Cycle Two: Then the two (2) flanking cars bound forward (staying abreast of each other), and stop.

        (5)     This cycle of bounding continues forward until the objective is met, or is changed.

        (6)     Do not use the vehicles to ram or bump the crowd.

        (7)     Once the crowd is moving, the bounding techniques keep the crowd moving.

    d.     Execution of Commands: All commands are given over the police radio by the squad leader.

    e.     Preparatory Command: "Prepare to Bound."

    f.     Command of Execution: "Execute."

4.    Mobile on Line - Dismounted Skirmish

    a.     Use of Formation: "Mobile on Line-Dismounted Skirmish", is a squad line of officers who are dismounted from their vehicles and positioned in front of the trailing vehicles.

        (1)     The squad leader remains inside of his/her  vehicle.

        (2)     The assistant squad leader is positioned outside of the vehicle, on foot, behind the dismounted line.

        (3)     Grenadiers or officers armed with tactical rifles may be strategically positioned to provide necessary cover or use chemical agents.

        (4)     This formation allows for a transition of force from officers who are posted inside their vehicles to dismounted officers prepared for close contact with the crowd.

    b.     Description of Formation:  This formation aligns three patrol vehicles abreast.

        (1)     If there is a fourth vehicle, this vehicle should line up directly behind the middle, squad leader, vehicle.

        (2)     The dismounted officers are in a squad line formation standing or walking in front of the vehicles.

        (3)     Both outside vehicles will be activated code-3.  The middle vehicle will be activated PA only.

    c.     Execution of Commands: All commands will be given by the squad leader in the squad leader vehicle via police radio or PA system.

    d.     Preparatory Command: "Prepare for on line dismounted Skirmish."

    e.     Command of Execution: "Execute."

D.    <u>OFFICER/CITIZEN RESCUE TACTICS</u>

1.    Purpose

    a.     Mobile vehicle rescue tactics are designed to limit an officer's exposure time to potentially hazardous situations in which incident participants engage in violent behavior towards innocent persons as well as law enforcement personnel.

    b.     These tactics provide for the safe and swift removal of person(s) requiring assistance.

2.    Basic Concepts of Mobile Vehicle Rescue

    a.     Surprise is a key element.  Vehicle movements performed at the last possible moment will limit the crowd's ability to counter the tactics used.

    b.     Movements must be assertive in nature.  Patrol vehicles should be assertive in nature and responding Code 3.

    c.     Using the maximum number of personnel in a minimal amount of vehicles economizes the field unit's ability to complete its mission without jeopardizing officer safety.

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 70 of 77

d. The supervisor's role in performing this strategy and tactic is to assess the situation, respond immediately with the appropriate course of action and oversee the rescue and evacuation operation.

e. Normally, Vehicle 2 is the rescue vehicle.  All other vehicles provide necessary support.

f. "In Trail" as described in C1 above is used when responding to and initiating a two (2), three (3), or four (4) vehicle rescue technique.

g. The unit supervisor quickly assesses the situation and determines the appropriate number of rescue vehicles.

h. The unit supervisor directs and guides the rescue vehicles during the immediate action response.

i. Because of the nature of the operation, team members must maintain awareness of their "Area of Responsibility" and effectively communicate status of the rescue when dismounted from the vehicle.

j. Whether the rescue involves one (1) squad (3 cars), one (1) squad and one (1) team (4 cars) or two (2) teams (2 cars), the same basic principles apply:
    (1) All units roll Code-3.
    (2) All units transition to, and stop at predesignated positions.
    (3) All officers, except drivers, exit vehicles and perform predesignated responsibilities.
    (4) When team members exit vehicles, weapons are drawn, and areas of responsibility covered.
    (5) Vehicle 2 team members contact and recover officer/citizen.
    (6) Prior to reentry of vehicles, all team members re-holster their weapons.
    (7) All units on command of the squad leader, exit to front, rear, left, or right.

3. Squad Rescue

a. The squad approaches the area in trail formation, code-3.

b. Based on the position of the crowd and other environmental considerations, the number 2 (rescue car) will move to the left or right side the formation.
    (1) The number 2 car will move to the side where the crowd is located.
    (2) The number 2 car acts as a buffer between the crowd and the physical extraction of the officer/victim.
    (3) The driver of the number 2 car must be careful not to park so close to the victim as to endanger him/her.

c. The number 3 car remains behind the number 2 car, but in alignment with the number 1 car.

d. Due to the high intensity of the operation and potential dangers, all vehicles and team members must remain in communication via police car radio, and when dismounted, also with verbal and physical signal.

e. Because team members, when dismounted, are focused on their area of responsibility and therefore, facing away from each other, the "Rescue Status Communication Flow" must be adhered to.

f. The ability of the mobile squad to effectively and safely initiate and monitor the choreographed rescue operation, is known as the "Rescue Status Communication Flow."
    (1) Squad leader preparatory command via police car radio: "Prepare for rescue!  Vehicle 2 left (or right) side!"
    (2) Squad leader command of execution: "Execute rescue!"
    (3) All vehicles stop in predesignated position.
    (4) All team members, except drivers, exit vehicles and with weapons drawn, cover areas of responsibility.
    (5) Vehicle 2, front team member and rear right team member immediately go to victim.
        (a) The right rear team member carries the victim's upper torso.
        (b) The front team member carries the lower torso.

      (6)     The right rear team member backs into and across vehicle 2's rear seat, pulling the victim onto the bench seat. The front team member assists in lifting the victim's lower torso onto the rear bench seat.

      (7)     Once the victim is in the vehicle, vehicle 2 left rear team member shuts the left rear door.  Once the door is shut, driver vehicle 2 advises on police car radio, "Vehicle 2, all team members in!"

      (8)     The left rear team member of vehicle 2 runs back to vehicle 3.  The left rear team member signals all vehicle 3 team members to enter their vehicle and then enters the rear of vehicle 3.

      (9)     As vehicle 3 team members are reentering the vehicle, the right front team member signals to vehicle 1 rear right team member to reenter their vehicle.  Once all team members are in vehicle 3, driver vehicle 3 advises on police car radio, "Vehicle 3, all team members in!"

    (10)    Driver vehicle 1 advises squad leader that team members of vehicle 2 and 3 are in vehicle 1 right rear team member signals to the left rear and right front (squad leader) team members to reenter vehicle 1.

    (11)    Driver vehicle squad leader quickly assess the vehicles to make sure all team members have reentered their respective vehicles.

    (12)    Squad leader commands and signals the formation to exit in the appropriate direction.

    (13)    Preparatory command: "Formation exit front (or left, or right, or rear)!"

    (14)    Command of execution: "Execute!"

    (15)    Driver vehicle 1 repeats in the police car radio, the direction of exit commanded by the squad leader.

    (16)    All vehicles exit code-3 In Trail formation.

    4.     Squad and One Team Rescue (Four Cars)

      a.     The tactic is essentially the same as a squad rescue. (Three Cars).

      b.     The number 2 car goes to the left of the formation, and the number 3 car goes to the right of the formation.  Both cars front bumpers are in approximate alignment.

      c.     After the number 2 car completes the victim rescue, the following rescue status communication flow occurs:

       (1)     Left rear team member shuts the left rear door of vehicle number 2 and runs to the rear of vehicle number 4.  This team member signals all team members of vehicle 4 to reenter their vehicle, and also enters the rear seat of vehicle 4.

       (2)     The right front team member of vehicle 4 signals the left rear team member of vehicle 3 to reenter his/her vehicle.

       (3)     The left rear team member of vehicle 3 signals the right rear and right front team member of vehicle 3 to reenter their vehicle.

       (4)     The right front team member of vehicle 3 signals the right rear passenger of vehicle 1 to reenter his/her vehicle.

       (5)     The rest of the sequence continues as with a squad rescue, D3f (8) through (13).

## CHAPTER SEVEN
## CHEMICAL AGENTS: CONCEPTS AND STRATEGIES

A.    <u>Chemical Agents:  Concepts and Strategies</u>

    1.     Considerations Prior to Use

      a.     Supervisors shall be familiar with Department RM 580.07, Chemical Agents Manual specifically:

       (1)     The types of chemical agent,

       (2)     Types of delivery systems,

       (3)     The use and maintenance of the chemical agent mask.

      b.     Before making a tactical commitment to the use of a chemical agent, other factors must be considered:

       (1)     Tactical capabilities of the team, squad, or platoon.

       (2)     Crowd conditions.

Case 2:21-cv-02211-JAM-DB Document 31 Filed 07/12/22 Page 72 of 77

   (3)  Weather conditions.
   (4)  Environmental hazards.

2.  Tactical Capabilities

 a.  Proper and sufficient quantities of the appropriate chemical agent should be available.

 b.  The teams should be properly equipped.  Minimal equipment should include ballistic helmet with face visor, ballistic vest, chemical agent mask and carrier, handcuffs, and personal weapons.

 c.  The team should be trained in tactical formations and how formations are used when a chemical agent is deployed.

 d.  The team leader must be able to lead and supervise the team within a chemical agent environment.

3.  The Crowd

 a.  When analyzing the crowd, the following factors should be considered:

   (1)  The legality of the activities the crowd.
   (2)  Size.
   (3)  Violent or non-violent.
   (4)  Which weapons are available/readily available.
   (5)  Outdoor or indoor situation.
   (6)  Whether the crowd is organized or chaotic.
   (7)  Whether the crowd is mobile or stationary.
   (8)  The age group of the crowd (children, young adults, adults, elderly).
   (9)  If chemical agent is deployed, the sufficiency of avenues for the crowd to escape.

4.  Weather Conditions

 a.  Weather conditions, particularly wind direction, wind speed,  and wind turbulence will determine whether chemical agent can be effectively and efficiently deployed.

 b.  Knowing wind direction will determine where the chemical agent grenades must be released so that the agent is carried into the crowd.

 c.  Where the grenades are thrown or released is known as the "release line".

 d.  Not knowing wind direction can result in two major problems:

   (1)  The chemical agent is carried into an ineffective or inappropriate area.
   (2)  The crowd can evade a misjudged release line, escaping the effects of the chemical agent.

 e.  The team leader must determine if there is "head wind" (wind coming at the team),  "tail wind" (wind coming from behind the team, or "flank wind" (wind coming from the side).

   (1)  Observing the direction tree leaves, tree branches or tall grass bends, flag movement, or dust blowing can help determine wind direction.
   (2)  A smoke grenade (HC) can also be released to determine wind direction.

 f.  Wind speed will determine how fast a chemical agent will be carried into a crowd and how wide, from the release line, the agent cloud pattern will be.

   (1)  Generally, the faster the wind, the narrower the chemical agent cloud pattern from the release line, and the faster the chemical agent is dissipated.
   (2)  A high wind speed coupled with insufficient number of grenades at the release line will result in members of the crowd escaping chemical agent exposure.

 g.  Wind turbulence is the effect air movement has on chemical agent.

   (1)  Air movement is effected by weather conditions and man-made or natural obstacles.
   (2)  As the chemical agent travels downwind, air movement can result in the chemical agent cloud moving side to side (lateral movement), rolling (drag effect), or drifting upward (vertical rise).
   (3)  If there is any doubt as to wind direction and the resulting chemical agent cloud movement, use HC (smoke) first.

5.  Environmental Hazards

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 73 of 77

a. Because chemical agent has an immediate and intense incapacitating effect, there are locations within riotous areas which are of concern, and if possible chemical agent use avoided.

b. These locations contain individuals who may be predisposed to severe or prolonged effects of chemical agent exposure.

c. These locations include:
(1) Hospitals.
(2) Convalescent homes.
(3) Schools.
(4) Child or day care centers.
(5) Similar institutions.

d. Prior to deployment, one must also consider the possible movement of the chemical agent cloud into heavily traveled roadways.

e. Additionally, continuous burn grenades can present extreme fire hazards. They should not be used indoors or around structures with extreme fire hazards such as gas stations.

f. Crowds exposed to chemical agents must always have exit/escape routes open to them so that they can leave.
(1) The tactical use of chemical agent is to disperse a crowd or prevent its presence in a certain area.
(2) Open, predetermined exit/escape routes must be provided to achieve this desired result.
(3) If exit/escape routes are blocked off, the crowd members cannot disperse and this may result in uncontrollable panic and escalation of violent resistance.

6. Chemical Agent Concentration/CS

a. Use of CS agent, due to its potency, should first be used in limited quantities, or small concentrations.
(1) Any escalation of the degree of concentration and area of coverage should be gradual, and the effects on the crowd closely watched.
(2) Avoid using heavy initial concentrations of CS agent on large crowds to reduce the possibility of creating blind panic, trampling, etc. Open, predetermined escape routes are mandatory.

b. Generally, persons reacting to CS are incapable of executing concerted actions and excessive exposure to CS may render them helpless to vacate the area.

B. <u>Carrying, Arming, and Throwing the Chemical Agent Grenade</u>

1. Precheck the Grenade Before Use

a. The safety pin should be correctly inserted into the fuse assembly.
(1 Safety pin legs should be spread 45-60 degrees. If improperly spread adjust prior to deployment.
(2) Do not overwork because this can cause metal fatigue in the pin legs, causing them to break off.
(3) The safety lever (spoon) should not be bent.
(4) Fuse assembly should not be unscrewed or loose. If loose, turn clockwise to tighten fuse to canister.
(5) Reject the grenade if it is corroded, edges chipped, or dented more than 1/4 inch.

2. Carrying the Grenade

a. Carry the issued grenades in an appropriate carrier or bag, fuses up.

b. While in the carrier, make sure pull rings and safety levers don't hook onto other pull rings and safety levers. Pull rings should be pointed downward.

c. Don't carry the grenade by its pull ring or safety lever. Also, don't attach the grenade to the uniform or Sam Browne byits pull ring or safety lever.

3. Arming the Grenade

a. Firmly hold the grenade in your throwing hand.
(1) The grenade should be cradled in the palm of the hand, between the thumb and index finger.

Case 2:21-cv-02211-JAM-DB  Document 31  Filed 07/12/22  Page 74 of 77

    (2) If using a right hand throw, the grenade is held in the right hand with the fuse upward.  If using a left hand throw, the grenade is held in the left hand, fuse is downward.

  b. To facilitate removal of the pin, the legs may now be bent together.  Remember that overworking of the safety pin can weaken the legs, resulting in a hazardous condition.

  c. The grenade should be held against the chest/ midsection area.This pins the grenade against the body so that it can't be pulled out of your grasp.

  d. Remove the safety pin using a pulling and twisting motion.  Don't discard the safety pin.  Hold onto the safety pin in the event the use of the grenade is halted.

  e. The grenade is now armed.  Release of the safety lever will cause the grenade to detonate.

 4. Throwing the Grenade

  a. As the safety pin is removed,  immediately look at the target, the release line.

  b. Throw the grenade in an underhand motion (like throwing a softball), keeping your eyes trained on the release line at all times.

    (1) Release the grenade forward of your body and in your general field of vision.

    (2) In this way you take advantage of the eye and hand coordination inherent in most people.

  c. Follow through on your throwing motion beyond the point where the grenade is released.  This follow through will improve distance and relieve the strain on your throwing arm.

  d. Do not throw the grenade using the overhand lob or overhand baseball throw. This could result in an air-burst, causing unnecessary, accidental injury to individuals in the vicinity of the air-burst.

C. <u>The Chemical Agent Mask</u>

 1. Purpose of the Mask

  a. The law enforcement chemical agent mask is only meant to filter solid particulate out of the air.

  b. It will not produce oxygen or filter toxic vapors or gas.

  c. It will not filter:

    (1) Carbon monoxide.

    (2) Propane gas.

    (3) Methane gas.

    (4) Ammonia vapors.

    (5) Toxic gas resulting from fire.

    (6) Chemical vapor present at illegal drug labs.

  d. The law enforcement chemical agent mask should be donned before employing chemical agent or entering a chemical environment.

 2. Basic Procedure for Putting on the Mask

  a. Kneel down in a balanced position, with the non-dominant knee up and the dominant knee on the ground.

  b. If the baton is held in the hands, immediately place the baton on the ground between your legs.

  c. Remove the ballistic helmet and also place it on the ground, open side (flat side) down.  This prevents the helmet from rolling away on the ground if it is accidentally kicked.

  d. Immediately remove the mask from the carrier and hold the harness in your hands.

  e. Place chin in chin cup.

  f. Pull harness over head so that the headpad is centered on the high point at the back of the head.  Adjust the straps with the pull tabs. The mask should be pulled over the face evenly.

  g. Take care to push back hair so the rubber of the mask is against the skin and not the hair.

  h. Cover exhale ports and exhale sharply.

Case 2:21-cv-02211-JAM-DB Document 31 Filed 07/12/22 Page 75 of 77

    i. Cover inhale ports and inhale.

    j. If mask collapses on face, an effective seal has been created. If not repeat steps e-h.

    k. Immediately pick up your helmet and replace it on your head. Refasten the chin strap.

    l. Pickup your baton and return to the standing position with the baton either in port or on guard position.

  3. Procedures for Putting on the Mask During Tactical Situations

    a. There are two procedures used when putting on the mask for tactical situations.

    b. The first procedure is known as Condition One:

      (1) The Condition One procedure is given when the crowd is at a distance and there is no chance the officers formation will be overrun.

      (2) During this condition, officers are in formation.

      (3) The Team Leader gives the visual signal and verbally gives the command, " Masks on, Condition One!"

      (4) All officers, at once, put on their masks, using the basic procedure.

    c. The second procedure is known as Condition Two:

      (1) This procedure is used when the formation is faced with a hostile crowd and the possibility exists that the officers formation will be overrun.

      (2) During this condition, officers are in a Team or Squad line formation.

      (3) The Team or Squad Leader gives the visual signal and verbally gives the command, "Masks on, Condition Two!"

      (4) On this command, the Apex Officer and every other officer take one step to the rear, behind the line, and put on their masks, using the basic procedure.

      (5) The unmasked officers standing on line, remain in port or on guard position, prepared to defend the line against any hostile attack or aggression.

      (6) After putting on their masks, the masked officers step back on line, and verbally and physically tell the unmasked officers to their left, to mask.

      (7) The unmasked officer now take one step to the rear, behind the line, and put on their masks, using the basic procedure.

      (8) The previously masked officers remain on line, in port or on guard position, ready to defend the line against any hostile attack or aggression.

      (9) Once masked, officers immediately return to their previous on line position. The entire formation is now masked.

## CHAPTER EIGHT
### THE BATON IN CROWD AND RIOT CONTROL

A. <u>The Baton in Crowd and Riot Control</u>

  1. General Guidelines

    a. Use of the police baton is appropriate in crowd and riot control situations where deadly force is not required.

    b. Officers should refer to RM 580.08, Baton Manual, regarding appropriate and effective use of the police baton and baton strike zones.

    c. Officers should refer to GO 580.02, Use of Force, regarding procedures for the use of force.

    d. Officers should refer to GO 522.02, Emergency Medical Care of Arrestees, regarding procedures for medical treatment of injured arrestees.

  2. Baton Guidelines Specific to Crowd and Riot Control

    a. When a crowd becomes hostile and violent, the baton is the primary weapon of choice when officers are in formation and engaged in crowd control duties.

    b. Armed with the baton, trained officers will have greater confidence in carrying out control tactics, and engaging, if necessary, in physical contact with violent crowd members.

    c. The baton enables great flexibility when deploying tactical formations, and can be employed in many ways with a minimum possibility of serious casualties.

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 76 of 77

    d.    The baton should be held and used with two hands.

        (1)    Two handed use of the baton allows for more control over the baton, especially when officers are in close formations and jabs, thrusts, and/or deflections are being used against a violent, hostile crowd.

        (2)    Two handed use also allows the officer greater leverage and power when using retention techniques if his/her baton is grabbed by a crowd member.

        (3)    In close formations, one handed use can be impractical, especially when large, swinging type strikes are used.

    e.    There are several baton techniques which would be appropriate if the officer is attacked and discomfort and/or pain compliance is necessary to control and subdue a violent individual.

**B.**    <u>Specific Baton Techniques for Crowd and Riot Control</u>

    1.    Carry Positions

        a.    There are four basic carry positions associated with the baton when officers are engaged in crowd and riot control responsibilities:

            (1)    The Parade Rest Position.

            (2)    The Port Position.

            (3)    The Upper Cradle/Lower Cradle Position.

            (4)    The On Guard Position.

        b.    The Parade Rest Position:

            (1)    This position is used when standing in front of a crowd and is similar to the Two Hand Low Defense carry.

            (2)    In this carry position, the baton is held in both hands, parallel to the ground, in the area of the upper thigh, with both arms extended straight.

            (3)    The non-dominant hand holds the forward end, underhanded, with the palm facing away.  The dominant hand holds the rear end, with the palm facing  toward the officer.

            (4)    The body is at parade rest - the torso, hips legs, and feet are square to the front.  The feet separated approximately 10 inches.

            (5)    From this carry position, and with adjustment of the body, the baton can be used for deflections, thrusts, jabs, or transitions to other baton carry or use positions.

        c.    The Port Position:

            (1)    This carry position is used when marching in basic or tactical formation or when standing in formation, in front of a crowd.

            (2)    The dominant hand and forearm are parallel to the ground, and forward of the dominant hip.  The non-dominant hand is held level and in front of the non-dominant shoulder.

            (3)    The baton is held at a 45 degree angle in front of the body. The dominant hand grips the rear end of the baton and the non- dominant hand grips the forward end of the baton.  The baton bisects the angle between the neck and the shoulder and is held approximately eight inches away from the body.

            (4)    From this position, the baton can be used for deflections, thrusts, jabs, or transitions to other baton carry or use positions.

        d.    The Upper Cradle/Lower Cradle Position

            (1)    In either of these carry positions, the baton's forward end is carried tucked (cradled) either above (Upper Cradle) or below (Lower Cradle) the dominant forearm.

            (2)    The non-dominant hand overhand grips the  rear end of the baton.

            (3)    The officer stands in the ready stance utilized with the slide step.

            (4)    This position is effective if the officer is approaching the crowd and wants to use the non-dominant hand to assist in physically moving or directing individuals away.

            (5)    This position may also be used if the officer is attacked by an unarmed assailant, deflects the attack with the non-dominant hand, and immediately counters with an Upper or Lower Cradle thrust or strike.

Case 2:21-cv-02211-JAM-DB   Document 31   Filed 07/12/22   Page 77 of 77

    e.    The On Guard Position

        (1)    This is a position which indicates the officer is ready to immediately use the baton.

        (2)    The officer stands in a position similar to the ready position held in the Five Count Thrust or when preparing for the slide step.

        (3)    The non-dominant hand holds the baton in a underhand grip, at the forward end of the baton.  The dominant hand holds the baton in an overhand grip, at the rear end of the baton.

        (4)    The dominant hand and the rear end of the baton are held snugly against the dominant hip.

        (5)    The non-dominant arm is bent so that the baton is pointed forward, at an approximate 45 degree angle to the front.

        (6)    In this position, the officer is ready to use a large selection of deflections, thrusts, jabs, or strikes.

2.    Baton Deflecting and Striking Techniques Associated with Crowd and Riot Control

    a.    There are a large number of appropriate techniques which the officer can select from and use, when attempting to control, and subdue a violent crowd or crowd member.

    b.    Deflection techniques:

        (1)    The officer may defend his/her upper, middle, or low  body zones, using the Two Hand Low Defense deflections.

        (2)    The officer may also defend his/her upper, middle, and low  body zones, using the Upper and Lower Cradle deflections.

    c.    There are a number of striking techniques which the officer can select and use, when attempting to control and subdue a violent crowd or crowd member, and discomfort or pain compliance is appropriate.

        (1)    The officer may apply two handed strikes associated with the Five Count Thrust, Two Hand Low Defense, Upper Cradle, and Lower Cradle.

        (2)    After using the appropriate baton technique, the officer must be prepared to assess the effectiveness of the force and be prepared to continue or transition to other appropriate force levels.