UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEGAN WHITE; JERONIMO AGUILAR; LOREN WAYNE KIDD; LYRIC NASH; NICOLLETTE JONES; and ODETTE ZAPATA; | Case No. 2:21-CV-02211-JAM-SCR |
| Plaintiffs, | **COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| SACRAMENTO POLICE DEPARTMENT; THE CITY OF SACRAMENTO; and DANIEL HAHN; | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiffs Megan White, Jeronimo Aguilar, Loren Wayne Kidd, Lyric Nash, Nicollette Jones and Odette Zapata ("Plaintiffs") are six self-described racial justice protestors who participated in vigils, rallies and demonstrations that took place in Sacramento on May 29, May 30, May 31 and June 1, 2020.  The protests were in response to the May 25, 2020, killing of George Floyd by Minneapolis, Minnesota police officer Derek Chauvin.  Plaintiffs and hundreds of other demonstrators took to the streets of Sacramento calling for police accountability.  These racial justice

protests sometimes lasted as long as fourteen hours, beginning around noon and ending around 2 a.m.  They took place at multiple sites around Sacramento including police headquarters on Freeport Boulevard, 12th Street and the entrance to Highway 99, the area around the State Capitol, Cesar Chavez Park on 10th Street, the Sacramento County Main Jail on 6th and I Streets, the entrance to Highway 5 near Old Sacramento, and midtown Sacramento on J Street between 19th and 21st Streets.

The Sacramento Police Department ("SPD" or "Defendant") was the primary law enforcement agency assigned to monitor and control the demonstrations.  SPD at times received assistance from the Sacramento County Sheriff's Department, the California Highway Patrol and the California National Guard.  Plaintiffs contend that SPD responded to Plaintiffs and other protestors with disproportionate, illegal and excessive force.  The evidence in this case included Body Worn Camera ("BWC") footage showing SPD and other law enforcement officers shooting less lethal impact munitions (pepper balls and bean bags), 40MM projectiles, and chemical weapons (tear gas) at the protestors.  Plaintiffs claimed that SPD's use of force and tactics employed during these demonstrations were illegal and excessive.

Plaintiffs filed this lawsuit against SPD seeking monetary compensation and permanent injunctive relief for the injuries they sustained during the demonstrations and their loss of civil rights under the First, Fourth and Fourteenth Amendments, the California Ralph Act and the California Bane Act.  Plaintiffs claimed that SPD's customs and practices, as well as its failure to properly train and discipline its police officers, were the moving forces

1  behind the constitutional violations they suffered.  SPD denied all

2  of Plaintiffs' claims and an eight-day bench trial was held before

3  this Court from March 24 to April 3, 2025.

4       Immediately prior to the beginning of the bench trial, the

5  parties informed the Court that they had reached a settlement of

6  Plaintiffs' monetary claims.  As a result of the settlement, the

7  focus of the bench trial was Plaintiffs' request for permanent

8  injunctive relief.[1]  At the Court's request, Plaintiffs filed a

9  Proposed Order Granting Permanent Injunction (ECF No. 132) which

10  Defendants objected to (ECF No. 133) and which the Court utilized

11  as the guidepost for deciding the issues raised by the parties in

12  this action.

13       As discussed in detail below, while the Court finds that

14  Plaintiffs introduced sufficient evidence to satisfy their burden

15  of proof that at least one of their claims succeeds on the merits,

16  they failed to demonstrate that they have standing -- and therefore

17  the Court has jurisdiction -- for permanent injunctive relief.

18  Further, the Court finds that Plaintiffs did not introduce

19  sufficient evidence to satisfy the traditional factors the Court

20  must weigh before granting injunctive relief.  Indeed, there was

21  little, or no evidence introduced at trial by Plaintiffs which

22  supported their argument that there is a substantial risk that the

23  harm they suffered during the May 2020 protests will occur going

24  forward.  Since these protests in 2020, the evidence shows that the

25

26  [1]Plaintiffs' Amended Complaint (ECF No. 31) included a request for
   declaratory relief (Id. p. 47) but this prayer for relief was

27  neither mentioned nor raised by Plaintiffs during the trial.  While
   Plaintiffs' Proposed Findings of Fact and Conclusions of Law

28  discuss the declaratory relief request, this Court's Order focuses
   primarily on the issue of Plaintiffs' prayer for a permanent
   injunction.

SPD has made numerous significant modifications and changes to its policies and practices concerning the use of less lethal force during public protests. Plaintiffs did not introduce any evidence of allegedly unconstitutional conduct by SPD during public protests over the past five years from which this Court could infer or conclude that the permanent injunctive relief sought by Plaintiffs was necessary or mandated as a matter of law.

In order to grant injunctive relief here, the Plaintiffs were required to show that SPD is engaged in a pervasive pattern of police conduct that flows from an intentional policy or plan on its part. While Plaintiffs' evidence demonstrated that SPD's policies, practices and lack of training was a moving force behind Plaintiffs' injuries in May 2020, these past wrongs do not in themselves amount to a real and immediate threat of injury requiring Court intervention at this time. Case law clearly counsels caution with respect to federal intervention in state law enforcement matters. Plaintiffs' evidence did not prove that they face a realistic threat from future applications of SPD's current policies and practices regarding the use of less lethal force during peaceful protests. Without more, this Court, as a matter of law, declines Plaintiffs' request to enjoin and monitor SPD through the issuance of a permanent injunction.

## II.  FINDINGS OF FACT

**The Protests**

1.   The May 2020 murder of George Floyd in Minneapolis, Minnesota sparked a series of protests throughout Sacramento.

2.   The protests were aimed at demanding police accountability.

3.   Sacramento community members found out about the protests through news sources, social media, and word of mouth.

4.   Officers of the SPD were assigned to and engaged protestors at protest events that took place in the streets of Sacramento between May 29 and June 1, 2020.

5.   The City of Sacramento received assistance from neighboring law enforcement agencies, including the Sacramento County Sheriff's Department, the California Highway Patrol, and the California National Guard.

6.   These mutual aid agencies reported to and were overseen by SPD officials.

7.   Officers of the SPD deployed tear gas canisters, rubber bullets, bean bag projectiles, pepper balls, and flash bang grenades into areas occupied by protestors at various times between May 29, 2020 and June 1, 2020.

8.   Aguilar, Zapata, Kidd, and Jones each attended protests on May 29, 2020.

9.   Protestors marched around downtown and rallied at the Sacramento Main Jail.

10.  SPD officers shot protestors with rubber bullets and pepper balls.

11.  Another protest on May 29, 2020 started at Cesar Chavez Park.

12.  Protestors marched from the park to a location around thirty to fifty yards from an entrance to Highway 99.

13.  SPD began using batons to hit protestors, including Kidd, who was not engaged in violent behavior at the time he was struck.

14.  Aguilar arrived at the protest near Highway 99.

15.   Police began firing pepper balls and chemical weapon cannisters into the crowd.

16.   Aguilar did not hear an audible warning about the deployment of less lethal munitions.

17.   Aguilar was shot twice with impact munitions.

18.   Nash and Jones each attended a protest on May 30, 2020.

19.   Late in the night and into the early morning of May 31, 2020, protestors clashed with police on J street between 20th and 21st streets.

20.   SPD used an overwhelming barrage of tear gas, rubber bullets, beanbags, and pepper bullets.

21.   Jones approached SPD officers and asked them to stop shooting protestors.

22.   Later, Jones was shot eleven times with rubber bullets.

23.   Jones was shot in the knee, right shoulder, and groin.

24.   As Jones ran away, she was shot in the back, shoulder, legs, buttocks, and hand.

25.   Jones' finger was broken in two places.

26.   At the time she was shot, Jones did not pose a threat to the safety of SPD officers or others.

27.   Nash, Zapata, and Jones each attended a protest on May 31, 2020.

28.   Nash and Kidd attended a vigil at Cesar Chavez Plaza on June 1, 2020.

29.   The protestors began marching from the park but were blocked by a police line.

30.   SPD officers began using less lethal munitions on the protestors.

1    31.   Kidd was hit with pepper balls.

2    32.   Kidd also was shot in his chest with a large projectile

3 that was either a rubber bullet or a gas cannister.

4    33.   As a result of their injuries, Plaintiffs' intent to

5 protest has been chilled.

6    34.   Kidd intends to protest but his willingness and ability

7 has been chilled.

8    35.   Nash was traumatized by SPD's actions and does not

9 protest as frequently.

10    36.   White has been completely deterred from protesting.

11    37.   Aguilar also has stopped protesting, citing concern about

12 SPD actions.

13 **SPD's Review of Complaints and Uses of Force**

14    38.   Sacramento General Affairs received over ninety

15 complaints against SPD officers arising from use of force during

16 the protests.

17    39.   If an officer had received "significant discipline," such

18 as "days off," Chief Hahn would have been the person to approve

19 that discipline.

20    40.   No officer received significant discipline as a result of

21 the complaints filed against SPD officers arising from use of force

22 during the protests.

23    41.   SPD established the Use of Force Review Board in July

24 2020.

25    42.   The Board met monthly to review uses of force and

26 determine whether they were in policy.

27    43.   The Professional Standards Unit prepared a spreadsheet of

28 the uses of force over the course of the George Floyd protests.

44.  The Board accepted the spreadsheet as accurate information that it used as part of its decision-making processes.

45.  The spreadsheet contained 227 incidences of use of force.

46.  The Board prepared monthly memoranda summarizing its findings.

47.  The Board found that the vast majority of uses of force were within policy.

48.  Some officers whose actions were not within policy received a watch level retraining, meaning that their supervisor would address the situation.

49.  Watch level retraining is not considered discipline by SPD.

50.  The Board considered the use of force within policy where officers utilized less lethal munitions against protestors who refused to disperse.

51.  SPD utilizes Blue Teams tracking software to log its officers' uses of force.

52.  SPD logged 148 uses of force in Blue Teams.

53.  140 of these uses of force were found to be within policy.

54.  Of the 8 incidents that were not within policy, 5 were remedied by watch level retraining.

55.  Of the 3 remaining incidents, only 2 were referred to Internal Affairs, and those officers were exonerated.

56.  As such, of the 148 logged uses of force in Blue Teams, no officer was disciplined.

///

///

**SPD Policies and Training in 2020**

57.  SPD had two prevailing sources of policy for use of force during the 2020 protests: the Riot and Crowd Control Manual ("Riot Manual") and General Order ("GO") 580.02, which governed use of force.

58.  SPD's policy governing "Less Lethal Weapon Systems," GO 580.12, required officers to comply with GO 580.02 when using less lethal weapons.

59.  SPD officers had access to long-range acoustic devices ("LRAD") mounted on a patrol vehicles that could have been deployed for warnings for the large crowds, but they were not used on May 29, 2020, and it is unclear if they were used on other nights.

60.  SPD's policy on "Less Lethal" munitions instructed that they were appropriate for "crowd control and civil unrest incidents."

61.  The policy also allowed "multiple officers with less lethal weapon systems" to be utilized simultaneously in the same incident.

62.  SPD's Chemical Agents Manual made the statement that chemical agents "are generally considered harmless."

63.  SPD's less lethal training made no distinction between deployment of these devices on an individual and deploying it into crowds, despite knowing there was "no way" to ensure accuracy of the weapons when shot into a crowd.

64.  SPD taught officers that they could use "overwhelming less lethal" as an option for crowd control.

65.  SPD trained officers on crowd control every other year during a five hour block of instruction, averaging two and a half

hours per year.

66. SPD did not provide specific training on the use of less lethal munitions in a crowd management context.

67. During the George Floyd protests, some SPD officers expressed a lack of knowledge about the operation of less lethal munitions.

68. In 2019, the California Department of Justice ("DOJ") identified various policies, practices, and procedures of the SPD that increased the risk of harm to individuals and recommended that SPD adopt changes and training to address them.

69. This 2019 DOJ report highlighted the need for SPD's Use of Force policy to affirm the importance of proportionality, sanctity of life, and de-escalation.

70. Additionally, the California DOJ recommended a standalone policy regarding use of force reporting and investigations in 2019.

71. The changes to SPD's use of force policy, reporting, and investigations recommended by DOJ had not been implemented as of May 30, 2020.

72. In a "Phase II" report released in 2020, the California DOJ identified various policies, practices, and procedures of the SPD that increased the risk of harm to individuals and recommended that SPD adopt changes and training to address them.

73. The Phase II report recommended the revision of SPD's use of force policy that permitted officers to use "overwhelming force."

74. In 2020, DOJ found "lapses in SPD's use of force reporting," a "lack of thoroughness and completeness [in] nearly one fifth of use of force case files," and that in 2020, SPD still

lacked a standalone policy dedicated to use of force reporting and investigations.

75.  Dr. Ed Maguire testified that the Use of Force policies in effect at the time of the protests were inconsistent with generally accepted police practices.

76.  Dr. Maguire testified that the Crowd and Riot Control policy in effect at the time of the protests was inconsistent with generally accepted police practices.

77.  Dr. Maguire found SPD's use of force training inadequate or inconsistent with best practices.

78.  SPD Chief Katherine Lester said that following the 2020 protests, it was clear that the department had training failures.

**Changes in SPD Policy and Training Since 2020**

79.  Since the George Floyd protests, there have been numerous changes to SPD policy and training.

80.  In 2021, the California legislature enacted Government Code Section 7072, which requires police departments to issue annual reports regarding the use of its military equipment.

81.  SPD's less lethal weapons are military equipment for the purposes of this Section.

82.  In 2022, the California legislature enacted Penal Code Section 13652 which served to restrict circumstances when officers may deploy less lethal munitions.

83.  This Section restricts the use of these tools when dispersing assemblies, protests, or demonstrations.

84.  SPD now includes Section 13652 in its policies and training.

85.  Since 2022, SPD has increased its training given to

1  officers on the use of less lethal munitions.

2      86.  SPD now provides specific and separate training for use

3  of less lethal munitions in crowd management scenarios.

4      87.  SPD has replaced its Crowd and Riot Control Manual with

5  the First Amendment Manual.

6      88.  The First Amendment Manual requires Incident Commander

7  approval for use of chemical agents and kinetic energy projectile

8  in crowd management situations.

9      89.  Prior to the 2024 presidential election, SPD conducted a

10  crowd management refresher training for all their specialty units

11  and detectives, who are typically the first group of officers

12  brought in to manage the events

13                      III. OPINION

14      A.  <u>Success on the Merits</u>

15      To be entitled to a permanent injunction, the party seeking

16  the injunction must actually succeed on the merits.  <u>Amoco Prod.</u>

17  <u>Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n. 12 (1987).

18  Accordingly, the Court cannot grant an injunction unless it holds

19  that Plaintiffs have prevailed on at least one of their claims.

20      1.  <u>Excessive Force</u>

21      "Determining whether the force used to effect a particular

22  seizure is reasonable under the Fourth Amendment requires a

23  careful balancing of the nature and quality of the intrusion on

24  the individual's Fourth Amendment interests against the

25  countervailing governmental interests at stake."  <u>Graham v.</u>

26  <u>Connor</u>, 490 U.S. 386, 396 (1989).  The "facts and circumstances"

27  of each case includes "the severity of the crime at issue, whether

28  the suspect poses an immediate threat to the safety of the

1  officers or others, and whether [the suspect] is actively

2  resisting arrest or attempting to evade arrest by flight." Id.

3  Courts also consider "the type and amount of force inflicted."

4  Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001). "The

5  'reasonableness' inquiry in an excessive force case is an

6  objective one: the question is whether the officers' actions are

7  'objectively reasonable' in light of the facts and circumstances

8  confronting them, without regard to their underlying intent or

9  motivation." Graham, 490 U.S. at 397. The balancing test

10 mandated by Graham "entails consideration of the totality of the

11 facts and circumstances in the particular case." Blanford v.

12 Sacramento Co., 406 F.3d 1110, 1115 (9th Cir. 2005) (citing

13 Graham, 490 U.S. at 396).

14     Here, Plaintiffs Jones, Aguilar, Kidd, Nash, and White were

15 harmed by less lethal weapons, including impact munitions,

16 chemical agents, baton strikes, and/or personal body weapons used

17 by SPD at protests. Plaintiffs did not experience this

18 significant force just once. Rather, the evidence shows that SPD

19 used force against Plaintiffs multiple times, sometimes in rapid

20 succession.

21     None of the Plaintiffs were engaged in any significant

22 criminal activity when they were subjected to SPD's use of less

23 lethal weapons. It is unreasonable to use less lethal force,

24 including impact munitions and chemical agents, against

25 individuals "who were suspected of only minor criminal activity"

26 or who "engaged in passive resistance, at most, by failing to

27 immediately disperse if and when such an order was given." Nelson

28 v. City of Davis, 685 F.3d 867, 885 (9th Cir. 2012). The fact

1  that a plaintiff "did not commit any chargeable offense, or, at

2  most, a misdemeanor, weighs heavily against the defendants' use of

3  force." Id. at 880.

4      Similarly, Defendants offered no evidence that any of the

5  Plaintiffs posed an immediate threat to officer safety at the time

6  force was used against them, and none of the Plaintiffs were

7  evading arrest or engaged in active resistance when they were

8  subjected to SPD's less lethal force.  The mere fact that some

9  Plaintiffs may have remained present after a dispersal order is

10  insufficient to justify Defendants' uses of force.  A desire to

11  disperse crowds quickly does not make the use of force reasonable.

12  See Nelson, 685 F.3d at 880, 882 (rejecting the argument that

13  police's "use of the pepperball guns was necessary because their

14  prior attempts to disperse the crowd had failed," and noting that

15  "[a]lthough the officers plainly had an interest in clearing the

16  apartment complex . . . the desire to do so quickly, in the

17  absence of any actual exigency, cannot legitimize the application

18  of force when it is not otherwise justified").

19      Based on the totality of the circumstances, the Court finds

20  that Plaintiffs' Fourth Amendment rights were violated by

21  excessive force.  Because Plaintiffs sought trial solely for

22  injunctive relief, and because they only need prevail on a single

23  claim to seek such relief, the Court does not consider the merits

24  of Plaintiffs' remaining claims.

25          2.  Monell Liability

26      The Court next determines if the City is liable for

27  Plaintiffs' constitutional injuries.  Plaintiffs can establish

28  liability by showing: (1) the police officers committed the

constitutional violations pursuant to a policy or custom; (2) the police officers who violated Plaintiffs' constitutional rights were not discharged or reprimanded; or (3) the constitutional violations flowed from a failure to train.

### 1.    Policy or Custom

"Absent a formal governmental policy, [a plaintiff] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citation omitted). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" Id. (citation omitted). "An isolated or sporadic incident cannot form the basis of Monell liability for an improper custom." Saved Magazine v. Spokane Police Dep't, 19 F.4th 1193, 1201 (9th Cir. 2021) (cleaned up). But Monell liability can exist based on a series of events over a short period of time. See Menotti v. Seattle, 409 F.3d 1113, 1148 (9th Cir. 2005) ("[A] policy may be inferred due to the widespread practices or evidence of repeated constitutional violations" that occurred during protests on a single day). Indeed, in large-scale protests "when the department is executing an organized, department-wide response, one can presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates. Therefore, it becomes easier to infer that the repeated conduct of individual police officers is really the conduct of the department, particularly when . . . the officers who used force did not meaningfully deviate from the department's plan for how to control the crowds." Martinez v. City of Santa Rosa,

1  499 F.Supp.3d 748, 750 (N.D. Cal. 2020).

2      Plaintiffs' police practices expert, Dr. Ed Maguire, testified

3  that the Use of Force and Crowd and Riot Control policies in effect

4  at the time of the George Floyd protests were inconsistent with

5  generally accepted police practices.  SPD had a policy of using

6  "overwhelming less lethal" during crowd control situations such as

7  protests.  Accordingly, by indiscriminately firing less lethal

8  munitions into the crowds, SPD officers who violated Plaintiffs'

9  constitutional rights were acting pursuant to SPD policy.

10              2.    Failure to Discharge or Reprimand

11      "Policy or custom may be inferred if, after the [incident]

12  . . . officials took no steps to reprimand or discharge the guards,

13  or if they otherwise failed to admit the guards' conduct was in

14  error."  McRorie v. Shimoda, 795 F.2d 780, 784 (9th Cir. 1986); see

15  also Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir. 2001) ("A

16  policy or custom may be found either in an affirmative proclamation

17  of policy or in the failure of an official 'to take any remedial

18  steps after the violations.'").

19      SPD did not discipline any officers for the use of less lethal

20  munitions at the protests, nor did they implement any training to

21  address "training failures."  The vast majority of "Less Lethal"

22  weapons deployments during the protests were found to be "within

23  policy."  Because officials did not reprimand the officers who

24  committed the constitutional violations, a policy may be inferred.

25  See McRorie, 795 F.2d at 784.

26              3.    Failure to Train

27      "Failure to train may constitute a basis for Monell liability

28  where the failure amounts to deliberate indifference to the rights

1   of those who deal with municipal employees." Benavidez v. County

2   of San Diego, 993 F.3d 1134, 1153 (9th Cir. 2021). "To allege a

3   failure to train, a plaintiff must include sufficient facts to

4   support a reasonable inference: (1) of a constitutional violation;

5   (2) of a municipal training policy that amounts to a deliberate

6   indifference to constitutional rights; and (3) that the

7   constitutional injury would not have resulted if the municipality

8   properly trained their employees." Id. at 1153-54 (citation

9   omitted). A pattern of similar constitutional violations by

10  untrained employees is ordinarily necessary to demonstrate

11  deliberate indifference for purposes of failure to train." Connick

12  v. Thompson, 563 U.S. 51, 61 (2011).

13       The evidence revealed that SPD's training was minimal and

14  incomplete prior to the 2020 protests. It did not provide specific

15  training regarding the use of less lethal weapons in crowd

16  settings. Dr. Maguire found SPD's use of force training inadequate

17  or inconsistent with best practices. Some officers during the

18  protests expressed that they did not know how to operate less

19  lethal munitions. Even Chief Lester acknowledged that there were

20  training failures leading up to the 2020 protests. SPD's failure

21  to train amounted to a deliberate indifference, and Plaintiffs'

22  constitutional injuries would not have occurred if SPD properly

23  trained its officers.

24       The Court finds that Defendants are liable for Plaintiffs'

25  constitutional violations on the basis of policy or custom,

26  failure to discipline, and failure to train.

27  ///

28  ///

1          B.    <u>Injunctive Relief</u>

2               1.    <u>Standing</u>

3          A plaintiff who has standing to seek damages does not

4     necessarily have standing to request injunctive relief.  Hodgers-

5     Durgin v. de la Vina, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999).

6     Instead, "a plaintiff must demonstrate standing separately for each

7     form of relief sought."  Mayfield v. United States, 599 F.3d 964,

8     969 (9th Cir. 2010).  For injunctive relief, "[a] plaintiff

9     threatened with future injury has standing to sue 'if the

10    threatened injury is certainly impending, or there is a substantial

11    risk the harm will occur.'"  In re Zappos.com, Inc., 888 F.3d 1020,

12    1024 (9th Cir. 2018) (quoting Susan B. Anthony List v. Driehaus,

13    573 U.S. 149, 158 (2014)).  "Past exposure to illegal conduct does

14    not in itself show a present case or controversy regarding

15    injunctive relief . . . if unaccompanied by any continuing, present

16    adverse effects."  City of Los Angeles v. Lyons, 461 U.S. 95, 102

17    (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)).

18    Moreover, where a party is seeking injunctive relief against a

19    state agency, there must be "proof that officers within the agency

20    have engaged in a persistent pattern of misconduct."  Thomas v.

21    County of Los Angeles, 978 F.2d 504, 508 (9th Cir. 1992) (citing

22    Allee v. Medrano, 416 U.S. 802, 815-16 (1974).  This standard

23    includes "only that conduct 'which flowed from an intentional,

24    concerted, and indeed conspiratorial effort to deprive [the

25    victims] of their [constitutional] rights.'"  Id. (quoting Rizzo v.

26    Goode, 423 U.S. 362, 375 (1976)).

27         Although "past wrongs are evidence bearing on whether there is

28    a real and immediate threat of repeated injury," O'Shea, 414 U.S.

1 at 496, "past wrongs do not in themselves amount to [a] real and
2 immediate threat of injury necessary to make out a case or
3 controversy." Lyons, 461 U.S. at 103. Accordingly, to establish
4 this Court's jurisdiction to grant injunctive relief, Plaintiffs
5 needed to show that there is a "real and immediate threat" of
6 future injury. The Ninth Circuit stated that "the factors that are
7 important in predicting the likelihood of future violations"
8 include "the degree of scienter involved; the isolated or recurrent
9 nature of the infraction; the defendant's recognition of the
10 wrongful nature of his conduct; the extent to which the defendant's
11 professional and personal characteristics might enable or tempt him
12 to commit future violations; and the sincerity of any assurances
13 against future violation." Fed. Election Comm'n v. Furgatch, 869
14 F.2d 1256, 1263 n.5 (9th Cir. 1989).

15      Based on the evidence, or lack thereof, at trial, the Court
16 finds that there is not a significant risk of Plaintiffs' injuries
17 reoccurring such that permanent injunctive relief is warranted.
18 The George Floyd protests uniquely demanded a large scale response
19 that included mutual aid agencies. Plaintiffs failed to identify
20 a single example since 2020 where SPD has used less lethal
21 munitions in response to a protest that resulted in violations of
22 constitutional law. The Court cannot conclude that there is a
23 real and immediate threat of these harms reoccurring given the
24 complete absence of evidence supporting Plaintiffs' claim that SPD
25 will unlawfully use less lethal munitions to control protests on
26 the scale of those that occurred in 2020.

27      Even if SPD were to employ less lethal munitions for crowd
28 control purposes in response to significant protests, there have

19

1   been substantial changes to SPD policy and training such that it

2   is unlikely Plaintiffs' constitutional rights would be violated

3   again.  Since the George Floyd protests, California enacted Penal

4   Code Section 13652.  The law states that less lethal munitions may

5   be used for crowd control only "if the use is objectively

6   reasonable to defend against a threat to life or serious bodily

7   injury to any individual . . . or to bring an objectively

8   dangerous and unlawful situation safely and effectively under

9   control."  Cal. Penal Code § 13652(b).  Moreover, police may only

10  use less lethal munitions after they have complied with various

11  requirements, including utilizing other de-escalation techniques,

12  providing repeated and audible announcements regarding the intent

13  to use such weapons, giving persons "an objectively reasonable

14  opportunity" to leave, and making an "objectively reasonable

15  effort" to identify persons engaged in violent acts and only

16  target such individuals with less lethal munitions.  Id.  These

17  post-2020 statutory requirements make a repeat of Plaintiffs'

18  injuries unlikely, especially because SPD's policy or custom, as

19  well as their training, now incorporate the demands of Section

20  13652.

21       Also, SPD's First Amendment Manual requires the Incident

22  Commander to approve the use of less lethal weapons in crowd

23  management situations.  California Government Code Section 7072

24  requires SPD to issue an annual report summarizing the use of its

25  military equipment, any complaints received, the results of

26  internal audits, the quantity of each type of military equipment,

27  and whether the department plans to acquire additional equipment.

28  Cal. Gov't Code § 7072.  Together, all these changes preclude the

1  Court from finding that there is a substantial risk of Plaintiffs'

2  constitutional violations reoccurring.

3      Plaintiffs lack standing to seek injunctive relief.  Because

4  standing is a threshold issue, the Court need not consider the

5  traditional factors for injunctive relief.  Nonetheless, the Court

6  examines these factors below to show that even if Plaintiffs had

7  standing they still would not be entitled to injunctive relief.

8          2.    Traditional Factors

9      A plaintiff seeking a permanent injunction must demonstrate:

10 "(1) that it has suffered an irreparable injury; (2) that remedies

11 available at law, such as monetary damages, are inadequate to

12 compensate for that injury; (3) that, considering the balance of

13 hardships between the plaintiff and defendant, a remedy in equity

14 is warranted; and (4) that the public interest would not be

15 disserved by a permanent injunction."  eBay Inc. v. MercExchange,

16 L.L.C., 547 U.S. 388, 391 (2006).  Where the government is a

17 party, elements (3) and (4) merge.  Drakes Bay Oyster Co. v.

18 Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014).  The Court considers

19 these elements in turn.

20     First, a plaintiff must show "that it has suffered an

21 irreparable injury."  eBay Inc., 547 U.S. at 391.  A

22 constitutional infringement often alone constitutes irreparable

23 harm.  Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ.

24 Equity, 950 F.2d 1401, 1412 (9th Cir. 1991).  Because Plaintiffs'

25 constitutional rights were violated, they have suffered an

26 irreparable injury.

27     Second, a plaintiff must demonstrate "that remedies available

28 at law, such as monetary damages, are inadequate to compensate for

that injury." eBay Inc., 547 U.S. at 391. "[C]onstitutional

violations cannot be adequately remedied through damages."

Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir. 2009)

(citation omitted). Because Plaintiffs suffered constitutional

violations, remedies available at law are inadequate to compensate

for their injuries.

Third, where the government is a party, a plaintiff must show

"that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted" and "that the

public interest would not be disserved by a permanent injunction."

eBay Inc., 547 U.S. at 391. "[I]t is always in the public

interest to prevent the violation of a party's constitutional

rights." Riley's Am. Heritage Farms v. Elsasser, 32 F.4th 707,

731 (9th Cir. 2022). "In each case, courts must balance the

competing claims of injury and must consider the effect on each

party of the granting or withholding of the requested relief. In

exercising their sound discretion, courts of equity should pay

particular regard for the public consequences in employing the

extraordinary remedy of injunction." Winter v. Nat. Res. Def.

Council, Inc., 555 U.S. 7, 24 (2008) (cleaned up).

Plaintiffs' proposed permanent injunction is extraordinary.

It would prohibit SPD from issuing dispersal orders or making

arrests at protests unless there is an "imminent threat of death

or serious bodily injury." ECF No. 132 at 4. It requires SPD to

"fully incorporate all recommendations from the California

Department of Justice" previously given to the Department. Id.

It also grants the Office of Public Safety Accountability "full

concurrent investigatory authority over complaints involving SPD

misconduct." Id. The proposed injunction further requires SPD to "amend all policies, guidance and training materials" to reflect these new requirements. Id. There would be significant public consequences in employing this extraordinary relief, as SPD would need to overhaul its policies and training. On the other hand, there is a minimal impact on Plaintiffs of withholding injunctive relief. As explained above, there is not a significant risk of their harm reoccurring. Because of the many changes to SPD policies and training, Plaintiffs are unlikely to experience the same constitutional violations at protests in Sacramento today and in the future. Accordingly, the balance of hardships weighs heavily in Defendants' favor. See Winter, 555 U.S. at 24.

Because Plaintiffs have not satisfied the traditional factors for injunctive relief, they are not entitled to a permanent injunction even if they had demonstrated standing.

C.   Declaratory Relief

Plaintiffs' "failure to establish a likelihood of future injury similarly renders their claim for declaratory relief unripe." See Hodgers-Durgin, 199 F.3d at 1044. "A plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." McGee v. S-L Snacks Nat'l, 982 F.3d 700, 709 (9th Cir. 2020). As explained above, see supra Part III.B, the evidence does not establish a substantial risk of Plaintiffs' harm reoccurring. As such, Plaintiffs do not have standing for declaratory relief.

IV.   CONCLUSIONS OF LAW

For the reasons set forth above, the Court concludes as

follows:

1.   SPD officers violated the Fourth Amendment rights of Plaintiffs by using excessive force.

2.   Defendants are liable for those constitutional violations on the basis of custom and policy, failure to discipline, and failure to train.

3.   Plaintiffs do not have standing for injunctive relief.

4.   Plaintiffs do not satisfy the requirements to be entitled to injunctive relief.

5.   Plaintiffs do not have standing for declaratory relief.

V.   ORDER

Given the Court's findings of fact and conclusions of law, Plaintiffs are not entitled to an order granting a permanent injunction against Defendants.  Judgment on Plaintiffs' prayer for injunctive relief is entered in favor of Defendants.

IT IS SO ORDERED.

DATED: May 19, 2025

_____
JOHN A. MENDEZ
SENIOR UNITED STATES DISTRICT JUDGE